Douglas T. Sloan, City Attorney (State Bar #194996)
Francine M. Kanne, Chief Assistant City Attorney (State Bar 139028)
**CITY OF FRESNO**
2600 Fresno Street, Room 2031
Fresno, California 93721-3602

**BETTS & RUBIN, A Professional Corporation**
907 Santa Fe Avenue, Suite 201
Fresno, California 93721
Telephone: (559) 438-8500
Facsimile: (559) 438-6959
James B. Betts (State Bar #110222)
Joseph D. Rubin (State Bar #149920)

Attorneys for CITY OF FRESNO, JEFFREY CARDELL, JENNIFER CLARK, KELLI FURTADO, TIMOTHY BURNS, KEVIN WATKINS, ANDREIA CUEVAS AND DEL ESTABROOKE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA-KEBBIA WILSON and CHARLES SMITH,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF FRESNO, HOWARD LACY, JEFFREY CARDELL, JENNIFER CLARK, KELLI FURTADO, TIMOTHY BURNS, KEVIN WATKINS, ANDREIA CUEVAS, DEL ESTABROOKE, and DOES 1 to 100, inclusive,<br><br>Defendants. | Case No.<br><br>NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(a), (c) |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendants City of Fresno, Jeffrey Cardell, Jennifer Clark, Kelli Furtado, Timothy Burns, Kevin Watkins, Andreia Cuevas and Del Estabrooke hereby remove to this Court the state court action described below.

1.      On October 22, 2019, an action was commenced in the Superior Court of the State of California in and for the County of Fresno, entitled La-Kebbia Wilson and Charles Smith vs. City of Fresno, et al. Does 1 through 100, inclusive, as Case Number 19CECG03821.  A copy of the Complaint is attached hereto as Exhibit A.  Plaintiffs allege causes of action for violations of Title VII, 42 U.S.C. Section 1983 and 42 U.S.C. Section 1981.

2.      The Complaint was served on Defendants City of Fresno, Jennifer Clark and Jeffrey Cardell on or about October 24, 2019.  Defendant Kelli Furtado was served on or about October 25, 2019.  Defendant Del Estabrooke was served by mail out of state on or about October 31, 2019.  Counsel for Defendants Kevin Watkins and Andreia Cuevas accepted service on November 1, 2019.  Counsel for Defendant Timothy Burns accepted service on November 5, 2019.  Attached as Exhibit B are documents that reflect the summons and service of certain Defendants, including the City of Fresno on October 24, 2019.  The City of Fresno and the above-mentioned Individual Defendants are being represented by Betts & Rubin and consent to the removal.

3.      Defendant Howard Lacy is being represented by Bruce Berger of Stammer, McKnight, Barnum & Bailey.  Defendant Lacy was served by notice of acknowledgment on November 14, 2019 (Exhibit C) and consents to the removal of the action.

4.      The docket and remaining part of the file is attached as Exhibit D.

5.      This action is a civil action of which this Court has jurisdiction under 28 U.S.C. Section 1331, 28 U.S.C. Section 1343(a)(3),(4), Title VII, 42 U.S.C. Sections 1981 and 1983, and is one which may be removed to this Court by Defendants

- 2 -      Notice of Removal of Action 28 USC§1441(a),(b),(c)

pursuant to the provisions of 28 U.S.C. Section 1441. Supplemental jurisdiction of the State claims can be invoked under 28 U.S.C. Section 1367. Venue is proper under 28 U.S.C. Section 1391.

6.    Written notice of the filing of this Notice of Removal is being served on Plaintiff's counsel.

7.    A true and correct copy of this Notice of Removal is being filed with the Clerk of the Superior Court of the State of California, County of Fresno.

WHEREFORE, Defendants City of Fresno, Jeffrey Cardell, Jennifer Clark, Kelli Furtado, Timothy Burns, Kevin Watkins, Andreia Cuevas and Del Estabrooke respectfully request that this Court assume full jurisdiction over the entire cause herein as provided by law.

Dated: November 21, 2019          BETTS & RUBIN


By _/s/ Joseph D. Rubin_____
Joseph D. Rubin
Attorneys for Defendants CITY OF FRESNO, JEFFREY CARDELL, JENNIFER CLARK, KELLI FURTADO, TIMOTHY BURNS, KEVIN WATKINS, ANDREIA CUEVAS AND DEL ESTABROOKE

Notice of Removal of Action 28 USC§1441(a),(b),(c)

## PROOF OF SERVICE

I am a citizen of the United States of America, a resident of Fresno County, California, over the age of 18 years and not a party to the within-entitled cause or matter. My business address is 907 Santa Fe Avenue, Suite 201, Fresno, California. On November 21, 201(, I served **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(a), (b), (c)** on the parties in this action by placing a true copy in an envelope and delivering it as follows:

_____**(By Overnight Courier)** I caused such envelope with postage fully prepaid, to be sent by _____.

_____**(By Mail)** I deposited the envelope, with postage fully prepaid, with the United States Postal Service at Fresno, Fresno County, California.

_X___ **(By Mail)** I placed the envelope for collection and processing for mailing following this business' ordinary practice with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service with postage fully prepaid.

_____ **(By Hand)** I caused each envelope to be delivered by hand.

_____ **(By Telecopy)** I caused each document to be sent by telecopier to the aforementioned number(s).

Each envelope was addressed as follows:

Gary G. Goyette, Esq.                         Bruce J. Berger, Esq.
Goyette & Associates, Inc.                    Stammer, McKnight, Barnum & Bailey
2366 Gold Meadow Way, Suite 200               2540 West Shaw Lane, Suite 110
Gold River, California 95670                  Fresno, California 93711

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on November 21, 2019, at Fresno, California.

/s/ Debbie Mazza
Debbie Mazza

- 4 -                        Notice of Removal of Action 28 USC§1441(a),(b),(c)

# EXHIBIT A

Gary G. Goyette, Esq. – SBN 224715
Rachel E. Simons, Esq. – SBN 322804
**GOYETTE & ASSOCIATES, INC.**
**A Professional Law Corporation**
2366 Gold Meadow Way, Suite 200
Gold River, CA 95670
Ph:   (916) 851-1900
Fax:  (916) 851-1995
Email:  goyetteg@goyette-assoc.com
          rachel@goyette-assoc.com

Attorneys for Plaintiffs LA-KEBBIA WILSON and
CHARLES SMITH

E-FILED
10/22/2019 11:35 AM
Superior Court of California
County of Fresno
By: A. Rodriguez, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF FRESNO

| | |
|---|---|
| LA-KEBBIA WILSON and CHARLES SMITH, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF FRESNO, HOWARD LACY, JEFFREY CARDELL, JENNIFER CLARK, KELLI FURTADO, TIMOTHY BURNS, KEVIN WATKINS, ANDREIA CUEVAS, DEL ESTABROOKE, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.:   19CECG03821 <br><br> **COMPLAINT** <br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

COME NOW Plaintiffs LA-KEBBIA WILSON and CHARLES SMITH (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, Gary G. Goyette and Rachel E. Simons of Goyette & Associates, Inc., who hereby file this Complaint against Defendants CITY OF FRESNO, HOWARD LACY, JEFFREY CARDELL, JENNIFER CLARK, KELLI FURTADO, TIMOTHY BURNS, KEVIN WATKINS, ANDREIA CUEVAS, DEL ESTABROOKE, and DOES 1 through 100, inclusive, (hereinafter collectively referred to as "Defendants"), and in support thereof state as follows:

///

///

1
COMPLAINT

**INTRODUCTION**

The City of Fresno, City supervisor Howard Lacy, and the other individual Defendants against whom this lawsuit is brought, have, as set forth in detail in this complaint, subjected Plaintiff La-Kebbia Wilson to disgusting, racially-motivated, long-repeated, and un-mitigated injustices for which Defendants must, finally, be accountable. Defendants, primarily Mr. Lacy, also subjected Plaintiff Charles Smith to career-ending retaliation for opposing the racist treatment of Ms. Wilson. While the many acts of racial hatred taken and allowed by Defendants against Ms. Wilson occurred over a long period of time, a single extreme statement, and the acts which followed, are entirely representative of how the City and the individual Defendants overtly violated the laws at issue, and the City's callous indifference to these violations of law: **Howard Lacy called La-Kebbia Wilson an "entitled nigga."**

Then, in order: Mr. Smith had the courage to, after hearing Mr. Lacy use this hateful, egregious racial slur against Ms. Wilson, tell him to leave him out of it, since he was offended/disgusted by the slur and since he wanted no part of Mr. Lacy's hatred towards Ms. Wilson; then, he had the courage to tell Ms. Wilson that Mr. Lacy had called her an entitled nigga; then, upon hearing of Mr. Lacy's racial slur against her, Ms. Wilson tried to report it to her manager, who refused to speak to her, and then to the Director of her Department, who acted concerned but essentially did nothing; instead, the City then, incredibly, had its managers immediately investigate and discipline Ms. Wilson for her 'inappropriate demeanor' in the office right after she learned she had been called an entitled nigga; then after disciplining her for not remaining unaffected after hearing Mr. Lacy had directed the worst racial slur possible at her, the City rewarded Ms. Wilson with the stigma of being placed on leave while, finally, an investigation into her complaint about Mr. Lacy's egregious racial slur was started; then, almost a year later, after having no communication with Ms. Wilson, the City called her back into work and placed her not only on the same floor and in the same Department but at a work station near Mr. Lacy, as if nothing had ever happened; then shortly thereafter the City issued a one paragraph letter to Ms. Wilson stating, with no explanation, that the investigation had found no policy violations stemming from Mr. Lacy's racial slur; then, as an exclamation point to this incredible string of events, the City suspended her

2

without pay for, in part, being upset that they had concluded there was nothing wrong with Mr. Lacy calling her an entitled nigga.

This sequence of acts and indifferent lack of action is, sadly, just part of the racially-motivated discrimination, harassment and retaliation Ms. Wilson endured at the hands of the City, Mr. Lacy, and the other individual Defendants. As pled in detail herein, and as will be uncovered in even more detail in litigation, the City of Fresno has long engaged in and allowed blatant racist treatment of Ms. Wilson, and has allowed career-ending retaliation against Mr. Smith for opposing this racism. Ms. Wilson has endured fifteen years of racism waged against her by the City and the individual Defendants, all because she is African-American. Prior to the string of events summarized above, the City laid Ms. Wilson off for three years with no pay, and during this long period brought every other person laid off - - *all* non-African-Americans *and all* with less seniority than Ms. Wilson - - back to work, as well as creating and filling numerous other positions for which Ms. Wilson was qualified but not selected. When she was finally reinstated from being laid off, Ms. Wilson was still subjected to racist treatment, including Mr. Lacy calling her a lazy "piece of shit" and saying that she only had her job because she "played the race card"; this coming from a Caucasian man who once told a City manager that 'the Lacys' blood is going to stay pure.' Ms. Wilson attempted on countless occasions to remedy this treatment by filing formal and informal internal complaints with the City, filing complaints with the Equal Employment Opportunity Commission ("EEOC") and/or the California Department of Fair Employment and Housing ("DFEH"), informing and acting through her union, Fresno City Employees' Association ("FCEA"), and even complaining directly to City Councilmembers and to the Mayor - - all while continuing to work for the City and suffer the ongoing racially-motivated discrimination, harassment, and retaliation. All of Ms. Wilson's remedial attempts were met with skepticism, ignorance, distrust, and newly refreshed racially-motivated conduct. Similarly, Mr. Smith attempting to report his concerns to his manager were met with indifference while his opposition directly to Mr. Lacy regarding the extreme racial slur against Ms. Wilson was met by Mr. Lacy ostracizing, transferring, and disregarding him, and ultimately forcing him out of his employment with the City.

All of these acts and lack of action by the City and the individual Defendants constitute the

COMPLAINT

violations of law, set forth in the sixteen causes of action comprising this lawsuit. The City, Howard Lacy, and the other City managers and supervisors against whom this lawsuit is brought must, finally, answer for these acts.

## PARTIES

1. Plaintiff LA-KEBBIA WILSON (hereinafter "Plaintiff WILSON") is a natural person who is now, and at all relevant times mentioned in this Complaint was, a resident of the State of California.

2. Plaintiff CHARLES SMITH (hereinafter "Plaintiff SMITH") is a natural person who is now, and at all relevant times mentioned in this Complaint was, a resident of the State of California.

3. Defendant CITY OF FRESNO (hereinafter "Defendant CITY") is a "public entity" within the definition of California Government Code § 811.2.

4. Defendant HOWARD LACY (hereinafter "Defendant LACY") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant LACY is sued in his individual capacity.

5. Defendant JEFFREY CARDELL (hereinafter "Defendant CARDELL") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant CARDELL is sued in his individual capacity.

6. Defendant JENNIFER CLARK (hereinafter "Defendant CLARK") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant CLARK is sued in her individual capacity.

7. Defendant KELLI FURTADO (hereinafter "Defendant FURTADO") is a natural person who was at all relevant times mentioned in this Complaint an employee of Defendant CITY, acting within the scope of that employment. Defendant FURTADO is sued in her individual capacity. Plaintiffs are informed and believe and hereon allege that Defendant FURTADO resigned from her position with Defendant CITY effective mid-July of 2019.

4

COMPLAINT

8. Defendant TIMOTHY BURNS (hereinafter "Defendant BURNS") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant BURNS is sued in his individual capacity.

9. Defendant KEVIN WATKINS (hereinafter "Defendant WATKINS") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant WATKINS is sued in his individual capacity.

10. Defendant ANDREIA CUEVAS (hereinafter "Defendant CUEVAS") is a natural person who is now, and at all relevant times mentioned in this Complaint was, an employee of Defendant CITY, acting within the scope of that employment. Defendant CUEVAS is sued in her individual capacity.

11. Defendant DEL ESTABROOKE (hereinafter "Defendant ESTABROOKE") is a natural person who was at all relevant times mentioned in this Complaint an employee of Defendant CITY, acting within the scope of that employment. Defendant ESTABROOKE is sued in his individual capacity. Plaintiffs are informed and believe and hereon allege that Defendant ESTABROOKE retired from his position with Defendant CITY on or about September 2017.

12. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, or of the factors linking them to causes of action stated herein and therefore sues such defendants by such fictitious names. Plaintiffs will amend their Complaint to allege the true names and capacities of DOES 1 through 100, inclusive, when ascertained. Plaintiffs are informed and believe and hereon allege that each DOE Defendant is responsible in some manner for the events and happenings hereinafter referred to and is jointly and severally liable for the injuries and damages to the Plaintiffs as herein alleged.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to California Code of Civil Procedure § 410.10. This Court also has jurisdiction over Defendants because all causes of action

5
COMPLAINT

arise out of transactions and/or occurrences that have occurred and are occurring in the County of Fresno.

14. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a), in that Defendants reside within the County of Fresno and the wrongful acts and violations of law asserted herein occurred within the County of Fresno.

## FACTUAL ALLEGATIONS – PLAINTIFF SMITH

15. On or about October 12, 2016, Plaintiff SMITH was hired by Defendant CITY as a Temporary Services Aide on the Vacant Buildings Blight Survey Team in the Code Enforcement division, in the Development and Resource Management department ("DARM") of Defendant CITY, under direct supervision of Defendant LACY.

16. On or about late December 2016, Plaintiff SMITH and Defendant LACY were walking down a hallway in Code Enforcement when Plaintiff SMITH witnessed Defendant LACY make very negative eye contact with an African-American woman who was walking towards them from the other side of the hallway. Plaintiff SMITH later learned that the woman was Plaintiff WILSON. When Plaintiff SMITH and Defendant LACY had exited the Code Enforcement division, Plaintiff SMITH asked Defendant LACY about that interaction and who the woman was. Defendant LACY told Plaintiff SMITH to "stay away from her because she's a no good piece of shit," that "she's lazy," and that when everyone got laid off, everyone else got their jobs back but the only reason she got her job back was because she "played the race card." Defendant LACY told Plaintiff SMITH to "avoid her like the plague" if he wanted "any chance of being hired full-time" and that Plaintiff SMITH should "walk the other way when she approaches." Plaintiff SMITH did as his supervisor Defendant LACY told him and avoided Plaintiff WILSON for the rest of his time as a temporary employee, which was until around May 12, 2017.

17. On or about April 2, 2018, Plaintiff SMITH was hired by Defendant CITY as a full-time probationary Community Revitalization Technician in the Code Enforcement division, under direct supervision of Defendant CITY employee John Giannetta in Area 4.

18. During the week of May 20 through May 25, 2018, Plaintiff SMITH, along with numerous other Defendant CITY employees, attended the California Association of Code

6

COMPLAINT

Enforcement Officers ("CACEO") training. On or about May 24, 2018, Plaintiff SMITH received a strange text message from Defendant LACY around 8:51pm, asking if he was still awake. Plaintiff SMITH responded saying that he was awake and asking if Defendant LACY wanted him to call. Defendant LACY replied that he did want Plaintiff SMITH to call him. When Plaintiff SMITH called Defendant LACY, Defendant LACY accused Plaintiff SMITH of having a 'private meeting' with Plaintiff WILSON during the training that they were both attending that week. Defendant LACY told Plaintiff SMITH that he "had eyes and ears everywhere" and that "a little birdie told him" that Plaintiff SMITH had been exchanging nods with Plaintiff WILSON and that they left training to have a private meeting outside. Plaintiff SMITH told Defendant LACY that this wasn't true and cited the previous conversation that Defendant LACY and Plaintiff SMITH had had, wherein Defendant LACY told Plaintiff SMITH to stay away from Plaintiff WILSON. Defendant LACY said that as long as Plaintiff SMITH "stuck with him" that Plaintiff SMITH would "make probation." Plaintiff SMITH accordingly understood that he needed to stay away from Plaintiff WILSON, per Defendant LACY, if he wanted to pass probation and continue his employment with Defendant CITY. Plaintiff SMITH thought this was especially odd considering Defendant LACY wasn't his supervisor or even in his chain of command at the time.

19. On or about June 8, 2018, Plaintiff SMITH was called into Defendant BURNS' office and was told that he was being transferred to Defendant LACY's team, effective the following Monday.

20. On June 28, 2018, Defendant LACY approached Plaintiff SMITH to tell him that he wanted Plaintiff SMITH to attend a specific inspection with him that morning, so that Plaintiff SMITH "could see what happens." Plaintiff SMITH agreed to accompany Defendant LACY to this inspection, thinking that it was more "on the job training," but it became clear quickly that Defendant LACY wanted Plaintiff SMITH to come to this particular inspection because it was of an African-American woman's property. After performing the inspection, when Plaintiff SMITH and Defendant LACY got back into their vehicle, Defendant LACY said "see Charlie, I'm not a racist. Kiki [referring to Plaintiff WILSON] wants to say that I'm a racist, but I'm not. I'm super nice. It's her." When Plaintiff SMITH didn't respond, Defendant LACY continued on saying,

7

"Kiki is an entitled nigga. I'm not saying nigger. I'm saying nigga – N-I-G-G-A." Plaintiff SMITH laughed uncomfortably and said something to the effect of "Howard, can this be over? Just stop it already. I don't want to hear this crap. I get it, you hate Kiki, but I'm not here for your issue with Kiki." Defendant LACY did not respond.

21. On June 29, 2018, Plaintiff SMITH received a voicemail from a resident complaining that she had been double-billed and that the second bill that she had received was signed by Plaintiff SMITH. Plaintiff SMITH pulled up the case in their electronic system and realized that he had never inspected that property, so there was no reason that he would have generated a bill or sent a letter to the woman. Defendant CITY employee Danny Smith was listed as the inspector on the property. Plaintiff SMITH returned the woman's call, telling her that it could be a mistake, and that he would look into it and get back to her.

22. On July 2, 2018, Plaintiff SMITH approached Danny Smith regarding the woman's case. Danny Smith responded to Plaintiff SMITH by saying, "What's your fucking problem? You put that case in your name on Friday, you fucking idiot. You don't even know what you're doing, you're a fucking moron." Plaintiff SMITH walked away without responding and went to his supervisor, Defendant LACY, to inform him of what had transpired. Danny Smith walked in behind him, and Plaintiff SMITH told Defendant LACY that Danny Smith had just berated him for no reason. Defendant LACY pulled up the case in the electronic system and confirmed that it was Danny Smith on that case; Danny Smith looked at Plaintiff SMITH and apologized sarcastically. Plaintiff SMITH then requested that he speak with Defendant LACY privately. Plaintiff SMITH expressed his concerns that letters were being sent as if he had done inspections and assessed a bill amount on properties to which he was never even assigned. Defendant LACY accused Plaintiff SMITH of no longer trusting him. Plaintiff SMITH assured Defendant LACY that he did trust him and that was why he had brought it to Defendant LACY's attention. Defendant LACY responded by saying that he would be sending out "a bunch of letters and bills in [Plaintiff SMITH's] name" and not to worry about it. Plaintiff SMITH further expressed his concern about the way that Danny Smith had spoken to him and Defendant LACY brushed him off.

/ / /

23. Also on July 2, 2018, Plaintiff SMITH asked Defendant LACY if his discussion regarding Danny Smith would affect his three-month evaluation, which had not yet been completed, but which was due. Defendant LACY told Plaintiff SMITH that it would be fine and that he would do an evaluation for Plaintiff SMITH. Plaintiff SMITH never received this three-month evaluation. Plaintiff SMITH is informed and believes and hereon alleges that Defendant LACY purposefully withheld Plaintiff SMITH's three-month evaluation so that he couldn't officially pass probation.

24. On July 3, 2018, Defendant LACY approached Plaintiff SMITH and told him that he would no longer be working on Defendant LACY's team and that he was being transferred to the tire team, effective July 5, 2018. After this conversation, Defendant LACY cut off all ties with Plaintiff SMITH, going so far as to ignore Plaintiff SMITH when he said hello when passing him in the hallway. Plaintiff SMITH is informed and believes and hereon alleges that Defendant LACY transferred him to the tire team in retaliation for his objection to the racial slur uttered by Defendant LACY against Plaintiff WILSON and for his objection to Defendant LACY fraudulently signing Plaintiff SMITH's name to Defendant CITY documents for property inspections he did not perform. This retaliation by Defendant LACY is even more evident considering there was a Defendant CITY employee who was already on the tire team and therefore already had tire team experience who should have been moved up into the position to which Plaintiff SMITH was transferred, but instead Defendant LACY transferred this Defendant CITY employee to Plaintiff SMITH's position.

25. On July 10, 2018, feeling as if he had no other choice, Plaintiff SMITH sent a resignation email to his manager, Defendant BURNS. Defendant BURNS responded, saying that he would forward the information to the personnel department. In another email chain that day, Defendant BURNS asked Plaintiff SMITH from what day he wanted to count his two-week notice. Plaintiff SMITH responded, saying that he would prefer to do it from the day before (a Monday) and he requested an in-person meeting with Defendant BURNS to discuss why he was leaving. Defendant BURNS did not reply to this request. Plaintiff SMITH then sent an additional email requesting that he speak with him before he leave, which also went unanswered. Defendant LACY then sent an email to Plaintiff SMITH that afternoon, saying that he had been informed of Plaintiff SMITH's resignation and that Plaintiff SMITH would "no longer be doing anything for the City of Fresno,"

9

COMPLAINT

but that he'd just be doing FresGo (an administrative program that converts complaints into service requests) for the rest of his time there. Plaintiff SMITH then attempted to speak to Defendant LACY in person when he passed him in the hallway, but Defendant LACY rebuffed his request. Now, again feeling as if he had no other choice based on his treatment over the course of the day by his former supervisor and by his current manager, Plaintiff SMITH sent yet another email to Defendant BURNS, letting him know that his resignation would now be effective immediately, rather than two weeks from the prior day.

26. Also on July 10, 2018, as Plaintiff SMITH was leaving his last day of work, he approached Plaintiff WILSON and gave her his cell phone number, feeling as if he needed to tell her about Defendant LACY's extreme racial slur and other comments because he didn't think these comments about her were fair and he no longer felt bound by Defendant LACY's commands to avoid her. Plaintiff WILSON called Plaintiff SMITH that night but he requested that he call her back the following day.

27. On July 11, 2018, Plaintiff SMITH returned Plaintiff WILSON's phone call. As reiterated below in Plaintiff WILSON's factual allegations, Plaintiff SMITH started by apologizing to Plaintiff WILSON for having pre-judged her and then told her that he couldn't stay working for Defendant CITY because he was a Christian man and he didn't think it was right what was happening; Plaintiff SMITH said that he had honorably served in the United States Navy to defend everyone, regardless of their color, race, gender, political affiliation, or religion. Plaintiff SMITH continued on, telling Plaintiff WILSON that Defendant LACY had told him to stay away from her back when he was a temporary employee with the Defendant CITY. Plaintiff SMITH continued on, telling her that Defendant LACY had called her a "piece of shit," said that she was "trouble" and that she liked to "play the race card" but that she comes to work and does nothing. Plaintiff SMITH said that it was clear to him that Defendant LACY hated Plaintiff WILSON but that he didn't understand why. Plaintiff SMITH then hesitated and expressed discomfort with telling Plaintiff WILSON anything further, but Plaintiff WILSON implored him to continue on. Plaintiff SMITH told Plaintiff WILSON about Defendant LACY accusing him of secretly meeting with Plaintiff WILSON at the CACEO training in May and then reluctantly told her of the conversation

10

COMPLAINT

he had with Defendant LACY in his truck wherein Defendant LACY referred to Plaintiff WILSON as an "entitled nigga." Plaintiff WILSON was so upset upon hearing the last comment that she ended the phone call with Plaintiff SMITH.

28. On July 12, 2018, Plaintiff SMITH met with labor representative Tony Silva of Goyette & Associates, Inc. at the firm's Fresno office and recorded a roughly 35-minute statement detailing the above incidents that Plaintiff SMITH experienced while employed by Defendant CITY, including but not limited to: Defendant LACY telling Plaintiff SMITH to avoid Plaintiff WILSON because she's a "lazy piece of shit"; Defendant LACY texting Plaintiff SMITH at night and the subsequent phone call in which Defendant LACY accused him of having a secret meeting with Plaintiff WILSON at the CACEO training; Plaintiff SMITH's conversation with Defendant LACY regarding his name being signed to letters that he didn't send and the aftermath of such conversation; the inspection of the African-American woman's property and subsequent conversation with Defendant LACY wherein he referred to Plaintiff WILSON as an "entitled nigga"; being transferred to the tire team and Defendant LACY ceasing all interaction with him; and Plaintiff SMITH having no other choice but to resign from his position with Defendant CITY.

29. On or about August 9, 2018, Plaintiff SMITH, by and through Mr. Silva, sent a letter to Defendant CARDELL, Defendant CITY's Director of Personnel, regarding his resignation. In this letter, Mr. Silva outlined that Plaintiff SMITH did not know that he could report his issues with Defendant LACY to personnel and summarized the recorded statement that Plaintiff SMITH had made regarding the same. Mr. Silva also advised Defendant CARDELL that Plaintiff SMITH attempted to reach out to his direct supervisor, Defendant BURNS, but received no response. Mr. Silva requested that Plaintiff SMITH be reinstated as a Community Revitalization Technician to minimize the damage that Plaintiff SMITH had already suffered.

30. On or about August 16, 2018, Defendant CARDELL called Plaintiff SMITH and assured him that he was hiring an unbiased external investigator to look into this matter. Initially Defendant CARDELL attempted to convince Plaintiff SMITH to come meet with this independent investigator and with Defendant CARDELL, without Mr. Silva; however, ultimately Defendant CARDELL confirmed that the independent investigator, Dallas Selling, would meet with Plaintiff SMITH and

11

COMPLAINT

Mr. Silva on August 21, 2018. At this meeting on the 21st, Mr. Silva played Plaintiff SMITH's recorded statement in its entirety for Ms. Selling, after which she followed up with a few questions. August 21, 2018 was the last day that Plaintiff SMITH communicated with anyone affiliated with Defendant CITY regarding the investigation.

31. Prior to being forced to resign from his permanent position with Defendant CITY, Plaintiff SMITH had been invited to test for various promotions; after completing these tests, he qualified for interviews for four positions with Defendant CITY. Plaintiff SMITH interviewed for these positions on or about the following dates: 1) Staff Assistant position within Code Enforcement on November 15, 2018; 2) Wastewater position on November 28, 2018; 3) Information Technology Personal Computer Specialist position on December 4, 2018; and 4) Billing System Specialist position on April 3, 2019. Plaintiff SMITH did not receive second interviews for any of the positions, despite his high test scores and excellent interview skills. Plaintiff SMITH ultimately attended these interviews genuinely hoping that Defendant CITY or at least his Defendant CITY co-workers in Code Enforcement were well-aware of the retaliation that he was subjected to because of his objection to Defendant LACY's use of the racial slur against Plaintiff WILSON and would hire him back. Plaintiff SMITH additionally assumed that Defendant LACY would be terminated by Defendant CITY for his retaliation against Plaintiff SMITH and for calling Plaintiff WILSON a "nigga," so it never occurred to him that if he was offered any one of these positions that he would again be working with Defendant LACY. Additionally, Plaintiff SMITH had applied for three temporary positions after his forced resignation but received no communications from Defendant CITY regarding these positions despite his previous experience as a temporary employee for Defendant CITY and his obvious over-qualification for such positions.

32. On or about September 6, 2019, Plaintiff SMITH received a letter from Defendant CARDELL, purporting to be the results of the investigation into Plaintiff SMITH's complaint regarding his constructive termination as a result of Defendant LACY's racist behavior and Defendant BURNS' subsequent refusal to speak to him regarding the issue. The letter in its entirety stated that: "Independent investigator Dallas Selling, Esq. conducted a fact finding investigation based upon allegations related to your complaint of discrimination, harassment, and retaliation filed

12

COMPLAINT

against multiple individuals, in or around June 2018. This memorandum is to inform you that the facts and evidence obtained during this investigation are not sufficient to sustain your allegations of discrimination, harassment, or retaliation in violation of Administrative Order 2-16." Plaintiff SMITH is informed and believes and hereon alleges that Defendant CARDELL intentionally mischaracterized the date of Plaintiff SMITH's complaint in order to thwart Plaintiff SMITH's compliance with the Government Tort Claims Act. In reality, as outlined above, Mr. Smith's complaint was made by Mr. Silva in a written letter to Defendant CARDELL dated August 9, 2018.

33. To this day Plaintiff SMITH suffers adverse consequences from Defendants LACY and BURNS' discrimination, harassment, and retaliation and Defendant CITY's failure to prevent the discrimination, harassment, and retaliation since Plaintiff SMITH, after being unemployed, still presently does not make the pay or receive the benefits he was provided while an employee of Defendant CITY, and Plaintiff SMITH remains stigmatized, and accordingly suffers emotionally, as an individual who could not succeed in his employment with Defendant CITY.

## FACTUAL ALLEGATIONS – PLAINTIFF WILSON

34. On or about February 2004, Plaintiff WILSON was hired by Defendant CITY as a full-time Neighborhood Standards Inspector in the Code Enforcement division, in the Development and Resource Management department ("DARM") of Defendant CITY.

35. Between February 2004 and May 2009, Plaintiff WILSON filed various verbal and written complaints with her managers and supervisors employed by Defendant CITY regarding Defendant LACY's racial animus and obvious disdain for African-Americans. The bases for these complaints include, but are not limited to: Plaintiff WILSON witnessed Defendant LACY participate in a "Using Urban Language" training wherein he donned a paper bag with a bottle in it and then told people he was from West Fresno, which has a significant African-American population; Plaintiff WILSON overheard Defendant LACY discussing racial stereotypes for African-Americans and when Plaintiff WILSON confronted Defendant LACY, saying "you know that I'm here and can hear you, right?," Defendant LACY did not respond; Plaintiff WILSON and another Defendant CITY employee overheard Defendant LACY talking about hanging African-Americans at City Hall; Plaintiff WILSON heard Defendant LACY say that code inspectors needed

13

COMPLAINT

to complete any inspections in West Fresno in the morning because "they would all be asleep" so the employees wouldn't be "at risk." Plaintiff WILSON is informed and believes and hereon alleges that Defendant LACY was never investigated or disciplined for these racist comments and demonstrations.

36. On or about May 19, 2009, by and through her attorney at the time, Rayma Church, Plaintiff WILSON and her co-worker Teri McCada filed a lawsuit in the United States District Court for the Eastern District of California against Defendant CITY and several individuals, alleging discrimination, harassment, and retaliation based on race and gender.

37. On or about March 26, 2012, Plaintiff WILSON and her counsel signed a settlement agreement with Defendant CITY and on or about April 9, 2012, the Eastern District entered a Stipulation of Dismissal with Prejudice, signed by the judge in that matter.

38. On or about June 6, 2013, Plaintiff WILSON was issued a parking ticket by Defendant CITY for her Defendant CITY vehicle, which was parked on Defendant CITY property. When Plaintiff WILSON questioned then-parking manager Defendant ESTABROOKE as to why she and another Defendant CITY Code Enforcement employee were ticketed, he told Plaintiff WILSON that he was directed to do so by Elaine Robles (a manager at the time) and Defendant LACY. Defendant ESTABROOKE also advised Plaintiff WILSON that he ticketed another employee from a different department because he thought it would be too obvious if they only ticketed Plaintiff WILSON and the other employee from Code Enforcement. Wanting to avoid any further animosity with Defendant LACY, Plaintiff WILSON emailed Ms. Robles regarding the parking ticket. Ms. Robles advised that she would need to speak with then-Defendant CITY Manager Mark Scott. Defendant ESTABROOKE eventually voided the ticket when Plaintiff WILSON was laid off two months later.

39. On or about the week of July 11, 2013, Defendant CITY sent out to eight individuals notices of their layoff allegedly due to budgetary concerns; these eight individuals were allegedly identified by Defendant CITY as those with the least seniority in the Code Enforcement division. Plaintiff WILSON was one such employee to receive a notice. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY changed the procedures for calculating seniority

14

COMPLAINT

so that she was put on the layoff list, and so that Defendant CITY could save other non-African-American employees with less seniority.

40. On or about July 12, 2013, a co-worker told Plaintiff WILSON that then-Deputy Defendant CITY Manager Renee Smith told this co-worker that she "finally got those two" referring to Plaintiff WILSON and Ms. McCada receiving their notices of layoff.

41. On or about the week of July 18, 2013, Plaintiff WILSON and Ms. McCada met with Defendant CITY employees TJ Miller and Jennifer Misner in the Human Resources ("HR") Department to ask for assistance in applying for temporary or part-time jobs, as was offered during Defendant CITY's previous layoffs several years earlier. Ms. Miller and Ms. Misner stated that they could provide no assistance to Plaintiff WILSON and Ms. McCada.

42. On or about July 23, 2013 and July 24, 2013, two anonymous emails were sent to the Defendant CITY Council, in anticipation of the July 25, 2013 Defendant CITY Council meeting, in which the Council was expected to provide the final approval for the eight layoffs. Two councilmembers and then Fresno City Employees Association ("FCEA") president Dee Barnes confirmed that the layoff was approved at least in part because of these anonymous emails. In addition to other criticisms of the Code Enforcement division, one of the emails stated that "problem staff are never dealt with effectively and the few times that attempts were made to actually discipline them, the race card or the gender card or both were played and the matter would be dropped, or end in lawsuits against the City, Managers, Directors and even other staff. Two of [the] major perpetrators of all that mess are part of these eight and are now gone. Please leave them gone." The other email stated that "Many in my Division feel this set of layoffs is the only way to save the City 100s of thousands of dollars lost each year in dealing with two employees' constant complaining, grievance filing, and lawsuit filing against the City and/or their co-workers. One of the two has filed eight lawsuits alone against the City, winning only one, with the rest being dismissed as unfounded...if you reinstated only two positions of the eight, due to Union rules and Seniority, it would be these two employees." Despite Defendant CITY citing budgetary concerns for this round of layoffs, and despite Defendant CITY allegedly determining that these eight employees had the lowest seniority of the Division, these emails demonstrate that Plaintiff WILSON was ultimately

15

COMPLAINT

laid-off based on her race and her prior lawsuit and/or complaints against/to Defendant CITY. Plaintiff WILSON is informed and believes and hereon alleges that these emails were written and disseminated by Defendant LACY and Defendant CITY employees Ben Rash (who is now deceased) and Al Brojavich (who is now retired).

43. On or about July 25, 2013, Defendant CITY Council held its weekly meeting, wherein the layoff at issue was discussed and approved. The reinstatement list following the layoff was as follows: (1) Plaintiff WILSON; (2) Teri McCada; (3) Stephen Cox; (4) Robert Flynn; (5) Desirick Garcia; (6) Jim Jones; (7) Kent Donnis; and (8) Rick Helm. Plaintiff WILSON is the only African-American person on the reinstatement list; besides Desirick Garcia, who is Hispanic, Plaintiff WILSON is the only minority on the reinstatement list. Upon information and belief, Plaintiff hereon alleges that Robert Flynn and Kent Donnis were never removed from Defendant CITY's payroll, and were simply moved to other departments, despite being lower on the reinstatement list than Plaintiff WILSON. Plaintiff WILSON and Ms. McCada had informed Ms. Miller and Ms. Misner of this fact when they met on July 18, 2013, but Ms. Miller and Ms. Misner denied knowing of this. Plaintiff WILSON was officially laid off from her position as a Community Revitalization Specialist ("CRS") in the Code Enforcement division effective on or about August 3, 2013.

44. On or about August 9, 2013, Plaintiff WILSON was called in to Defendant CITY to return her Defendant CITY equipment. When Plaintiff WILSON arrived to her desk and also to her Defendant CITY-issued truck, she found that someone had gone through her things. Plaintiff WILSON is informed and believes and hereon alleges that it was Defendant LACY who did this. Plaintiff WILSON approached Defendant LACY that day, asking where her equipment was and why he had gone through her things. Defendant LACY became irate, cursing and yelling at her, and then walked out the door. In fear of being punished, Plaintiff WILSON went to Ms. Robles' office to tell her that some of her Defendant CITY equipment was missing from her desk and truck. Ms. Robles called Defendant LACY on her cell phone to ask about Plaintiff WILSON's missing Defendant CITY equipment. Plaintiff WILSON was sitting close enough to Ms. Robles to hear Defendant LACY through the phone say "fuck her, fuck Kiki." Ms. Robles ultimately signed off on all of Plaintiff WILSON's equipment being returned.

16

COMPLAINT

45. On or about September 2013, Plaintiff WILSON applied to receive notifications for any temporary or part-time positions that became available with Defendant CITY. She never received any job postings from this list.

46. On or about December 19, 2013, emails began to circulate about the creation of a new position exclusively for Rick Helm, who was Caucasian and eighth and last on the reinstatement list. On or about January 2014, this position was posted under the title Housing Rehabilitation Specialist, but contained the exact description for a CRS, the position which both Plaintiff WILSON and Mr. Helm held at the time of the layoff. Plaintiff WILSON attempted to apply for this position electronically but was denied access. She then contacted HR to challenge the description and the certification requirements, which purported to be higher than those for a CRS, despite having the exact same job description. In response, Defendant CITY granted Plaintiff WILSON access to the application. Plaintiff WILSON applied, but Mr. Helm was awarded this newly-created position, despite being last on the reinstatement list and despite Defendant CITY citing budgetary concerns that led to the layoff in the first place.

47. On or about February 13, 2014, Plaintiff WILSON was called to interview for a Development Service Coordinator position the following day. Plaintiff WILSON interviewed the following day but later found out that the position was promised and awarded to Joanne Zuniga, who is Caucasian.

48. On or about June 2014, Defendant CITY employee David Johnson was terminated from his position as a CRS in Code Enforcement. This position remained vacant, despite Plaintiff WILSON remaining laid off, but number one on the reinstatement list. FCEA President Dee Barnes later told Plaintiff WILSON that the position was eventually eliminated.

49. On or about September 19, 2014, Plaintiff WILSON reapplied to receive notifications for any temporary or part-time positions that became available with Defendant CITY. During the previous year that Plaintiff WILSON had been laid off, numerous part-time and temporary positions had been posted and awarded to various other non-African-American individuals; Plaintiff WILSON was never notified of any of these job postings, despite having signed up for this list a year before.

17

COMPLAINT

50. Also on or about September 19, 2014, Plaintiff WILSON applied for a Community Coordinator position; she received no acknowledgement from HR, let alone an invitation to interview. That same morning, Plaintiff WILSON also applied for a Housing Program Supervisor position; she later received a letter saying that she didn't meet the requirements, despite her resume clearly meeting all requirements. Calls and emails from Plaintiff WILSON to the person that signed the letter went unanswered.

51. On or about October 7, 2014, Plaintiff WILSON applied for a Community Outreach Specialist position; Plaintiff WILSON's resume mimicked the job description completely. She was never contacted by Defendant CITY regarding this application.

52. Upon information and belief, Plaintiff hereon alleges that also on or about October 7, 2014, Defendant ESTABROOKE informed his team and others in a meeting that Defendant CITY couldn't hire any inspectors because they were waiting for the current reinstatement list to expire. He attributed this decision to "upper management."

53. On or about February 2015, Defendants LACY and WATKINS were both promoted from senior positions to supervisors. Despite Defendant CITY citing budgetary concerns for Plaintiff WILSON's layoff, they continued to promote Caucasian employees and thus incur more expenses. At the very least, these promotions created additional lower level positions, none of which were offered or opened up to Plaintiff WILSON, despite being number one on the reinstatement list.

54. On or about February 10, 2015, Plaintiff WILSON was told that Mr. Rash passed away, which vacated his senior position within Code Enforcement. Neither this position, nor any created under it, was offered or opened up to Plaintiff WILSON, despite being number one on the reinstatement list.

55. On or about April 24, 2015, Plaintiff WILSON applied for a Fire Prevention Specialist I position; she was told by HR that she missed passing the exam by one point.

56. On or about May 30, 2015, Defendant CITY Mayor Ashley Swearengin presented a new Code Enforcement budget at the Defendant CITY Council meeting, which included funding for several more positions in the division. Plaintiff WILSON attended this meeting and went on the

18

record, telling the Council that she still wasn't back at work, despite being first on the reinstatement list. Plaintiff WILSON invited Councilmembers and then-Deputy Defendant CITY Manager Renee Smith to follow up with her regarding why she hadn't been put back to work. Plaintiff WILSON received no follow-up from anyone at Defendant CITY regarding her reinstatement.

57. On or about June 17, 2015, Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY began holding interviews for temporary jobs within the Code Enforcement division. Plaintiff WILSON confirmed with multiple co-workers that these temporary employees had the same job responsibilities as a CRS, the position from which Plaintiff WILSON was laid off. Plaintiff WILSON was never contacted to interview for any of these positions, despite having twice applied for notifications of any part-time or temporary positions with Defendant CITY.

58. On or about June 30, 2015, Plaintiff WILSON applied for another Community Coordinator position; despite her resume matching the requirements exactly, she never received any acknowledgement from HR, let alone an interview. Caucasian Defendant CITY employees Suzie Williams, Robert Flynn, and Heather Aceves were all invited to interview and ultimately Heather Aceves got the position, despite having less education and work experience than Plaintiff WILSON.

59. On or about July 21, 2015, in an article entitled "Grand jury: Fresno needs better code enforcement to end blight," the Fresno Bee reported that a grand jury had found that Defendant CITY, among other things, needed to increase its data collection and provide more funding for Code Enforcement to help resolve the blight issue in the city.

60. On or about July 23, 2015, Plaintiff WILSON applied for a Senior CRS position – one of several positions that were created as part of Mayor Swearengin's new Code Enforcement budget. Plaintiff WILSON interviewed for this position on or about September 9, 2015. On September 15, 2015, Plaintiff WILSON received her results from that interview, which put her in 3rd place with a 97.66% score. On or about October 22, 2015, Plaintiff WILSON had her Department Interview for this position before a panel which consisted of Defendant ESTABROOKE, Defendant WATKINS, Defendant CITY employee Phillip Weathers, and Defendant CITY employee Randy Nichols. Plaintiff WILSON was familiar with Mr. Weathers as having personal issues with Ms. McCada and being involved with incidents that were covered in her first lawsuit. Plaintiff WILSON had dealt

19
COMPLAINT

directly with Defendant ESTABROOKE regarding the parking ticket she received in 2013 and is informed and believes and hereon alleges that Mr. Nichols was also involved in that incident. Despite the negative history that Plaintiff WILSON had with most members of the panel, Plaintiff WILSON was confident in her performance at the interview based on her answers to all questions posed by the panel and the fact that she was entirely qualified for the position. On or about November 5, 2015, Plaintiff WILSON received a letter detailing that she was not being offered the position, despite coming in third in her interview and still remaining first on the reinstatement list.

61. On or about September 7, 2015, Plaintiff WILSON received an anonymous letter mailed to her home confirming that four temporary employees - - all non-African-American - - were hired by Defendant CITY in Code Enforcement and that these employees were tasked with the job responsibilities of a CRS.

62. On or about December 2015, Defendant CITY employee Eb Garcia was terminated from his position as a CRS in Code Enforcement, but his position was not eliminated; Defendant CITY again had the opportunity to move Plaintiff WILSON directly into Mr. Garcia's slot, considering she was first on the reinstatement list, but they instead chose to further the ongoing discrimination, retaliation, and harassment that Plaintiff WILSON had suffered.

63. On or about January 2016, Plaintiff WILSON was again informed by multiple co-workers that Defendant CITY was waiting for the reinstatement list to expire to open inspector positions, despite Mayor Swearengin's new budgetary plan, the new senior CRS positions already created, and the grand jury's findings.

64. On or about January 19, 2016 - - after two and a half years of diligently applying for the various positions described above, after either receiving no response from Defendant CITY or being rejected by Defendant CITY, and after watching all the positions be filled by Defendant CITY with non-African-American individuals, lower than her on the reinstatement list, or not on the list at all - - Plaintiff WILSON filed a complaint with the EEOC for failure to reinstate and retaliation.

65. On or about July 2, 2016, Goyette & Associates Attorney Heather Phillips sent an email to Defendant CARDELL, asking whether Defendant CITY had any intention of rehiring Plaintiff

20

COMPLAINT

WILSON prior to the expiration of the reinstatement list the following month. Defendant CARDELL did not respond.

66. On or about August 10, 2016, the reinstatement list on which Plaintiff WILSON was listed first, expired. Of the eight people on the reinstatement list, Plaintiff WILSON was the only one that remained unemployed at the time of expiration, despite being first on the list. Ms. McCada had retired prior to the list's expiration. Plaintiff WILSON is informed and believes and hereon alleges that Jim Jones sought employment elsewhere because he had originally been placed in Code Enforcement as a disciplinary action, so he had no expectation of being hired into another Code Enforcement position. Stephen Cox, Robert Flynn, Desirick Garcia, Kent Donnis, and Rick Helm - - all non-African-American - - had been rehired into other positions with Defendant CITY.

67. Beginning on or about August 11, 2016, Ms. Phillips went back and forth in phone calls and emails with Defendant CITY's outside counsel Jim Betts and/or Joe Rubin regarding the expiration of the reinstatement list and the fact that Plaintiff WILSON still had not been hired back. Ms. Phillips advised Mr. Betts and Mr. Rubin that she would be filing a formal grievance with Defendant CITY and a California CCP § 1085 writ regarding these matters. *Only upon* threat of litigation did Mr. Betts and Mr. Rubin offer and begin negotiating details of Plaintiff WILSON's reinstatement. These conversations continued for three months, until on or about November 9, 2016, when Plaintiff WILSON finally was offered to return to work as a CRS with the same seniority. After three years of receiving no pay, watching as every non-African-American person on the layoff list with less seniority regained employment, and having to file an EEOC complaint and get her union attorney involved, Plaintiff WILSON was finally reinstated.

68. In the midst of the negotiations between Ms. Phillips and Defendant CITY's outside counsel regarding Plaintiff WILSON's reinstatement, on or about September 7, 2016, Plaintiff WILSON received a voicemail on her home phone from Defendant CITY employee Phil Skei, inviting her to interview again for a Senior CRS position. Plaintiff WILSON accepted the invitation and interviewed again for a Senior CRS position on or about September 21, 2016. The panel members were Defendant CITY employees Dena Kalar, Lupe Perez, and Mr. Skei, none of whom had any Code Enforcement experience. At the end of her interview, Plaintiff WILSON asked Mr.

21

COMPLAINT

Skei how two other Defendant CITY employees, both Caucasian males, had received department interviews for this position, despite ranking lower than her in their initial interviews. Mr. Skei directed her to Ms. Kalar, who then directed Plaintiff WILSON to "management." Plaintiff WILSON is informed and believes and hereon alleges that the Caucasian males to which she was referring were both promoted to Senior CRS positions.

69. Also on or about September 7, 2016, Plaintiff WILSON is informed and believes and hereon alleges that Defendant ESTABROOKE approached one of Plaintiff WILSON's co-workers and asked if he could vouch for her because Defendant ESTABROOKE had heard bad things about Plaintiff WILSON. Plaintiff WILSON's co-worker assured Defendant ESTABROOKE that Plaintiff WILSON was a good worker and confirmed that he could 'vouch for her' as an employee and a friend. Plaintiff WILSON's interactions with Defendant ESTABROOKE up until this point were limited to when he issued her a parking ticket at Defendant LACY's direction and when she interviewed the first time for a Senior CRS position. Plaintiff WILSON is informed and believes and hereon alleges that Defendant ESTABROOKE's previous negative knowledge of Plaintiff WILSON at least contributed to her being denied a Senior CRS position and remaining laid off, despite being first on the reinstatement list.

70. On or about December 13, 2016, more than three years after being laid off, Plaintiff WILSON returned to work at Defendant CITY as a full-time CRS. Plaintiff WILSON's chain of command upon her return was as follows: Defendant CITY employee Esko Siipola was her senior; Defendant WATKINS was her supervisor; Defendant ESTABROOKE was her manager; Defendant FURTADO was the Assistant Director of DARM; and Defendant CLARK was the Director of DARM. When Plaintiff WILSON arrived that morning, it was as if no one was told that she was returning to work; she was met with surprised expressions and conversations, even from those in her chain of command, and she was placed at a desk in the library, with no computer, phone, or supplies. In light of this, Plaintiff WILSON contacted her FCEA union attorney Heather Phillips to set up a meeting and she also set meetings with Defendants WATKINS, ESTABROOKE, FURTADO, and CLARK for that day. In her meeting with Defendant ESTABROOKE, he casually mentioned "whatever you do Kiki, please don't sue me. I just want to retire and get out of here." It

22

COMPLAINT

was again clear to Plaintiff WILSON that Defendant ESTABROOKE had perceptions of and knowledge about her that hadn't stemmed from their personal interactions.

71. After Plaintiff WILSON set the lunch meeting with Ms. Phillips, she approached her Senior, Mr. Siipola, to advise him that she would be taking an early lunch to go meet with her union.[1] Plaintiff WILSON then realized that her meeting with Ms. Phillips would interfere with the time that she was set to meet with Defendants FURTADO and CLARK, so she returned to Defendant CLARK's assistant's desk to change the time of the meeting to 3p.m. that afternoon. Within minutes of Plaintiff WILSON arriving to her meeting with Ms. Phillips at her union's office, Defendant CARDELL called Ms. Phillips on her cell phone. Defendant CARDELL advised Ms. Phillips that Plaintiff WILSON had walked in that morning as if she owned the place and that she left campus without anyone knowing and with the attitude that she didn't have to answer to anyone. Neither Plaintiff WILSON nor Ms. Phillips could determine a reason why the Director of HR for Defendant CITY would be calling Ms. Phillips regarding a meeting that Plaintiff WILSON was taking on her lawful lunch break. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has ever experienced anything remotely in this realm of scrutiny and micromanagement.

72. When Plaintiff WILSON walked into Defendant CLARK's office for their 3 p.m. meeting, Defendants CLARK and FURTADO were present, and Defendant CLARK greeted Plaintiff WILSON as if nothing had transpired already that day, saying "Hi La-Kebbia, welcome back!" Plaintiff WILSON inquired as to why Defendant CARDELL had called her union attorney as if she was already in trouble on her very first day back. Defendant CLARK feigned surprise and responded that they had been concerned that perhaps Plaintiff WILSON didn't have any leave time on the books and that perhaps Plaintiff WILSON wasn't aware of the policies and procedure in the Code Enforcement division. Plaintiff WILSON responded by saying that she had actually helped draft the Code Enforcement policies and procedures so she was very familiar with them, but that she knew of no other employees who would have their time banks looked into if they rescheduled

[1] There is no Defendant CITY policy that requires that employees alert their chain of command as to when they will be taking required meal and rest periods.

23

COMPLAINT

a meeting with a supervisor or left for lunch. Plaintiff WILSON continued on to say that she was very disheartened that she was being treated this way on her first day back. Defendant CLARK offered disingenuous condolences for Plaintiff WILSON feeling that way and when Plaintiff WILSON responded by saying that this was normal, Defendant FURTADO rolled her eyes; besides obviously negative body language and gestures, Defendant FURTADO said nothing during the entirety of this meeting.

73. On or about December 16, 2016, only three days after her return to work, Plaintiff WILSON was first informed that Defendant WATKINS was asking various other Defendant CITY employees about Plaintiff WILSON's whereabouts and asking them to keep an eye out for her. Over the next 18 months, Plaintiff WILSON was informed on multiple occasions by multiple Defendant CITY employees of the same behavior by Defendant WATKINS. Defendant WATKINS did not keep track of any other employee's whereabouts in this manner besides Plaintiff WILSON.

74. On or about December 21, 2016, Plaintiff WILSON noticed that a piece of paper with her name on it had been placed on an assembled cubicle in the main Code Enforcement bullpen. This particular cubicle was directly next to a door with significant foot traffic and had no tall partition like every single other cubicle in the bullpen. Assuming that this was where Defendant CITY planned on permanently placing her, Plaintiff WILSON approached Defendant CLARK's assistant and requested a tall partition like every single other cubicle, which was especially important because of the high foot traffic directly next to that cubicle. Plaintiff WILSON was told that it couldn't be done so she next approached Defendant ESTABROOKE. Defendant ESTABROOKE brushed it off but when Plaintiff WILSON persisted, he went to the bullpen and saw that Plaintiff WILSON's planned cubicle was literally the only one that did not have the same tall partitions. Only due to Plaintiff WILSON's persistence, tall partitions were then installed on that cubicle.

75. On or about January 5, 2017, Plaintiff WILSON was moved from her desk in the library to her permanent cubicle. Plaintiff WILSON requested an ergonomic assessment from Defendant CITY employee Christina Pasillas, reminding her that before she was laid off, she had had a special chair, keyboard, and mouse to account for a back injury that she had previously suffered. Ms. Kalar

24

COMPLAINT

later provided her with putty-colored keyboard that had never been used but that was technology from at least 20 years ago. Plaintiff WILSON went back to Ms. Pasillas and told her that she needed a real keyboard, preferably the one that she had had before she was laid off. Because of Defendant CITY's lack of accommodation for her ergonomic requests, Plaintiff WILSON had to return to her desk in the library for the time being. On or about January 10, 2017, Defendant CITY employee David Bolton from HR came to Plaintiff WILSON's cubicle to do an ergonomic assessment, telling Plaintiff WILSON that HR had no record of her previous ergonomic assessments. Plaintiff WILSON was not given her new keyboard and her desk was not lowered until the end of January; her chair was never replaced because Mr. Bolton maintained that there was no history of previous ergonomic needs. Interestingly, when Plaintiff WILSON acquired a copy of her personnel file in August 2019, discussed in more detail below, the documents that presented her entire history of ergonomic needs were in fact contained in the file.

76. On or about January 10, 2017, Defendant CITY employee Craig Agabashian circulated resource guidelines and policies regarding office conduct to the entirety of DARM. Plaintiff WILSON is informed and believes and hereon alleges that the guidelines had not been circulated at all while Plaintiff WILSON had been laid off. Plaintiff WILSON later confirmed with Defendant ESTABROOKE that Mr. Agabashian admitted that he circulated them because Plaintiff WILSON was back, while also acknowledging that there hadn't been any need to address these guidelines for several years. Mr. Agabashian was involved in Plaintiff WILSON's first lawsuit; Plaintiff WILSON is informed and believes and hereon alleges that this fact provided Mr. Agabashian the motivation to single out Plaintiff WILSON by circulating the resource guidelines and policies upon her return to work.

77. On or about February 21, 2017, Defendant LACY assigned Plaintiff WILSON her work truck. Plaintiff WILSON is informed and believes and hereon alleges that it was the oldest truck in the entire fleet of Defendant CITY vehicles. Upon Plaintiff WILSON's initial inspection of the truck, she discovered that it was caked with two inches of mud around the entirety of the outside, which had also been tracked inside the cab, and that a metal rod in the driver's seat was poking through the upholstery. Plaintiff WILSON went to Defendant LACY and told him that her truck

25

COMPLAINT

needed to be detailed and that the metal rod needed to be repaired. Defendant LACY told Plaintiff WILSON that she could only take the truck to the carwash that Defendant CITY contracted with to get it washed. Plaintiff WILSON again insisted that the truck needed to be detailed, not simply washed, and that Defendant CITY's Fleet Management Division ("Fleet") needed to look at the metal rod coming through the driver's seat. Defendant LACY dismissed Plaintiff WILSON's concerns with a coarse attitude and Plaintiff WILSON requested that Defendant LACY not speak to her in that tone. Defendant LACY replied that things had changed since she'd been gone; Plaintiff WILSON responded that apparently things had not changed, feeling like Defendant LACY was still targeting her because of her race, as he had over the past 10 years.

78. The following day, on or about February 22, 2017, Plaintiff WILSON went to Defendant ESTABROOKE to discuss Defendant LACY's tone and demeanor regarding the simple and obvious request made by Plaintiff WILSON that was well within the scope of Defendant LACY's job duties as the equipment manager. Defendant ESTABROOKE agreed that Defendant LACY's attitude was inappropriate and told Plaintiff WILSON that he just didn't understand why the truck couldn't be detailed. A couple of weeks later, Plaintiff WILSON was told that her truck had been detailed and the upholstery repaired and that she was able to pick it up from Fleet. A receipt that she found in her truck was dated February 23, 2017, although she wasn't notified until weeks later that the truck was ready for pick-up.

79. Also on or about February 22, 2017, Defendant LACY assigned Plaintiff WILSON her work tools. Although there was a toolbox attached to the bed of her work truck, that toolbox was completely filthy and unusable. Because of all of the pushback she had received regarding getting the truck detailed and repaired, Plaintiff WILSON simply asked Defendant CITY employee Jennifer Brown for some kind of container to keep her tools in. Ms. Brown was an inspector but was working out of class doing clerical work and ordering supplies, so this request was squarely within her job duties. Ms. Brown said that Plaintiff WILSON needed to speak to Defendant LACY regarding getting a bag or box for her tools. Again not wanting to endure Defendant LACY's racially-motivated harassment, Plaintiff WILSON got through the next couple of months without a tool bag or box. However, finally determining that she could no longer get by with nothing, Plaintiff

26

COMPLAINT

WILSON approached Defendants ESTABROOKE and WATKINS on or about May 1, 2017. Defendant ESTABROOKE initially sent Plaintiff WILSON to Defendant CITY employee Heather Aceves to see if she could give Plaintiff WILSON a bag of any kind. Ms. Aceves offered Plaintiff WILSON a standard reusable grocery bag, but the tools ripped right through it. Defendant WATKINS offered her a box, but the box was too big to fit into the cab of her work truck. On or about May 5, 2017, Plaintiff WILSON showed Defendant WATKINS that her tools had simply ripped right through the reusable bag given to her by Ms. Aceves. Defendant WATKINS pulled Plaintiff WILSON into a conference room and proceeded to explain to her what happens when someone "goes against the group." Defendant WATKINS told Plaintiff WILSON that he didn't want to participate in meetings in which employees discussed her but if he were to speak up, he'd be pushed out of the group. Defendant WATKINS also lamented the fact that the root of the tool bag situation was Defendant LACY, and that he did not understand why he was making such a big deal out of it. Plaintiff WILSON told Defendant WATKINS that she just wanted to be treated like everyone else. Plaintiff WILSON is informed and believes and hereon alleges that there are other Defendant CITY employees who are unable to use the toolbox attached to their work truck but that those employees are immediately given a tool bag to keep in their truck. By the end of that same day, finally, Defendant ESTABROOKE presented Plaintiff WILSON with an appropriate bag to hold her tools.

80. On or about March 10, 2017, Plaintiff WILSON made a hostile work environment complaint to Defendant ESTABROOKE regarding Defendant CITY employee Matt Wade, a senior CRS on the Neighborhood Revitalization Team. Plaintiff WILSON had been informed prior to this day that Mr. Wade had discussed Plaintiff WILSON with some of her co-workers. When one particular co-worker told Mr. Wade that Plaintiff WILSON had gone through enough and that none of what he had heard was true, Mr. Wade went to Defendant LACY (who was not in Mr. Wade's chain of command) to complain about that co-worker. Plaintiff WILSON is informed and believes and hereon alleges that Defendant LACY had previously spoken negatively about Plaintiff WILSON to Mr. Wade. On this particular date, Mr. Wade, who is neither in Plaintiff WILSON's chain of command nor in her division, sent Plaintiff WILSON an email questioning her about her

27

COMPLAINT·

work on a particular case. Thereafter, Mr. Wade started telling Plaintiff WILSON's co-workers that she was lazy. When Plaintiff WILSON went to Defendant ESTABROOKE, he said he would address the matter directly with Mr. Wade and Defendants CLARK and CARDELL. Plaintiff WILSON never heard anything else from anyone with Defendant CITY regarding this complaint.

81. On or about March 21, 2017, Plaintiff WILSON applied for a Housing Program Supervisor position. Plaintiff WILSON received an email response from HR advising her that she did not meet the minimum requirements for the position. The email additionally advised Plaintiff WILSON that if she still felt that she met the minimum qualifications, she could submit additional information by May 5, 2017. Plaintiff WILSON again submitted her application, knowing that it already contained everything to qualify her for the position. Plaintiff WILSON was again told that her application was deficient and that she would need to provide proof of the qualifications and experience that she listed on her application. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has had to provide proof or any additional documentation to prove work experience that they obtained while working for Defendant CITY. Plaintiff WILSON then sent emails and other documents to HR that demonstrated her experience in a lead position with Defendant CITY. Despite Plaintiff WILSON clearly demonstrating that she had the qualifications to apply for this position, Defendant CARDELL refused her application. Plaintiff WILSON then requested that the Civil Service Board review Defendant CARDELL's findings, and a hearing was held on July 31, 2017. On October 11, 2017, the Civil Service Board handed down its decision, finding not only that Plaintiff WILSON absolutely met the minimum requirements to apply for the position, but also confirming that she had one year of experience as a Project Manager, which made her beyond qualified for any senior or supervisor position. Although Defendant CITY was then essentially forced to allow Plaintiff WILSON to interview for the position, it was ultimately filled by a Caucasian male that had no Code Enforcement experience.

82. Plaintiff WILSON was approached by a representative of the United States Office of the Inspector General ("OIG") regarding an audit they were doing on Defendant CITY's Community Development Block Grant Program. On or about March 22, 2017, Plaintiff WILSON met with OIG and was very candid with them, presenting them with documents and tangible evidence regarding

the topic of their audit. Defendants FURTADO and WATKINS and Mr. Skei attempted to prevent other staff from meeting with OIG on this topic and even admonished staff who had already done so. Defendant FURTADO in particular was very unhappy with Plaintiff WILSON's meeting with OIG and she let Plaintiff WILSON know these feelings. The OIG's final audit report was released on or about August 9, 2017; the report asserted that Defendant CITY had not administered the Block Grant in accordance with U.S. Department of Housing and Urban Development requirements.

83. On or about April 3, 2017, Plaintiff WILSON contacted Ms. Misner in HR, requesting that the spelling of her name be corrected from "Lakebbia" to "La-Kebbia", in keeping with her 13-year history with Defendant CITY and with her given birthname. Plaintiff WILSON had been ignoring the misspelling since she returned in December of 2016, but ultimately determined that because her name was going out on official Defendant CITY documents to customers, that it was important that it be changed. Ms. Misner emailed Plaintiff WILSON requiring her to submit a formal name change request form and to bring her social security card to HR for approval. Ms. Misner attempted to demonstrate that Plaintiff WILSON's name had always been "Lakebbia" in Defendant CITY's records and programs, since her initial employment in 2004. Plaintiff WILSON replied that since 2004, her name has always been displayed as "La-Kebbia" as shown on her social security card, her work email, and her work business cards. She reminded Ms. Misner that she had to have it corrected within the PeopleSoft program once before, but that it's not an official name change because it is simply a correction to a mistaken spelling entry. Ms. Misner again demanded that Plaintiff WILSON submit a formal name change request form and bring her social security card to HR for verification. Plaintiff WILSON then physically went down to the HR department and the woman working the front desk (not Ms. Misner) changed the spelling of her name to "La-Kebbia" without requiring the name change request form or her social security card. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has been required to submit their social security card to HR to "correct a mistake" made by Defendant CITY that was no fault of the Defendant CITY employee.

84. On or about June 2017, Plaintiff WILSON was contacted by a customer who informed her that he had received an invoice for an inspection and abatement that was signed by Plaintiff

29

COMPLAINT

WILSON and that included a $200 administrative fee that he wanted explained to him. Plaintiff WILSON had inspected that property at an earlier time but had not signed or sent out an invoice for abatement of the property; Plaintiff WILSON also couldn't explain the additional $200 administrative fee, as it was outside Defendant CITY's master fee schedule. Knowing that Defendant LACY was in charge of inspections and abatements of properties that had weed violations, but not wanting to go outside of her chain of command or endure his endless racially-motivated harassment of her, Plaintiff WILSON first approached her supervisor, Defendant WATKINS, regarding the fee and the fact that her name had been signed to a letter that she hadn't sent. Defendant WATKINS told Plaintiff WILSON that they would continue to send out letters signed by her 'because they were allowed to do so' and that the fee was simply to cover administrative costs associated with inspections and abatement. Plaintiff WILSON requested that Defendant WATKINS put that in writing so that she had something to refer to when explaining this to customers; Defendant WATKINS refused. Plaintiff WILSON then reached out to Defendant ESTABROOKE regarding these same issues, which led to a string of emails in which no definitive answer was given. In the following weeks, Defendant ESTABROOKE retired, so Plaintiff WILSON approached Defendant FURTADO to discuss these issues, but she told Plaintiff WILSON that this was the way that Defendants LACY and WATKINS wanted it and that they would put it aside until the new manager came on. Eventually, Plaintiff WILSON is informed and believes and hereon alleges that the matter was submitted to Defendant CITY Attorney's office to determine the legality of the fee. Plaintiff WILSON did not definitively hear back from management regarding this issue until on or about December 1, 2017, when the new manager, Defendant BURNS, pulled Plaintiff WILSON and Defendant WATKINS into his office and told Defendant WATKINS that he in fact could not sign Plaintiff WILSON's names on letters without her knowledge. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY Attorney's office determined that the $200 administrative fee was illegal and that they could not continue to charge customers for it but that neither Defendant LACY nor Defendant WATKINS were ever disciplined for their involvement with the charging of this illegal fee.

///

85. In the time that it took Defendant CITY to give Plaintiff WILSON a final answer on the issue, weed abatement season was still continuing and still had to be handled. On or about late July or early August 2017, Plaintiff WILSON began receiving numerous phone calls from one customer in particular about the $200 administrative fee. Having received no concrete directives from management, Plaintiff WILSON gave this customer Defendant LACY's contact information as the supervisor in charge of the abatements and as the person who actually did the abatement on that particular property, despite Plaintiff WILSON's signature on the invoice. It wasn't long before this customer was again calling Plaintiff WILSON, saying that she had made numerous attempts to contact Defendant LACY but had received no answer and no return call or email. Plaintiff WILSON eventually started forwarding the messages to Defendants CLARK and WATKINS.

86. On or about August 8, 2017, Defendant WATKINS approached Plaintiff WILSON about her Defendant CITY vehicle being parked in one of the "Official Cars Parking" spots at City Hall allegedly for two days; he told her that her vehicle had to be moved. Despite nearly every Defendant CITY employee parking in and around City Hall, Plaintiff WILSON is informed and believes and hereon alleges that she was the only Defendant CITY employee that was addressed regarding parking in this particular spot and who had to move their vehicle. Plaintiff WILSON asked Defendant WATKINS if Defendant LACY was behind this, considering his direction several years earlier that she get a parking ticket for parking in the "North Lot" at City Hall; Defendant WATKINS denied it at first, but then admitted that it was brought to his attention by Defendant LACY. Plaintiff WILSON told Defendant WATKINS that this had nothing to do with her Defendant CITY vehicle, but that this was Defendant LACY attempting to retaliate against her because she had been questioning the weed abatement fee and had given his contact information to a customer. Defendant WATKINS offered no response. As Plaintiff WILSON went to go move her vehicle, she saw Defendant CLARK and asked her if she was going to let Defendant LACY do whatever he wanted, including with weed abatement issues and singling Plaintiff WILSON out for her vehicle. Defendant CLARK said that she would handle it. Shortly thereafter, Defendant ESTABROOKE sent out an email telling employees not to park their vehicles in and around City Hall.

87. On or about August 9, 2017, Defendant CLARK told Plaintiff WILSON that she had filed a complaint with HR on Plaintiff WILSON's behalf regarding the retaliation that Plaintiff WILSON was experiencing from Defendant LACY. Later on that day, Plaintiff WILSON is informed and believes and hereon alleges that Defendants LACY and ESTABROOKE were in Defendant CLARK's office and Defendant LACY was yelling at her for filing this complaint.

88. On or about August 11, 2017, Plaintiff WILSON emailed Goyette & Associates Labor Representative Tony Silva, preemptively asking that Defendant CITY employee Rhonda Lacy not be used as the investigator into the complaint made on her behalf by Defendant CLARK. Ms. Lacy has acted as the investigator for numerous other similar complaints filed both by Plaintiff WILSON and others and has found that no discrimination, harassment, or retaliation has occurred in every instance. Plaintiff WILSON is also informed, believes, and hereon alleges that Ms. Lacy is close friends with Defendant LACY so Plaintiff WILSON did not think that this complaint would be fairly investigated if Ms. Lacy acted as investigator. Mr. Silva forwarded Plaintiff WILSON's concerns to Defendant CARDELL via email. On or about August 22, 2017, Plaintiff WILSON received an email from David Bolton in HR requesting to set up an interview regarding Defendant CLARK's complaint. On or about August 30, 2017, Plaintiff WILSON, along with Mr. Silva, met with Mr. Bolton regarding the complaint. Plaintiff WILSON was unsure of what expertise Mr. Bolton had in conducting interviews and investigations into complaints, considering just a few months earlier he had done the ergonomic assessment on her workstation, but she was determined to give him the benefit of the doubt. She told Mr. Bolton everything that had happened up until this point, specifically emphasizing the disparate treatment she was receiving from Defendant LACY because of her race. Plaintiff WILSON repeated a conversation that she had been told about between Defendant LACY and Ms. Robles regarding Ms. Robles' grandchildren, who are interracial, in which Defendant LACY commented that 'the Lacys' blood is going to stay pure.' Mr. Bolton had no reaction and simply asked Plaintiff WILSON what she thought that meant. Plaintiff WILSON was very discouraged by that response, especially considering the statement's obvious racial undertones, but continued the interview, even giving Mr. Bolton pictures, audio files, emails, and a list of other people to interview that could corroborate her interview.

COMPLAINT

89. On or about September 9, 2017, Plaintiff WILSON showed Defendant CLARK emails between Plaintiff WILSON and Defendant ESTABROOKE proving that Defendant LACY had requested Defendant ESTABROOKE give Plaintiff WILSON a parking ticket in 2013. Defendant CLARK's response was simply to remind Plaintiff WILSON about the complaint she had just reported to HR on Plaintiff WILSON's behalf.

90. On or about September 11, 2017, Plaintiff WILSON was emailed by another African-American female Defendant CITY employee who informed her of an interaction that she just had with Plaintiff WILSON's new manager, Defendant BURNS. Defendant BURNS came up to this employee saying "aren't you the one whose son plays football? Someone told me your son plays football." The employee replied by saying that he must have been thinking of Plaintiff WILSON. It was very clear to both Plaintiff WILSON and this employee that Defendant BURNS had misidentified this employee as Plaintiff WILSON solely based on the color of their skin.

91. Shortly before September 18, 2017, Plaintiff WILSON's grandfather passed away. Plaintiff WILSON requested sick leave for bereavement purposes for September 18th and 19th of 2017. On September 22, 2017, Ms. Kalar emailed Plaintiff WILSON to let her know that she could only take bereavement sick leave for immediate family members and if she did not respond within five days, Ms. Kalar threatened to take two vacation days from Plaintiff WILSON. On September 25, 2017, Plaintiff WILSON responded and pointed to the recently expanded Labor Code definition of "family member", which was amended effective 1/1/17 to include grandparents. Ms. Kalar responded telling Plaintiff WILSON that Defendant CITY's Municipal Code would control here because bereavement leave isn't included in the Labor Code. Plaintiff WILSON then reached out to Defendant CLARK to request "Special Leave" pursuant to the Defendant CITY Municipal Code Section 3-107, which allows an employee to attend the funeral of a person other than a member of the immediate family if approved by the employee's department head. Defendant CLARK almost immediately approved Plaintiff WILSON's request. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has been subjected to such scrutiny when attempting to use bereavement leave. Further, on January 5, 2018, Defendant CITY sent out an email notifying employees that effective January 6, 2018, Defendant CITY Municipal Code

33

COMPLAINT

Section 3-107 had been amended to include grandparents in the definition of family members for the use of Sick Leave.

92. Also on or about September 2017, Plaintiff WILSON was told by a long-time female Defendant CITY employee that she had been interviewed by Ms. Lacy regarding Defendant CLARK's complaint on Plaintiff WILSON's behalf. Plaintiff WILSON was not surprised that Defendant CITY was still utilizing Ms. Lacy, despite Plaintiff WILSON's objections. This female employee also told Plaintiff WILSON that Ms. Lacy was asking questions about incidents that occurred more than ten years earlier, which were completely unrelated to the current investigation. Plaintiff WILSON's concerns that Ms. Lacy could not be objective and conduct a fair investigation were obviously justified; Ms. Lacy was attempting to pry information out of this female employee regarding Plaintiff WILSON's history with Defendant CITY, rather than the issue at hand, namely, Defendant LACY's racially-motivated discrimination, harassment, and retaliation against Plaintiff WILSON.

93. On or about September 27, 2017, Plaintiff WILSON had her second interview with Mr. Bolton. She again implored Mr. Bolton to keep Ms. Lacy out of the investigation. Mr. Bolton did not seem concerned with Plaintiff WILSON's apprehension regarding Ms. Lacy and did not engage her further. Plaintiff WILSON is informed and believes and hereon alleges that this interview only occurred to attempt to quell Plaintiff WILSON's complaints, but was not utilized to actually obtain information in furtherance of the investigation, further supporting Plaintiff WILSON's precise complaint regarding Ms. Lacy's mishandlings of previous internal complaints.

94. On or about January 22, 2018, Plaintiff WILSON received her Employee Performance Evaluation for the rating period of December 12, 2016 through December 11, 2017. Plaintiff WILSON received "Meets Requirements" for every category, which includes: (1) Job Knowledge, Skills, & Proficiency; (2) Quality & Accuracy of Work; (3) Responsiveness; (4) Technical Knowledge; (5) Adaptability to Change; (6) Use of Resources; (7) Interpersonal Skills; and (8) Attendance. There was no category for which Plaintiff WILSON needed improvement, and she was given an overall rating of "Meets Requirements." Plaintiff WILSON was empowered but also

disheartened because the acknowledgment of her work as satisfactory demonstrated that the disparate treatment she was suffering at the hands of Defendant CITY was entirely based on her race.

95. Also on or about January of 2018, Defendant CITY employee Desirick Garcia was abruptly promoted to a senior CRS position; Defendant CITY then immediately closed that senior list, for which Plaintiff WILSON was already qualified, even though the list had not met its expiration date. A couple of weeks later, Defendant CITY then reopened the senior list, a tactic which Plaintiff WILSON is informed and believes and hereon alleges was utilized for the express purpose of forcing Plaintiff WILSON to have to reapply to the list to qualify. In light of Mr. Garcia's abrupt promotion and the subsequent closing and then reopening of the senior list, Plaintiff WILSON met with Defendant CLARK, on or about February 6, 2018, regarding her lack of promotion since she had returned to work in December of 2016. Plaintiff WILSON wanted clarity on why she had watched 16 Defendant CITY employees, none of whom were African-American, be promoted to senior positions within Code Enforcement over her since then. Defendant CLARK said that she wasn't aware of the promotions and that she relied on other people who she put in charge of those positions to handle the hiring process. Defendant CLARK also told Plaintiff WILSON that it's about being the "right fit" and when Plaintiff WILSON questioned what the objective definition of that term was, Defendant CLARK said something to the effect of that "it's about the right people in the right place" and that "some people don't fit in and it's more about style." Plaintiff WILSON took this to mean that her "style" was her demeanor and personality, which in turn was different from others that had been promoted because she was African-American and none of the others that had been promoted above her were African-American. Plaintiff WILSON named some of the people that had been promoted over her and explicitly asked what qualities they had that she did not; Plaintiff WILSON expressed that she knew she had more education and experience than all of them. Defendant CLARK had no answer besides reiterating that it would have to be the "right fit" and then she disingenuously told Plaintiff WILSON that they really wanted to work with her so that she could be a "star" and that she hoped that Plaintiff WILSON would continue to apply for senior positions as they became available. Defendant

35

COMPLAINT

CLARK then went on to ask Plaintiff WILSON what she thought of Defendant BURNS. Plaintiff WILSON told Defendant CLARK that she thought that Defendant BURNS was okay from what she knew and that she thought they were on a better path than she had been with other managers. Plaintiff WILSON then brought up Defendant LACY and the alleged investigation that was supposed to have been taking place, about which she had heard nothing since her last interview with Mr. Bolton in September 2017. Defendant CLARK said she'd get back to Plaintiff WILSON within a week.

96. On or about the following day, February 7, 2018, Defendant BURNS delivered a letter signed by Defendant CARDELL that purported to be the findings, or lack thereof, of the investigation into Defendant CLARK's complaint on Plaintiff WILSON's behalf from 6 months earlier. The letter simply said there were no discriminatory findings but did not address either the retaliation or hostile work environment allegations. The letter was also back-dated to the week before; Plaintiff is informed and believes and hereon alleges that this was done to pretend as if Plaintiff WILSON's meeting with Defendant CLARK on February 6, 2018 wasn't the trigger for Defendant CITY to finally issue the investigation "findings."

97. Also on or about February 7, 2018, Plaintiff WILSON went down to the HR department to set up an appointment with Defendant CARDELL regarding the alleged investigation findings. As she walked in the door to HR, Defendant CARDELL walked in and because he happened to be available right then, they met for about three hours that afternoon. Plaintiff WILSON explained her meeting with Defendant CLARK the day before and questioned Defendant CARDELL as to why she had been passed over for promotion time and time again. Plaintiff WILSON told Defendant CARDELL that she was aware how Defendant CITY had "gotten creative" with other employees and that she was hoping they would do that for her, since she obviously was being blocked through the normal channels. Defendant CARDELL simply smirked in response. Plaintiff WILSON continued on about the investigation and questioned why the letter didn't address any of the retaliation or hostile work environment claims that she had told Defendant CLARK about. Defendant CARDELL responded with "all of this about a bag?" Plaintiff WILSON was taken aback considering this was her first time speaking with Defendant CARDELL, yet he was acting as if he

36

COMPLAINT

had personally interviewed Plaintiff WILSON and as if he was present for all of the incidents about which she was speaking. Plaintiff WILSON replied, saying "no, this is about an accumulation of everything that's happened." Plaintiff WILSON continued on telling Defendant CARDELL about her history with Ms. Lacy, specifically that every single complaint that she's ever made has been handled by her and every single time there has been no findings for any of Plaintiff WILSON's allegations; Plaintiff WILSON pointed out that even with Ms. Lacy consistently finding nothing, Plaintiff WILSON was still allowed to shred portions of her personnel file as part of the settlement of her initial lawsuit, after alleging that certain documents had been falsified. Defendant CARDELL told Plaintiff WILSON that he didn't take kindly to someone telling him as the Director of HR who is going to lead a particular investigation. Plaintiff WILSON clarified that it was a professional request, not a challenge, and Defendant CARDELL admitted that he was unaware of Plaintiff WILSON's history with Ms. Lacy. When Plaintiff WILSON reminded Defendant CARDELL that Mr. Silva had sent him an email telling him about her history with Ms. Lacy, Defendant CARDELL admitted that he could have hired an outside investigator. Plaintiff WILSON continued to recount the retaliation and hostile work environment that she felt after questioning Defendant LACY regarding the $200 administrative fee. Defendant CARDELL seemed surprised that Plaintiff WILSON knew about the fee and about the fact that Defendant CITY Attorney's office had determined that it was illegal. Plaintiff WILSON continued on to attempt to explain to Defendant CARDELL, a Caucasian man, what is was like for Plaintiff WILSON to work for Defendant CITY as an African-American woman. She explained that every African-American that was hired in the Code Enforcement division since she had started there in 2004 had been fired, except for two men. Defendant CARDELL's response was something to the effect of "that's why *I* have two black women working for me." Plaintiff WILSON took this as an acknowledgement of the problem that she was referencing and as Defendant CARDELL's weak attempt to combat the problem within his own department. Defendant CARDELL ended the conversation by telling Plaintiff WILSON that he would get back to her within two weeks, and then adding, as if he were surprised, that Plaintiff WILSON was "so professional." Plaintiff WILSON asked what he'd expected from her and Defendant CARDELL responded with something to the effect of "well, considering what you've

37

COMPLAINT

gone through…" Plaintiff WILSON is informed and believes and hereon alleges that Defendant CARDELL had been told negative things about Plaintiff WILSON prior to first meeting her, which was on this date.

98. On or about February 8, 2018, Plaintiff WILSON met with Defendant BURNS regarding her meetings with Defendants CLARK and CARDELL over the past couple of days. Plaintiff WILSON reiterated what she had told Defendant CLARK about being time and time again looked over for promotion and he responded by saying that he hoped that she'd apply the next time there was an opening for a senior position. Remembering that Defendant CLARK had said almost precisely the same thing, Plaintiff WILSON asked if Defendant BURNS had already spoken to Defendant CLARK regarding their conversation. Defendant BURNS admitted that he had spoken to Defendant CLARK and thanked Plaintiff WILSON for speaking highly of him. He then continued on to say that he had worked for a lot of local governments but never for a city that handled personnel the way that Defendant CITY did, and that he wanted Plaintiff WILSON to know that he was just the messenger. Plaintiff WILSON said that because he knows what's going on and knows it isn't right, he can't just pretend that he's not involved. Defendant BURNS again encouraged Plaintiff WILSON to apply for more jobs and said that he thought she was doing great.

99. On February 13, 2018, Plaintiff WILSON was asked by Defendant BURNS to work a special Mardi Gras event for Defendant CITY; her entire chain of command was aware that she would not be in the office that day, but would be working an evening shift at the event, beginning at 4pm. At 2:31pm that day, Defendant WATKINS called Plaintiff WILSON's work cell phone. As she was not yet working, she did not answer. At 2:37pm, Defendant WATKINS then sent an email asking Plaintiff WILSON if she was at work that day, saying that he had no information that she wouldn't be there. After receiving no answer on Plaintiff WILSON's work cell phone and no response to his email, within a few minutes, Defendant WATKINS next called Plaintiff WILSON's home phone number. Plaintiff WILSON recognized the caller identification and answered the call, asking Defendant WATKINS why he was calling her at home. Defendant WATKINS asked if she was in the office because no one had seen her that day and she had missed the annual DARM department-wide meeting that morning. Plaintiff WILSON told him that, as Defendant WATKINS

38

COMPLAINT

was acutely aware, she was working a special late shift at the Mardi Gras event and therefore was not expected to be in the office. Defendant WATKINS provided no explanation as to why he was aggressively searching for Plaintiff WILSON, despite knowing that she was working that night. Plaintiff is informed and believes and hereon alleges that no other Defendant CITY employee has been subjected to such micromanagement and scrutiny by a supervisor, particularly being contacted at home even after being cleared to work a different shift as a favor to Defendant CITY. Plaintiff WILSON advised Defendant BURNS about this call and he admitted that Defendant WATKINS was out of line. The next day, Plaintiff WILSON sent an email to Defendant WATKINS delineating the timeline of events from the day before and again requesting that Defendant WATKINS only utilize her home phone number as a last resort after all other resources have been exhausted and after a reasonable response time has expired. Defendant WATKINS replied, incredulously pretending as if the reason for his blatant breach of privacy was that he was worried for Plaintiff WILSON's safety. He also confirmed that Defendant BURNS had spoken to him regarding the inappropriate nature of his actions and he apologized. Plaintiff WILSON responded and accepted his apology, while also telling him that she appreciated that he acknowledged her concerns and thanking him for respecting and understanding her areas of discomfort.

100. On or about February 18, 2018, Plaintiff WILSON was attempting to help a customer bring in his tires for Tire Amnesty Day. Plaintiff WILSON approached Defendant CITY employee Anna Manzulla, a senior on the tire team, to make arrangements for Plaintiff WILSON to go pick up the tires from this customer and bring them back for the tire team to collect. Plaintiff WILSON is informed and believes and hereon alleges, that Ms. Manzulla spoke with Defendant LACY regarding Plaintiff WILSON's plan for this customer and then determined and communicated to Plaintiff WILSON that she was not allowed to pick up these tires from this particular customer based on this conversation with Defendant LACY. Plaintiff WILSON had previously worked on the tire team and knew that this was normal practice for Defendant CITY, as she and other Defendant CITY employees had done this numerous times. Ms. Manzulla told Plaintiff WILSON that she could not pick up the customer's tires, so the customer would have to bring them in himself. Plaintiff WILSON told Ms. Manzulla that she was making it difficult for Plaintiff WILSON to do her job

39

COMPLAINT

and that because of her decision, the customer would have to make multiple trips to bring in all of the tires on his property. Plaintiff WILSON observed and photographed multiple other Defendant CITY trucks, all of which were operated by non-African-American Defendant CITY employees, on that same day that had picked up tires from customer locations and brought them back for the tire team to retrieve.

101. On or about April 10, 2018, Defendant BURNS sent out an email saying that he was recruiting for trainers for mental health. Plaintiff WILSON responded that she was interested in becoming a mental health trainer. About a week later, Defendant BURNS responded saying that Plaintiff WILSON wasn't eligible or qualified because of her job classification. He further said that "HR" was really cracking down on people working out of class. When Plaintiff WILSON questioned who he meant by "HR", Defendant BURNS said he was talking about Dena Kalar, who wasn't even in Defendant CITY's HR department. Plaintiff WILSON wasn't surprised that this order came from Ms. Kalar, considering she previously denied Plaintiff WILSON's request for bereavement leave for her grandfather's funeral. Plaintiff WILSON herself had previously worked out of class numerous times, but Defendant BURNS again could not offer any plausible reason for why she was blocked from doing so in this particular instance. Plaintiff WILSON is informed and believes and hereon alleges that another non-African-American Defendant CITY employee that had just been promoted to a CRS position was allowed to present a training to the entirety of Code Enforcement just a month before this.

102. On or about April 26, 2018, Plaintiff WILSON again interviewed for a Housing Program Supervisor position before a panel that included Defendant CUEVAS and Defendant CITY employees Letty Sharma and Christina Roberson. Plaintiff WILSON came in third after this interview panel. Defendant CITY has no precise policy, but typically the top three interviewees in this round of interviews are seriously considered for the position; however, sometimes Defendant CITY chooses the top four or only top two, or in more hiring processes than not that Plaintiff WILSON has been involved in, Defendant CITY will pull whoever they want from this round of interviews, regardless of their rankings. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY does not have an official policy in this regard precisely so they can

40

COMPLAINT

prevent anyone that they do not like from promoting, specifically Plaintiff WILSON on countless occasions, while also providing them the freedom to select their chosen candidates. On or about May 3, 2018, Plaintiff WILSON is informed and believes and hereon alleges that Defendant FURTADO approached a member of Plaintiff WILSON's interview panel and said that she wanted to change Plaintiff WILSON's ranking so that she wouldn't be seriously considered for the position. Plaintiff WILSON is also informed and believes and hereon alleges that Defendant FURTADO did actually change Plaintiff WILSON's ranking, which did actually prevent her from being seriously considered for and ultimately offered this position.

103. During the week of May 20th through 25th, 2018, Plaintiff WILSON and numerous other Defendant CITY employees attended a California Association of Code Enforcement Officers ("CACEO") training. On a break during this training, Defendant CITY employee Lisa Casillas approached Plaintiff WILSON, reminding her about a conversation that they had previously had regarding a sexual relationship between Ms. Casillas and Defendant WATKINS, who was Ms. Casillas' Senior at the time. In the previous conversation, Ms. Casillas had told Plaintiff WILSON that she didn't want to continue this sexual relationship with Defendant WATKINS but that she felt like she had to in order to keep her job. On this day during the training break, Plaintiff WILSON confirmed that she remembered the prior conversation. Ms. Casillas expressed discomfort and stress to Plaintiff WILSON because she had just witnessed Defendant WATKINS throw her under the bus to Defendant BURNS, who was Ms. Casillas' manager. Ms. Casillas then asked Plaintiff WILSON if she would mind if Ms. Casillas told Defendant WATKINS that she had told Plaintiff WILSON about the relationship and that Plaintiff WILSON was going to tell Defendant BURNS about it. Ms. Casillas thought that if she told Defendant WATKINS that Plaintiff WILSON was going to go to Defendant BURNS, who was also Defendant WATKINS' manager at the time, then Defendant WATKINS would leave her alone. Plaintiff WILSON said that she absolutely would mind because Defendant WATKINS was Plaintiff WILSON's supervisor at the time and she was worried that he would retaliate against her. Despite telling Ms. Casillas that she didn't want her to tell Defendant WATKINS, Plaintiff WILSON felt that Ms. Casillas, who she considered a friend, must have been desperate to ask her such a thing. Feeling as if her hands were tied, Plaintiff WILSON told

41

COMPLAINT

Defendant BURNS that she needed to meet with him the following week when she saw him that day on another training break.

104. On or about May 30, 2018, Plaintiff WILSON met with Defendant BURNS to address multiple concerns she had with the department. Plaintiff WILSON first told Defendant BURNS that she had been told by another co-worker that Plaintiff WILSON was regularly bad-mouthed by various Defendant CITY employees at the senior and supervisor meetings. Defendant BURNS' response was that he had been in those meetings and never heard anyone speak about Plaintiff WILSON, let alone bad-mouth her. Knowing that the co-worker that told her this had heard this directly from a senior that attended every one of these meetings and that he had no reason to approach Plaintiff WILSON with this information if it wasn't true, Plaintiff WILSON felt that Defendant BURNS brushed off her complaint and essentially said that she was lying. Although she felt discouraged, Plaintiff WILSON then told Defendant BURNS about the sexual relationship between Ms. Casillas and Defendant WATKINS and the fact that Ms. Casillas felt pressured to continue the relationship because Defendant WATKINS was her Senior. Plaintiff WILSON emphasized that she was telling Defendant BURNS this information for two reasons: (1) that she felt that Ms. Casillas was extremely desperate to attempt to have a third party get involved so that Defendant WATKINS would leave her alone; and (2) to put Defendant BURNS on notice that Plaintiff WILSON was worried about retaliation from Defendant WATKINS for having this information. Defendant BURNS said that he would take this information to Defendant CUEVAS and, remembering that Ms. Casillas was on medical leave at the time, asked Plaintiff WILSON if she would be willing to join Ms. Casillas for the meeting in which Defendant BURNS discussed the situation with her. Plaintiff WILSON said she would of course support Ms. Casillas if she wanted her to be there. Plaintiff WILSON is informed and believes and hereon alleges that Ms. Casillas was on medical leave at the time for stress stemming at least partially from this sexual relationship with Defendant WATKINS.

105. On or about June 4, 2018, Plaintiff WILSON ran into Defendant CARDELL on the elevator in City Hall. While on the elevator, Defendant CARDELL complimented Plaintiff WILSON's shoes; she thanked him. As Defendant CARDELL was getting off the elevator, Plaintiff

42

COMPLAINT

WILSON said something to the effect of "oh Jeff, did you forget about me?" Defendant CARDELL replied that he hadn't. Plaintiff WILSON said "well the investigation is unfinished and I'm still experiencing things." Defendant CARDELL replied "oh, this again about that bag? Jennifer [referring to Defendant CLARK] already spoke with you." Again appalled by Defendant CARDELL's cavalier treatment of Plaintiff WILSON's allegations of harassment, discrimination, and retaliation, especially considering his position as Director of HR, Plaintiff WILSON responded by asking what her conversation with Defendant CLARK about lack of promotion had to do with the investigation of her allegations against Defendant LACY. Quickly realizing his mistake, Defendant CARDELL replied that she was right, that the two things weren't related. Plaintiff WILSON asked Defendant CARDELL how long he was going to let Defendant LACY terrorize the division. Defendant CARDELL laughed and said, "really, Kiki? Terrorize? He's not terrorizing you or the division." Plaintiff WILSON was again thoroughly defeated by Defendant CITY's continued dismissal of her and her legitimate complaints and concerns regarding Defendant LACY's ongoing racially-motivated discrimination, harassment, and retaliation.

106. On or about June 7, 2018, Plaintiff WILSON unexpectedly needed to take a vacation day and called in that morning to do so. Defendant WATKINS and Ms. Kalar informed Plaintiff WILSON via email that she needed to take a sick day because of the short notice. Plaintiff WILSON responded that she wasn't sick and she therefore wasn't going to use a sick day and that she had plenty of accrued vacation days to use. After a string of emails, Plaintiff WILSON eventually sent the pertinent Administrative Order regarding vacation days and was finally allowed to take a vacation day. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has ever had to provide Administrative Orders to prove that she is allowed to use one of her lawfully accumulated vacation days.

107. On or about late June 2018, Plaintiff WILSON is informed and believes and hereon alleges that another Defendant CITY employee filed an internal complaint against Defendant LACY for racially-motivated conduct similar to that alleged herein by Plaintiff WILSON. Plaintiff WILSON is informed and believes and hereon alleges that this Defendant CITY employee's complaint has never been addressed or investigated by Defendant CITY. Plaintiff WILSON is also

43

COMPLAINT

informed and believes and hereon alleges that at least one additional Defendant CITY employee has also filed a similar complaint against Defendant LACY for racially-motivated conduct shortly before Plaintiff WILSON returned to work in December 2016, and that this complaint has similarly been ignored by Defendant CITY.

108. On or about July 3, 2018, Plaintiff WILSON noticed that Defendant LACY had placed paperwork on her co-worker's desk regarding his new work truck; this act reminded Plaintiff WILSON that her work truck had been in Fleet for repairs for several weeks. Plaintiff WILSON was originally supposed to pick up her truck right before the May 20th CACEO training, but had been told multiple times that it wasn't ready. Plaintiff WILSON went to Fleet on this day to inquire about the status of her truck and to request an explanation as to why Plaintiff WILSON's co-worker, who was essentially a brand-new Defendant CITY employee, was receiving a new truck, yet she still had the oldest in the entire fleet, despite her seniority. Defendant CITY employees at Fleet told Plaintiff WILSON that they had determined that her truck wasn't worth doing repairs on and they had been waiting for Defendant LACY to approve Plaintiff WILSON getting a new truck. Fleet also informed Plaintiff WILSON that hers was one of seven trucks that were deemed not worth repairing, yet all of the other six Defendant CITY employees had received their new trucks by this date. Plaintiff WILSON went to Defendant BURNS to inquire why she had not been given a new truck considering she had the single oldest truck in the fleet, yet had a high level of seniority. Defendant BURNS said that he had heard that her truck wasn't even up for replacement because it only had 80,000 miles on it. When Plaintiff WILSON pulled out her mileage logs to demonstrate that that wasn't true, Defendant BURNS said he'd look into it. Later that day, Defendant BURNS called Plaintiff WILSON back into his office to tell her that she was in fact getting a new truck and then proceeded to admonish her for not informing him of the condition of her truck earlier. Plaintiff WILSON responded saying that because Defendant LACY was in charge of Fleet that he should have been well-aware that the mileage log for her truck alone should have identified it as needing to be replaced; she continued on saying that when she does say something, it ends up being a problem and now she's being admonished for not saying something, so she felt like she can't win. On or about July 5, 2018, Plaintiff WILSON finally received her new work truck.

44

COMPLAINT

109. On or about July 10, 2018, Plaintiff WILSON returned to her desk during the day to find that her earbuds, which she typically draped across her workstation when she wasn't using them, had been neatly wrapped, zip-tied with a black zip-tie, and thrown behind her workstation. The only zip-ties that Plaintiff WILSON is aware of in her division are kept in a locked file cabinet to which only Defendant LACY has access. Plaintiff WILSON is informed and believes and hereon alleges that Defendant LACY zip-tied her earbuds. Plaintiff WILSON approached Defendant BURNS regarding this incident and he laughed and casually said something to the effect of "Kiki, I don't know why people here do the things they do." Exasperated by the continued casual treatment by Defendant CITY of Plaintiff WILSON's complaints regarding clear harassment based on her race, she returned to her desk. That same day she emailed Defendant BURNS, asking him to tell staff not to disturb anyone's personal items; Defendant BURNS did send out an email to that effect. No other investigation, inquiry, or remedy was provided to Plaintiff WILSON for this obvious invasion of her privacy.

110. Also on July 10, 2018, later in the day, Plaintiff WILSON was seated at her desk when Plaintiff SMITH approached. Plaintiff WILSON felt very uncomfortable with him walking up to her desk because all that she knew of him at that point was that he was close with Defendant LACY. Their only actual interaction had been in passing at the CACEO training in May 2018. When Plaintiff SMITH walked up to Plaintiff WILSON's desk, he didn't say anything, so Plaintiff WILSON asked him what he needed. Plaintiff SMITH looked around nervously and then handed her his business card on which he had written his personal cell phone; he told her that she needed to call him because he had some things to tell her. Plaintiff WILSON assumed that the topic must have been their union because there was a director's meeting that evening. Plaintiff WILSON attempted to call Plaintiff SMITH on his personal cell phone after work that day, but he didn't answer. After the FCEA director's meeting, Plaintiff WILSON again called Plaintiff SMITH. This time, he answered, telling her that he had resigned from his position with Defendant CITY but that he would need to call her the following day.

111. On the afternoon of July 11, 2018, Plaintiff WILSON was at work when she received a call from Plaintiff SMITH on her cell phone. Plaintiff WILSON went outside to speak with him.

45

COMPLAINT

Plaintiff SMITH started by apologizing to Plaintiff WILSON for having pre-judged her and told her that he couldn't stay working for Defendant CITY because he was a Christian man and he didn't think it was right what was happening; Plaintiff SMITH said that he had honorably served in the United States Navy to defend everyone, regardless of their color, race, gender, political affiliation, or religion. Plaintiff SMITH continued on, telling Plaintiff WILSON that Defendant LACY had told him to stay away from her back when he was a temporary employee with Defendant CITY. Plaintiff SMITH continued on, telling her that Defendant LACY had called her a "piece of shit," said that she was "trouble" and that she liked to "play the race card" but that she comes to work and does nothing. Plaintiff SMITH said that it was clear to him that Defendant LACY hated Plaintiff WILSON but that he didn't understand why. Plaintiff SMITH then hesitated and expressed discomfort with telling Plaintiff WILSON anything further, but Plaintiff WILSON implored him to continue on. Plaintiff SMITH told Plaintiff WILSON about Defendant LACY accusing him of secretly meeting with Plaintiff WILSON at the CACEO training in May and then reluctantly told her of the conversation he had with Defendant LACY in his truck wherein Defendant LACY referred to Plaintiff WILSON as an "entitled nigga." Plaintiff WILSON was so upset upon hearing the last comment that she had to hang up with Plaintiff SMITH. Plaintiff WILSON then started walking back into City Hall, but Defendant CITY employee Eva Flores, a friendly co-worker, saw her crying as she was walking in and approached her, asking what was the matter. Plaintiff WILSON didn't want to articulate what had just transpired and was likely too upset to do so; however, Ms. Flores continued to try to comfort her, commenting that she was very concerned because she'd never seen Plaintiff WILSON cry before. Eventually Plaintiff WILSON went inside to go get her things and leave for the day, but she saw Defendant BURNS standing in a hallway, talking with Defendant CITY employees John Giannetta and Christina Pasillas. Plaintiff WILSON approached Defendant BURNS and said that she needed to speak with him; Defendant BURNS refused, saying he had a meeting to attend. Plaintiff WILSON said okay and that she'd just speak with Defendant CLARK. As Plaintiff WILSON was walking towards Defendant CLARK's office, Plaintiff WILSON saw Ms. Flores standing by one of the conference rooms next to Defendant CITY employee Phil Skei. Plaintiff WILSON looked at Ms. Flores, still crying, and said "they're all

46

COMPLAINT

fuckin' liars - all of them," and then continued on to Defendant CLARK's office. Plaintiff WILSON told Defendant CLARK that Defendant LACY had called her a "nigga" and asked her if it's "going to take this white guy Charlie from Clovis to prove what has been happening" to her all along. Defendant CLARK repeated over and over again that she didn't know what to say but that she would talk to HR. Defendant CLARK told Plaintiff WILSON that she could leave for the day but that they would talk the following day. Plaintiff WILSON left City Hall and called her union labor representative Tony Silva on her way out to let him know everything that had happened.

112. The next day, on July 12, 2018, Plaintiff WILSON returned to work and sent Defendant CLARK a follow-up email to confirm the conversation that they had had the previous day. Given that Defendant LACY had uttered the worst of all racial slurs against Plaintiff WILSON, Goyette & Associates Attorney Heather Phillips also emailed Defendants CLARK and BURNS asking that Defendant LACY be put on leave immediately. Defendant CLARK replied with a generic response that Defendant CITY was taking this complaint very seriously and that they would look into Plaintiff WILSON's complaint against Defendant LACY.

113. On July 16, 2018, having heard nothing from Defendant CITY regarding her complaint or Defendant LACY being placed on leave, Plaintiff WILSON then received an email from Defendant CUEVAS (which courtesy copied Defendant WATKINS), inviting her to attend an "Action Letter Meeting" the following day, at which she had a right to representation. Plaintiff WILSON responded, asking Defendant CUEVAS what an "action letter" was, considering she had never heard that term used before. Defendant CUEVAS informed Plaintiff WILSON that it was "a letter in response to an action or incident." Plaintiff WILSON approached Defendant WATKINS in person, asking him if, as her director supervisor, he knew anything about this meeting. Defendant WATKINS originally denied knowing anything about the meeting, but eventually admitted that he had been made aware of an 'incident' that had happened the week before. Plaintiff WILSON then responded to Defendant CUEVAS' email, courtesy copying Mr. Silva, Ms. Phillips, her entire chain of command, including Defendants BURNS and CLARK, and Defendant CARDELL, telling Defendant CUEVAS that the term "action letter" was not defined in FCEA's Memorandum of Understanding or in Defendant CITY's municipal code and therefore asking if she would be subject

47

COMPLAINT

to any discipline at this meeting, and also telling her of her conversation with Defendant WATKINS. Defendant CUEVAS replied that the meeting was "to determine if any attention is necessary due to an event that occurred on July 11, 2018 at 3:30pm." Defendant CUEVAS also assured Plaintiff WILSON that "this meeting is not to present any discipline or progressive discipline." Plaintiff WILSON questioned whether this was a meeting or an investigation and if this was a response to her numerous complaints for ongoing retaliation, discrimination, and hostile work environment, including her most recent complaint regarding the candid use of racial slurs by Defendant LACY. Defendant CUEVAS clarified that this meeting was to discuss Plaintiff WILSON's own actions on that day and not any complaint that she filed. Additionally, Defendant CUEVAS said that discussions at this meeting "may determine progressive discipline if it is determined that any MOU, Municipal Codes, Policies, Rules, or Guidelines have been violated," and Defendant CUEVAS said this less than four hours after she had confirmed in the same email chain that this meeting was not for the purposes of any discipline. This exchange with Defendant CUEVAS left Plaintiff WILSON stunned; it was beyond reason that *her* 'actions' the day she found out that Defendant LACY had called her an "entitled nigga" were being investigated while Defendant LACY's use of the slur remained ignored.

114. The following day, July 17, 2018, Defendant CUEVAS sent another email on the above email chain, notifying everyone that she had been informed that Defendant CITY Attorney's office would be handling any questions or concerns and she cancelled the scheduled "Action Letter Meeting."

115. Also on or about July 17, 2018, Plaintiff WILSON attended an FCEA meeting and was approached by another Defendant CITY employee who told her that Defendant LACY had told him to stay away from Plaintiff WILSON because she was trouble.

116. On July 23, 2018, Defendant CUEVAS again emailed Plaintiff WILSON, courtesy-copying Defendant BURNS this time, asserting, without any explanation, that she was resetting their "Action Letter Meeting" for July 27, 2018. Defendant CUEVAS again said that the "discussion may result in the imposition of progressive discipline." After alerting Mr. Silva and requesting that the meeting date be changed to August 1, 2018, Plaintiff WILSON replied to

48

COMPLAINT

Defendant CUEVAS' email, courtesy-copying Defendants BURNS, CLARK, and CARDELL, and attaching four relevant email threads, which contained Plaintiff WILSON's most recent complaints made to Defendant CITY.

117. Incredibly, given that Plaintiff WILSON had reported that Defendant LACY had called her a "nigga" and that her source was a completely independent third party, Defendant CITY had still taken no discernible steps to initiate an investigation on the matter. On or about July 26, 2018, Plaintiff WILSON contacted Mr. Silva, again imploring him to demand that Defendant CITY at the very least move Defendant LACY, if not put him on administrative leave. Mr. Silva emailed Defendant CARDELL again requesting that Defendant LACY be at the very least moved from Code Enforcement. Plaintiff WILSON had received no news of an investigation into her complaint regarding Defendant LACY at this point, despite 15 days having passed and despite exchanging numerous emails with Defendant CITY regarding her own alleged actions on that same day.

118. On August 1, 2018, Plaintiff WILSON and Mr. Silva met with Defendants BURNS and CUEVAS for the aforementioned "Action Letter Meeting." Prior to starting the audio recording device and going on the record in the meeting, Defendant CUEVAS said that Plaintiff WILSON could receive a Letter of Understanding for her actions. Mr. Silva said that it was his understanding that an outside investigator was going to be hired to conduct the investigation into Plaintiff WILSON's most recent complaint against Defendant LACY and he suggested that Defendant CITY allow the investigation to be completed before determining whether Plaintiff WILSON was deserving of even a Letter of Understanding. Defendant CUEVAS flatly said no, again demonstrating Defendant CITY's willingness to ignore complaints made by African-American employees alleging especially egregious behavior, yet promptly and unabashedly investigate a complaint made by a Caucasian employee regarding his fabricated hurt feelings by the innocent actions of another. Defendant CUEVAS said that there were two to three witnesses that saw and heard what happened. Plaintiff WILSON said that there were only Ms. Flores and Mr. Skei that could see where she was looking and if and at whom she was pointing. Defendant CUEVAS insisted she had other witnesses. To date, Plaintiff WILSON has never learned what additional witness(es) Defendant CUEVAS was referring to and Plaintiff WILSON is informed and believes and hereon

49

COMPLAINT

alleges that Defendant CUEVAS was fabricating evidence to justify Plaintiff WILSON's ultimate discipline in this matter. Once on the record, Defendant CUEVAS informed Plaintiff WILSON that she had received an email from Mr. Skei on July 11, 2018, regarding "the incident." According to Defendant CUEVAS, Mr. Skei said that around 3:30pm that day he was standing by Conference Room 3071 and Plaintiff WILSON passed by, pointed directly at him, and said "they're all fuckin' liars – all of them." Mr. Skei said that he didn't respond and that Plaintiff WILSON kept walking. Mr. Skei also said that there was a Senior Inspector that was standing next to him that witnessed this. Defendant CUEVAS said that she had spoken with this Senior Inspector and she said that Plaintiff WILSON did say that statement. Plaintiff WILSON admitted that she had said those words, but said that she was talking to Ms. Flores, presumably the Senior Inspector that Defendant CUEVAS had spoken to, who was standing beside Mr. Skei, and who had previously seen that she was upset and tried to comfort her. Defendant CUEVAS said that Ms. Flores had told her that she thought that Plaintiff WILSON had been pointing at and speaking to Mr. Skei. Plaintiff WILSON explained that she wasn't pointing at anyone, let alone Mr. Skei, and that she was clearly distraught and emotional at the time. Defendant CUEVAS appeared indifferent. Plaintiff WILSON expressed her shock that Defendant CITY would attempt to discipline her for using colorful language when it happens all the time in Code Enforcement, including by supervisors and managers. Plaintiff WILSON then looked at Defendant BURNS and said "well, Tim [referring to Defendant BURNS] curses all the time as the manager." Neither Defendant BURNS nor Defendant CUEVAS replied. Plaintiff WILSON continued on by saying that she felt like this was disparate treatment and retaliatory because she's being singled out. Defendant CUEVAS responded by saying that in the past they've "had employees with unprofessional behavior and language" and they've been addressed through letters of understanding and letters of reprimand. Defendant CUEVAS said that if they didn't discipline her at this stage, then *that* would be disparate treatment. Both Plaintiff WILSON and Mr. Silva were shocked that they had to sit through a meeting addressing Plaintiff WILSON's legitimate emotional *reaction to* being called an "entitled nigga," rather than addressing the underlying complaint that a Defendant CITY employee had *called her* an "entitled nigga." Plaintiff WILSON immediately reminded Defendant CUEVAS that she had just learned that she

50

COMPLAINT

had been called a "nigga" and in that moment she was trying to address it. Mr. Silva interjected because Plaintiff WILSON was becoming emotional; he suggested that the interview be concluded because Defendant CUEVAS should have everything she needed.

119. On or about August 2, 2018, Ms. Casillas approached Plaintiff WILSON, having returned from medical leave shortly before then. Ms. Casillas admitted to Plaintiff WILSON that she had told Defendant WATKINS in January 2018 that Plaintiff WILSON knew about their relationship, despite having pretended that he didn't know during their conversation at the CACEO training in May. Ms. Casillas also admitted that Defendant WATKINS was constantly asking her about Plaintiff WILSON regarding her whereabouts, her friends, and her acquaintances. Plaintiff WILSON then admitted that she had told Defendant BURNS about the relationship shortly after the CACEO training. Ms. Casillas was a little upset with Plaintiff WILSON for having done so, but Plaintiff WILSON explained that she felt as if Ms. Casillas had tied her hands on the matter. Plaintiff WILSON then began to reflect on Defendant WATKINS' behavior over the last several months, realizing that he had been treating her even worse ever since Ms. Casillas told him that Plaintiff WILSON knew about their relationship. Plaintiff WILSON had previously assumed that Defendant WATKINS was treating her badly based on his close relationship with Defendant LACY, but then realized that his behavior had worsened over the last several months; Ms. Casillas had simply provided the context for Defendant WATKINS' increasingly negative treatment of Plaintiff WILSON.

120. On or about August 3, 2018, Plaintiff WILSON was walking out of the back of City Hall when she saw Defendant CITY Mayor Lee Brand. Plaintiff WILSON had a working relationship with Mayor Brand, so she approached him and told him about the disgusting racial slur uttered by Defendant LACY. Mayor Brand asked if Defendant LACY was still working there, and when Plaintiff WILSON said yes, Mayor Brand responded that he should be fired. Mayor Brand then gave Plaintiff WILSON his cell phone number because he wanted to discuss the matter further. Plaintiff WILSON politely declined his request to call him, saying that she wanted to speak with him in person. Later that day, Plaintiff WILSON sat down with Mayor Brand in his office. Plaintiff WILSON told Mayor Brand about the anonymous letters that led to her lay-off, the history of

51

COMPLAINT

Defendant LACY's racially-motivated targeting of her, the additional fees charged for weed abatements, and her subsequent conversations with Defendants CLARK, BURNS, and CARDELL. Plaintiff WILSON later received a text message from Mr. Silva letting her know that Defendant LACY would be moved the following Monday, August 6, 2018.

121. On or about August 7, 2018, when Defendant LACY still hadn't been moved, Plaintiff WILSON gave Mr. Silva the cell phone number of Mayor Brand. Mr. Silva called Mayor Brand the following day and Defendant LACY was finally moved up to Parking that day; this was nearly one month after Plaintiff WILSON first reported to Defendant CITY that he had called her a "nigga," among other things.

122. Also on or about August 7, 2018, Defendant CITY held a training for all management and supervisorial staff regarding professional behavior and language in the workplace. Plaintiff WILSON is informed and believes and hereon alleges that this training was scheduled by Defendant CUEVAS and that it was scheduled as a direct result of Mr. Skei's fabricated complaint that Plaintiff WILSON pointed at him and said "they're all fuckin' liars." This again demonstrates that Defendant CITY takes very seriously the complaints made by their Caucasian employees, so much so that a department-wide training was necessary to rectify the alleged hurt feelings that Mr. Skei felt; yet, as of this date, Defendant CITY had taken zero steps to investigate African-American Plaintiff WILSON's obviously more serious complaint that Defendant LACY had called her an "entitled nigga."

123. On or about August 9, 2018, Plaintiff WILSON received an email from Defendant CUEVAS to schedule a second meeting regarding Mr. Skei's complaint for August 16, 2018.

124. On or about August 13, 2018, Plaintiff WILSON encountered Defendant LACY getting coffee in the breakroom on her floor, despite him being moved to an entirely different floor with its own separate breakroom. On or about August 15, 2018, Defendant LACY walked directly past Plaintiff WILSON's cubicle, which could have easily been avoided based on the lay-out of the third floor, if Defendant LACY was there for legitimate business. Having been forced to move to a different floor, Defendant LACY clearly knew that Plaintiff WILSON had reported the "nigga" comment and clearly felt no remorse for uttering such a disgusting racial slur, as he continued to

52

COMPLAINT

parade himself around on the floor from which he was just forcibly removed and in front of the person at which he had directed the slur. It was equally clear that no one at Defendant CITY had required that or cared whether Defendant LACY stayed clear of Plaintiff WILSON.

125. Also on or about August 15, 2018, an employee from Defendant LACY's team told Plaintiff WILSON, and subsequently made a formal complaint through FCEA, that Defendant LACY had held a meeting wherein he told staff that he had chosen to move upstairs because Plaintiff WILSON was bringing drama to the department by accusing him of being a racist. This team-member also said that during this meeting Defendant LACY polled each Defendant CITY employee present, asking each if they thought he was racist. This team-member also informed Plaintiff WILSON that he has heard on multiple occasions Defendant LACY utter racist comments regarding African-Americans, Hispanics, and Asians. Mr. Silva sent an email on this team-member's behalf to Defendant CARDELL and Mayor Brand regarding this incident.

126. On or about August 16, 2018, Plaintiff WILSON attended a division meeting, wherein Defendant BURNS informed all attendees that it's unacceptable to use profane language on the floor. He stressed that this also included himself because he was guilty of cursing as well. When Plaintiff WILSON returned to her desk after the division meeting, she found her reading glasses broken in half. Plaintiff WILSON immediately told Defendant BURNS and his response was something to the effect of "I can't believe that anyone would be that petty." Plaintiff WILSON reminded Defendant BURNS that she had been called a "nigga". Defendant BURNS said that he's never heard anyone use "that word" before and Plaintiff WILSON said "well, I hope not. I hope people aren't comfortable using that word." Plaintiff WILSON again was extremely discouraged by her manager's cavalier treatment of such an egregious complaint.

127. Later in the day on August 16, 2018, Plaintiff WILSON and Mr. Silva met with Defendants CUEVAS and BURNS for the second "Action Letter Meeting." Recognizing the absurdity of yet another meeting regarding Caucasian Mr. Skei's trivial and falsified complaint, and still no investigation into Plaintiff WILSON's complaint regarding Defendant LACY's racial slur, Mr. Silva wished to put several things on record before the subject of the meeting began. Mr. Silva noted this absurdity, and then made it clear that Plaintiff SMITH resigned under duress and was told

53

that he wouldn't make probation unless he ostracized Plaintiff WILSON and that that was what tipped off this whole investigation into Defendant LACY's racist comments. Mr. Silva continued on to say that Plaintiff SMITH felt that if he even said "hello" to Plaintiff WILSON that he wouldn't make probation, so he resigned; Mr. Silva commented that that's a pretty serious allegation from someone who doesn't even know Plaintiff WILSON and has no axe to grind. Mr. Silva further reiterated that FCEA had asked for Defendant LACY to be put on administrative leave but that he still hadn't been. Mr. Silva also described the team meeting that Defendant LACY held, wherein he asked each Defendant CITY employee whether they thought he was racist. Mr. Silva asserted that Defendant LACY was a supervisor that still had access to the pool of potential witnesses prior to the investigation and that that was unacceptable. Mr. Silva advised that Plaintiff WILSON's glasses had been broken that morning and that her earbuds had been zip-tied previously, yet there was never any questions or investigation into those acts. Mr. Silva then questioned again why Defendant LACY was still in the building when he was the subject of an investigation that was brought to light by someone else; he additionally told Defendant CUEVAS he had written an email to Defendant CARDELL the previous day with the same question. Also during this meeting, Plaintiff WILSON expressed her desire for complete transparency for all of those involved; she asked whether Defendant FURTADO was aware of these action letter meetings, because she had been left off of the email chains between Defendant CUEVAS and Plaintiff WILSON. Defendant CUEVAS confirmed that Defendant FURTADO was aware of these action letter meetings as well as the complaint that Plaintiff WILSON had made against Defendant LACY. Plaintiff WILSON also made it clear that she was aware that Defendant CUEVAS was involved in her failure to promote complaint because she was on one of her interview panels, so she wasn't a completely neutral party in this matter. Both Plaintiff WILSON and Mr. Silva expressed their confusion as to why Defendant CITY was spending so much time to investigate Plaintiff WILSON's reaction to being called a "nigga" by a Defendant CITY employee, yet no action had been taken to investigate that very racial slur by Defendant LACY or any of Plaintiff WILSON's previous complaints. Defendant CUEVAS said that Defendant CITY is looking into the entire incident but continued to stress that Plaintiff WILSON's reaction was inappropriate. Defendant CUEVAS then said that she

54

COMPLAINT

had another employee that was in a different cubicle that heard the incident. Plaintiff WILSON asked how that would prove who she was talking to, considering she had already admitted that she did say those words. Plaintiff WILSON again emphasized that she was not speaking to Mr. Skei and that she can't understand why he would think so considering she wasn't even looking at him. Defendant CUEVAS told her that she would be receiving a Letter of Reprimand for her actions. Mr. Silva objected, reminding Defendant CUEVAS that prior to going on the record at Plaintiff WILSON's first "Action Letter Meeting" on August 1st that she said it would be a Letter of Understanding; Mr. Silva continued that he had advised Plaintiff WILSON to take it at that point but she didn't think it was fair and opted to go on the record. Mr. Silva said that Plaintiff WILSON shouldn't be punished because she chose to go on record in the matter. Defendant CUEVAS said that it must have been a misunderstanding and then admitted that she had the Letter of Reprimand already printed out at the August 1st meeting. Mr. Silva again challenged Defendant CUEVAS, saying that for all of the time that Plaintiff WILSON had worked for Defendant CITY and had been discriminated against, that she finally got proof, and from an employee that Plaintiff WILSON didn't even know that had to resign under duress; Mr. Silva emphasized that this would be a very emotional moment for anyone, not unlike being hit by a car and reacting by saying the 'f' word. Defendant CUEVAS attempted to differentiate between Mr. Silva's example and what happened by saying that she directed her profanity at a manager. Plaintiff WILSON again said that she was not speaking to Mr. Skei and said that she has heard differently from witnesses than what Defendant CUEVAS was saying. Defendant CUEVAS immediately shifted gears and said that even if she was speaking to Ms. Flores, and not to Mr. Skei, that it would have been inappropriate. Plaintiff WILSON asked whether Defendant CUEVAS had recorded Ms. Flores' testimony; Defendant CUEVAS said that she hadn't recorded it, but had simply taken notes on what Ms. Flores said. Plaintiff WILSON asked that Ms. Flores' testimony be put on the record so that it's clear who said what; Defendant CUEVAS' response was that she wasn't doing a disciplinary investigation, implying that recording was unnecessary. Mr. Silva quickly corrected her, saying that a Letter of Reprimand is clearly and categorically a disciplinary action, while a Letter of Understanding is not. Mr. Silva further explained that when Plaintiff WILSON said "they're ALL liars," she was referring

55

COMPLAINT

to everyone who has tried to convince her that no one was discriminating against her because of her race and to everyone who has failed to protect her from this discrimination. Plaintiff WILSON ultimately signed the Letter of Reprimand as "refusing to sign" and requested the typed notes that Defendant CUEVAS allegedly took while interviewing Ms. Flores; Defendant CUEVAS provided such notes. Plaintiff WILSON ultimately wanted on the record that Mr. Skei was lying that she was pointing at him and speaking to him; that Plaintiff WILSON has always been professional with co-workers even if they've been complete jerks to her; and she reiterated that she wanted Ms. Flores to be put on the record. Overall, this second "Action Letter Meeting' confirmed that Defendant CITY was more committed to investigating and handing down discipline for trivial and falsified complaints by Caucasian employees than prioritizing or taking any action whatsoever on complaints made by African-American employees, even when the complaint involves the worst racial slur possible.

128. Later that same day, August 16, 2018, Plaintiff WILSON received a voicemail from Defendant CARDELL notifying her that Defendant LACY had finally been put on administrative leave and that the outside investigator, Dallas Selling, would be contacting her for an interview.

129. Over the next two weeks, Plaintiff WILSON observed Defendants FURTADO and CUEVAS having numerous meetings, whispering, and exchanging looks between them. Defendant BURNS had finally asked Plaintiff WILSON how much her glasses cost to replace and Plaintiff WILSON had gotten back to him with an estimate right away. On or about August 31, 2018, Defendant BURNS approached Plaintiff WILSON and asked her to meet him in Defendant CUEVAS' office; Plaintiff WILSON assumed that they wanted to further discuss replacing her glasses, so she didn't think to bring a recording device or to ask for the right to representation. When Plaintiff WILSON went to Defendant CUEVAS' office, Defendant BURNS was already there, and Plaintiff WILSON was immediately told that, at the direction of the Defendant CITY Attorney and personnel, she was being put on administrative leave. The paperwork that Plaintiff WILSON was given was done hastily, as Defendant LACY's position was still typed out in the body of the Notice, but was then crossed out in pen to reflect that Plaintiff WILSON held the position of CRS. Plaintiff WILSON questioned why she was being penalized and why Defendant CUEVAS was acting as if

56

COMPLAINT

she had done something wrong; Defendant CUEVAS then attempted to argue that Plaintiff WILSON wasn't being penalized because she was being put on *paid* administrative leave, as opposed to unpaid. Plaintiff WILSON said that her being paid is irrelevant to the perception of her being put on leave after having made a complaint. Defendant CUEVAS' response was that Defendant CITY wanted to "maintain the integrity of the investigation." Plaintiff WILSON told Defendants BURNS and CUEVAS that she thought this action was retaliatory and that it didn't make sense that all of a sudden Defendant CITY wanted to maintain the integrity of the investigation after already allowing Defendant LACY to be in contact with witnesses for over a month following Plaintiff WILSON's complaint. Defendant CUEVAS then told Plaintiff WILSON that she would need to return all of her Defendant CITY equipment and clear off her desk. Plaintiff WILSON said that she didn't want to clear off her desk because then it would look even more so as if she had done something wrong; Defendant CUEVAS simply said that that was her opinion. Defendant BURNS then went down the list of Defendant CITY items that Plaintiff WILSON would need to turn in and Plaintiff WILSON acknowledged that she would, of course, return all of those items. Entirely inconsistent with Defendant CUEVAS' contention that Plaintiff WILSON was not being punished, Defendant CUEVAS then informed Plaintiff WILSON that she would be supervised when she returned to her desk to ensure that she did not take any Defendant CITY property. Although Defendant BURNS chose not to watch her pack up her personal belongings, after Plaintiff WILSON returned all of her Defendant CITY equipment to him, Defendant BURNS told Plaintiff WILSON that he was directed to escort her from the building, which was also entirely inconsistent with the contention that Plaintiff WILSON was not being punished. Plaintiff WILSON was completely humiliated and is informed and believes and hereon alleges that Defendant CITY intentionally and maliciously subjected Plaintiff WILSON to this retaliatory behavior for that precise reason. Plaintiff WILSON is also informed and believes and hereon alleges that Defendant CITY intentionally withheld, at the time she was told to go to Defendant CUEVAS' office, the information that Plaintiff WILSON was being put on paid administrative leave that day for the precise reason that she would not be able to notify her union or attorney.

///

57

COMPLAINT

130. Plaintiff WILSON was 'interviewed' by Defendant CITY's outside and allegedly neutral investigator, Dallas Selling, on or about the following dates: September 19, 2018; October 1, 2018; October 11, 2018; October 23, 2018; December 5, 2018; and December 19, 2018. In each 'interview', Plaintiff WILSON explained the history of her employment with and the discrimination, harassment, and retaliation that she suffered at the hands of Defendant CITY over the preceding 14 years; Ms. Selling asked minimal to no questions. At the end of the last 'interview' on December 19, 2018, after Plaintiff WILSON had talked cumulatively for over 15 hours, Ms. Selling announced that she had had some questions but that Plaintiff WILSON had answered all of them. Plaintiff WILSON gave Ms. Selling a list of suggested people to interview and a list of suggested questions to ask in her interviews. Plaintiff WILSON is informed and believes and hereon alleges that Ms. Selling did not interview most, let alone everyone, on Plaintiff WILSON's list and that she did not ask any of Plaintiff WILSON's suggested questions. Plaintiff WILSON is further informed and believes and hereon alleges that the focus of Ms. Sellings' questions was on Plaintiff WILSON's friendships, mannerisms, and whether or not she is considered a "confrontational" person, rather than asking questions in furtherance of the actual complaint at hand, namely that Defendant LACY had called Plaintiff WILSON an "entitled nigga."

131. Based on Plaintiff WILSON's previous experiences with Defendant CITY and their investigations into her prior complaints, she asked Ms. Selling at her first interview how and why she was retained and what her interest was in this investigation. Ms. Selling told Plaintiff WILSON that she assumed she was retained because her office is downstairs from the Betts & Rubin office and that she knows Mr. Betts, but that she typically does family law and conservatorships. Betts & Rubin is the firm that operates as outside counsel for Defendant CITY and who represented Defendant CITY against Plaintiff WILSON's first lawsuit. When Plaintiff WILSON told Ms. Selling of this fact and asked her whether she rented from Betts & Rubin, since they owned that building, Ms. Selling said that she rented directly from a third owner and that she was unaware of any previous litigation, but that she was aware that Betts & Rubin represented Defendant CITY. Ms. Selling said that she was told that the reason she was hired was because Plaintiff WILSON had been unhappy with prior investigations. Plaintiff WILSON is informed and believes and hereon

COMPLAINT

alleges that Ms. Selling was retained because of her relationship with Betts & Rubin and that this presented a clear conflict of interest and compromised the entire alleged investigation completed by Ms. Selling. Plaintiff WILSON is further informed and believes and hereon alleges that the retainer of Ms. Selling presented an even clearer conflict of interest because Ms. Selling and Defendant FURTADO are at the very least acquaintances, as they were each included in Fresno's 40 under 40 in 2012 and 2014, respectively. Plaintiff WILSON discussed Defendant FURTADO at length over the course of her six interviews with Ms. Selling. Further, according to Defendant LACY, as alleged by and through his attorney, J. Brent Richardson, in his June 3, 2019 government damages claim sent to Defendant CITY, Ms. Selling additionally compromised the integrity of her investigation when she told Defendant LACY at the conclusion of her interview of him that "she believed none of the witnesses she had interviewed supported Ms. Wilson's allegations of wrongdoing."

132. On or about October 12, 2018, Plaintiff WILSON is informed and believes and hereon alleges that Defendant ESTABROOKE, despite having retired a year earlier, came to Code Enforcement looking for Defendant LACY. Defendant CITY employee Danny Smith told Defendant ESTABROOKE that Defendant LACY was on leave and that it was bullshit how they're treating him and that he doesn't even know what's going on. Defendant ESTABROOKE told Danny Smith to tell Defendant LACY that Defendant ESTABROOKE would vouch for him. Considering Defendant ESTABROOKE was Plaintiff WILSON's manager for a number of months, it is particularly disgusting that Defendant ESTABROOKE, without knowing any details, would just blindly support Defendant LACY. Plaintiff WILSON is informed and believes and hereon alleges that this type of blind support, which can also be attributed to numerous other Defendant CITY employees that Ms. Selling interviewed, also contributed to Ms. Selling's investigation being at the very least compromised.

133. On or about December 13, 2018, Plaintiff WILSON interviewed for yet another Senior CRS position; on the panel was Defendant CITY employee Randy Calvert, Ms. Flores, and Defendant CITY employee Erin Martin When Plaintiff WILSON saw Mr. Calvert on the panel, she knew that she would not be promoted, remembering a conversation that she had had with a Defendant CITY employee regarding Mr. Calvert. This employee had told Plaintiff WILSON that

59

COMPLAINT

Mr. Calvert had made the racist comment to other Defendant CITY employees that he didn't want "that shit over here," referring to when Plaintiff WILSON had interviewed for his team. Mr. Calvert's questions, tone, and body language during this interview were in keeping with what this employee had told Plaintiff WILSON and, needless to say, she did not get this position.

134. On or about December 27, 2018, Plaintiff WILSON, realizing that she had completely forgotten to discuss in her interviews anything relating to the day that she was put on administrative leave, recorded herself discussing the events of August 31, 2018 and sent the tape to Ms. Selling and Mr. Silva.

135. On or about January 30, 2019, Plaintiff WILSON interviewed for a Housing Program Supervisor position; on this panel was Defendant WATKINS, a friend of Defendant BURNS, and a third person that Plaintiff WILSON did not recognize. At one point, Defendant WATKINS said to Plaintiff WILSON something to the effect of "give an example of an incident or situation that you were not proud of that you could have handled differently." Plaintiff WILSON is informed and believes and hereon alleges that Defendant WATKINS was pointedly asking her to admit that she could have handled the incident with Mr. Skei differently. Plaintiff WILSON felt that this question was entirely retaliatory, in line with the other retaliatory treatment that Plaintiff WILSON had already suffered at the hands of Defendant WATKINS due to her knowledge of his relationship with Ms. Casillas and his close friendship with Defendant LACY. Again, Plaintiff WILSON was not offered this position.

136. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY invited her to attend these two interviews while on administrative leave based on her list eligibility, knowing full-well that Plaintiff WILSON would not even be seriously considered, let alone offered, the ultimate positions because she was still on administrative leave. Plaintiff WILSON is further informed and believes and hereon alleges that Defendant CITY intentionally and maliciously subjected her to such interviews to exacerbate her emotional distress associated with being put on leave and enduring interviews impaneled with Defendant CITY employees who have previously and continuously subjected Plaintiff WILSON to racially-motivated discrimination, harassment, and retaliation.

60

COMPLAINT

137. On or about June 20, 2019, Defendant CITY Council voted to move the Code Enforcement division from DARM to the Defendant CITY Attorney's office, effective July 1, 2019.

138. On or about July 16, 2019, Plaintiff WILSON received a call from Defendant CITY employee Erica Camarena in the Defendant CITY Attorney's office, requesting that Plaintiff WILSON return to her employment with Defendant CITY, under the purview of the Defendant CITY Attorney's office, the following Monday, July 22, 2019. Plaintiff WILSON was taken completely aback, considering she had not heard from anyone at Defendant CITY regarding her employment or the underlying investigation for nearly a year. Ms. Camarena told Plaintiff WILSON that it had come to her attention that there were two employees on paid administrative leave and that that was unacceptable. Plaintiff WILSON told Ms. Camarena that she was very uncomfortable with this phone call and that she wanted to speak with her attorneys; Ms. Camarena commented that she likely should have contacted Plaintiff WILSON's attorneys first. Plaintiff WILSON then provided her attorney, Gary Goyette, with Ms. Camarena's contact information and he left a voicemail for Ms. Camarena that afternoon. Plaintiff WILSON is informed and believes and hereon alleges that the immediacy of her return to work is direct retaliation for Plaintiff WILSON filing a Claim for Damages with Defendant CITY the month prior.

139. On or about July 17, 2019, Mr. Betts returned Mr. Goyette's call, in lieu of Ms. Camarena, as outside counsel for Defendant CITY. Mr. Betts told Mr. Goyette that he would be sending a letter regarding Plaintiff WILSON reporting back to work on July 22, 2019. Once that letter was received, Mr. Goyette issued a response letter, requesting that Defendant CITY rescind or delay Plaintiff WILSON's return to work unless and until a status update of the investigation was provided and questioning whether Defendant LACY was returning to work as well.

140. On or about July 18, 2019, Mr. Betts issued a response letter to Mr. Goyette's July 17th letter, informing him that the investigations were not complete, but that they "have proceeded to a sufficient stage that the City is confident that it is appropriate for both Ms. Wilson and Mr. Lacy to return to work." The letter additionally noted that Plaintiff WILSON's position in the newly reassigned Code Enforcement division "will not require her to have any contact with Mr. Lacy." Other than "incidental situations in which two employees who both work in City Hall happen to

61

COMPLAINT

pass in the parking lot or hallway, there is no reason for them to have any contact or interactions." The letter finally addressed the issue of whether Plaintiff WILSON would be allowed to have Mr. Silva accompany her to her first meeting with Doug Sloan, Defendant CITY Attorney, on her first day back at work; Mr. Betts was allowing this.

141. On or about July 22, 2019, Plaintiff WILSON returned to her employment with Defendant CITY and, with Mr. Silva present, immediately met with Mr. Sloan, Ms. Camarena, and Defendant CITY employee Christina Roberson. At this meeting, Mr. Silva expressed his obvious concern that Plaintiff WILSON was forced to work on the same floor in the same department as Defendant LACY who was accused of uttering the most despicable racial slur in existence in reference to her, an accusation which was initiated by Plaintiff SMITH who had no dog in this fight. Mr. Silva expressed his disappointment in Defendant CITY's reaction to this accusation and noted that he has worked with numerous cities but that Defendant CITY is the only one that would bring back the offending employee on the same day as the complaining employee when the investigation was incomplete; Mr. Silva again implored Defendant CITY to put Defendant LACY back on administrative leave until the investigation was complete, but Mr. Sloan refused. Ms. Camarena, who had now been introduced as Plaintiff WILSON's manager, said something to the effect of "we just want professionalism from both of you." Plaintiff WILSON responded asking, "okay, so then this is my fault?" Ms. Camarena immediately began tripping over her words, but eventually said that that's not what she said; Mr. Silva confirmed that that's exactly what he had heard her say. Ms. Camarena then asked Plaintiff WILSON how she would handle herself if she ran into Defendant LACY. Mr. Silva responded, asking about Mr. Betts' last letter and its contention that Plaintiff WILSON and Defendant LACY would only have incidental contact, explaining that not only will they be on the same floor, but they'd be sitting about 100 feet from each other and would be sharing the same breakrooms. Mr. Sloan again did not express any concern regarding these points and flatly said that if there's ever a problem, he wanted to be notified.

142. Once this initial meeting was over and Mr. Silva had left, Ms. Camarena and Ms. Roberson escorted Plaintiff WILSON to the third floor, where her new cubicle was located, directly outside Ms. Camarena's and Ms. Roberson's offices, amongst other Defendant CITY Attorney

investigators. Plaintiff WILSON noticed that she was the only former Code Enforcement member that was now located within this new area and that the area seemed to have very high traffic, with staff routinely passing through and by hers and the other investigators' workstations. Ms. Camarena then led Plaintiff WILSON into her office where Ms. Roberson, Plaintiff WILSON's new supervisor, was waiting, allegedly to discuss Plaintiff WILSON's new position on the legal team. However, Ms. Camarena used this opportunity away from Mr. Sloan and Mr. Silva to again stress that she expected professionalism from "both parties" and to ask Plaintiff WILSON if she would be able to get her job done and work with the public. Plaintiff WILSON reminded Ms. Camarena that there had never been complaints about her work ethic or productivity and that her issues with Defendant CITY had revolved around her lack of promotion, discrimination, retaliation, harassment and hostile work environment -- all based on her being African-American -- inappropriate sexual relationships within the department, illegal code enforcement processes, and lack of accountability with leadership. Ms. Camarena told Plaintiff WILSON that she needed to "leave the baggage behind" and that she needed to view this position as a fresh start on a new team. Plaintiff WILSON expressed her shock and disbelief, saying that she could not act as if nothing had happened, especially because the investigation was still ongoing and because the person who had directed the racial slur at her was brought back to work on the same day and on the same floor. Ms. Camarena immediately said that the investigation had nothing to do with her position moving forward and that she would absolutely not tolerate any disruptive behavior or issues with other employees in regards to the ongoing investigation. Ms. Camarena then asked Plaintiff WILSON again, "I never got a straight answer from you – what would happen if you ran into Howard?" Plaintiff WILSON replied that she would do what she has always done with Defendant LACY, which is to just go about her own business and ignore him. Plaintiff WILSON then said that Ms. Camarena's accusatory and aggressive tone insinuated that Ms. Camarena had learned information about Plaintiff WILSON prior to this meeting; Ms. Camarena of course denied knowing anything about her prior to her phone call the previous week. Ms. Camarena then informed Plaintiff WILSON that she would be reporting to Mr. Skei for training on Accela, one of Defendant CITY's internal computer programs. Plaintiff WILSON explained to Ms. Camarena that she wasn't comfortable being trained by Mr. Skei,

63

COMPLAINT

considering he had filed a fabricated complaint against her, for which she had been unjustly disciplined; further, Plaintiff WILSON reminded Ms. Camarena how swiftly Defendant CITY addressed Mr. Skei's complaint, all while ignoring Defendant LACY calling Plaintiff WILSON an "entitled nigga", which ultimately culminated in her being placed on administrative leave. Ms. Camarena snapped back at Plaintiff WILSON saying something to the effect of "why don't you make a list of the people that you *are* able to work with." Plaintiff WILSON took great offense to this comment, especially considering it came from her brand-new manager on her very first day back and considering all that had already transpired that day. Plaintiff WILSON said that she could work with anyone and be professional and cordial but reiterated that she did not feel comfortable receiving training from Mr. Skei. Ms. Roberson interrupted, suggesting that perhaps Defendant CITY employee Christina Pasillas could train Plaintiff WILSON; both Plaintiff WILSON and Ms. Camarena agreed. Plaintiff WILSON did in fact receive this training from Ms. Pasillas on or about August 12, 2019. Throughout the meeting, Plaintiff WILSON was gesturing with her hands as she spoke, an innocent habit that apparently did not sit well with Ms. Camarena, because she exploded at one point, accusing Plaintiff WILSON of putting her finger in Ms. Camarena's face. However, Plaintiff WILSON was situated on the opposite side of a table from Ms. Camarena, with a chair and Ms. Roberson between them. Plaintiff WILSON said that Ms. Camarena might not like the things that she's saying or that she gestures with her hands and fingers when she talks, but for Ms. Camarena to accuse Plaintiff WILSON of at the very least being in Ms. Camarena's personal space was absolutely unacceptable. Ms. Roberson immediately interrupted, saying that she didn't want to be a mediator but that she understood both Plaintiff WILSON's and Ms. Camarena's points but also thought that emotions were running high because of the previous meeting. Ms. Camarena continued to question whether Plaintiff WILSON could do her job, emphasizing that Defendant CITY Attorney's office worked quite closely with Defendant CITY Council and that Plaintiff WILSON's position would be a Council Liaison. Ms. Camarena admitted that her office was caught off guard when the Council announced that Code Enforcement would be placed within her office. Plaintiff WILSON replied that she was aware that the Council had been working on the transition for quite some time; Plaintiff WILSON reminded Ms. Camarena that she had previously been a

64

COMPLAINT

Council Liaison for Code Enforcement for a couple of years. Once Ms. Camarena knew that Plaintiff WILSON had some sort of affiliation with the Council, her entire demeanor, including her physical body language, changed, and she grabbed Plaintiff WILSON's hand and said something to the effect of "La-Kebbia, let's start all over. I really want to work with you. Let's start over." Ms. Camarena then started asking Plaintiff WILSON about her husband, who is a Defendant CITY Police Department Sergeant, saying that they had worked together when Mr. Wilson was in Internal Affairs. This of course contradicted Ms. Camarena's insistence earlier that she knew nothing of Plaintiff WILSON prior to their phone call the previous week. Before ending the meeting, Plaintiff WILSON spoke about feeling scrutinized because of the location of her new workstation, especially when compared to Defendant LACY's placement, which was tucked away from the main throughways but is immediately adjacent to the door to the main breakroom on the third floor. Plaintiff WILSON requested that since she and Defendant LACY were going to be in such close proximity anyway, that she be able to sit at her old desk so that no additional attention was drawn to her. Mr. Sloan was called up to the third floor to discuss Plaintiff WILSON's request to sit at her former workstation; after some discussion, it was agreed that it would be the best seating arrangement for her.

143. After Plaintiff WILSON moved back to her old workstation, she noticed that several items were missing out of her desk, the most important being her digital recorder, on which she had recorded her interviews with Mr. Bolton and with Defendant CUEVAS, among other things. Plaintiff WILSON alerted Ms. Camarena that it was clear that someone had gone through her things and had obviously taken her digital recorder; Ms. Camarena said she would address this. Later on, a co-worker who is known to be a friend of Defendant LACY came up to Plaintiff WILSON to apparently welcome her back to work. She asked Plaintiff WILSON how she was doing and then commented that Plaintiff WILSON's eyes looked sad. Plaintiff WILSON said she was doing as well as to be expected and nodded regarding the sad eyes comment. Then this co-worker said that Plaintiff WILSON had "brought it all on herself anyway" and then lingered at her workstation for a few minutes before walking away. Plaintiff WILSON went to Ms. Roberson to tell her of this incident, which perfectly demonstrated Plaintiff WILSON keeping to herself and someone else

65

COMPLAINT

approaching her to start drama. Plaintiff WILSON did not ask that Ms. Roberson do anything about it, but because of Ms. Camarena's earlier statements regarding a low tolerance for disruptive behavior, she felt as though she needed to alert Ms. Roberson as to how others treat her.

144. Once Plaintiff WILSON was able to more fully settle into her workstation and check her email, she saw that Mr. Skei had actually emailed her that morning to let her know that he'd be coming by her desk later to train her. Attempting to move past that email and the emotions that it presented, Plaintiff WILSON then found a second troubling email, which was forwarded to her from Ms. Roberson regarding Plaintiff WILSON's log-in information for Accela. Plaintiff WILSON scrolled to the bottom of the email to start at the beginning of the chain only to find that the original email was discussing Defendant LACY's log-in information first and started with an email directly from Defendant LACY to Mr. Skei. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY employee Mr. Skei intentionally left the chain between he and Defendant LACY in the email that he forwarded to Ms. Roberson in the hopes that Plaintiff WILSON would see it; at the very least, allowing Plaintiff WILSON to see this chain was a breach of Defendant LACY's privacy (i.e. Plaintiff WILSON having his log-in information), but more importantly, it showed Defendant CITY's blatant disregard for the sensitivity of the subject matter of the investigation and the intentional demonstration of such disregard.

145. Also on this day, despite Ms. Camarena and Ms. Roberson assuring Plaintiff WILSON that she would not need to train with Mr. Skei, he came to Plaintiff WILSON's desk to pass her a post-it note with a passcode for her to use during their training. When Plaintiff WILSON approached Ms. Roberson with this information, Ms. Roberson said "oh, we didn't get a chance to tell him." This statement by Ms. Roberson is further acknowledgement and confirmation that Plaintiff WILSON did not need to train with Mr. Skei, a seemingly minute fact which will become more critical *infra*.

146. The next day, on July 23, 2019, Plaintiff WILSON discovered that the computer she had been using before being put on administrative leave was retired so she didn't have access to any of her old files. Plaintiff is informed and believes and hereon alleges that Defendant CITY

misappropriated Plaintiff WILSON's digital recorder and desktop computer in an effort to withhold notes, documents, and evidence that Plaintiff WILSON had been gathering.

147. On July 24, 2019, Mr. Goyette emailed a letter to Mr. Betts regarding Plaintiff WILSON's first day back at work. Mr. Goyette reiterated the notable incidents outlined above and requested that Mr. Betts consider the letter notice of Plaintiff WILSON's formal objection and condemnation of Defendant CITY placing Plaintiff WILSON on the same floor as Defendant LACY, and bringing Defendant LACY back to work at all, considering the investigation was incomplete. Further, Mr. Goyette established that Plaintiff WILSON considers all of the statements and actions that occurred on Plaintiff WILSON's first day that were described earlier in the letter as continued retaliation, harassment, discrimination, and the failure to prevent such retaliation, harassment, and discrimination by Defendant CITY. Mr. Goyette received no written response from Mr. Betts or anyone at Defendant CITY for that matter, regarding the treatment of Plaintiff WILSON on her first day back to work.

148. Not surprisingly, Plaintiff WILSON had far more than incidental contact with Defendant LACY during her first few weeks back; specifically, in addition to seeing him in passing in the hallways of City Hall, Defendant LACY made a habit of congregating with other Defendant CITY employees right near her cubicle or at the very least walking directly by her cubicle multiple times per week. On one occasion, Defendant LACY and Plaintiff WILSON physically collided as Plaintiff WILSON was emerging from her cubicle.

149. On July 31, 2019, Plaintiff WILSON received an email invitation for an evaluation with Defendants WATKINS and BURNS and Ms. Camarena scheduled for Friday, August 2nd. Plaintiff WILSON is informed and believes and hereon alleges that this evaluation was scheduled in retaliation for Mr. Goyette's letter from the previous week. Also on this day, Ms. Roberson assigned Plaintiff WILSON three case assessments, two of which had been completed by Defendant CITY employees directly within Defendant LACY's chain of command. Plaintiff WILSON's job responsibilities included auditing the work of code inspectors, which required her to interact with those inspectors if she found that they have done something wrong. Of all the inspections that she has audited to date, she has found at least one mistake or deficiency in each and every one of them,

67

COMPLAINT

requiring her to speak directly to the inspectors and usually with their supervisors as well. The following day, August 1, 2019, Plaintiff WILSON met with an inspector who was in Defendant LACY's chain of command, Ms. Roberson, and Defendant CITY employee David Ceballos, who was apparently acting in Defendant LACY's place as Housing Program Supervisor for the first month of his return to allow Defendant LACY to become re-acclimated with his position. Had Mr. Ceballos not been put into this position, Plaintiff WILSON would have been forced to meet directly with Defendant LACY himself regarding the defective performance of his subordinate. Further, Plaintiff WILSON was not given a month or even a day to become re-acclimated to her position and was actually thrown into an entirely new one, again illustrating the disparate treatment that Plaintiff WILSON suffered because of her race.

150. On August 2, 2019, Plaintiff WILSON asked Ms. Camarena if Mr. Silva could be present for her evaluation meeting. When Ms. Camarena refused, Plaintiff WILSON said that she was uncomfortable meeting without Mr. Silva and suggested that a physical meeting was unnecessary anyway if they were simply going to hand her a written copy of an evaluation. Ms. Camarena agreed that the evaluation could simply be delivered to Plaintiff WILSON and she cancelled the meeting. Later that day, Ms. Roberson delivered the evaluation of Plaintiff WILSON's work from December 12, 2017 to December 11, 2018, signed by Defendants WATKINS, BURNS, and CLARK. As she handed the document to Plaintiff WILSON, Ms. Roberson made it clear that Defendant CITY Attorney's office had nothing to do with that evaluation. The evaluation included the same eight categories as the previous one that Plaintiff WILSON received, but this time "Improvement Needed" was marked for six of the eight categories, including: Job Knowledge, Skills, & Proficiency; Quality & Accuracy of Work; Responsiveness; Adaptability to Change; Interpersonal Skills; and Attendance. In the "Supervisor's Comments" section, Defendant WATKINS alleges "facts" and incidents which he mischaracterized, took out of context, or completely fabricated. After Plaintiff WILSON read through the evaluation, she approached Ms. Camarena about it, saying that it was not an accurate assessment of her work productivity and that Defendant WATKINS was again retaliating against her. When Ms. Camarena asked why Defendant WATKINS would be retaliating against her, Plaintiff WILSON told her about her knowledge of the relationship between

68

COMPLAINT

Defendant WATKINS and Ms. Casillas. Plaintiff WILSON reiterated everything that she had told Defendant BURNS more than a year prior and told Ms. Camarena the fact that she had told Defendant BURNS, yet nothing had been done to address her concerns, which had again come to fruition. Ms. Camarena simply told Plaintiff WILSON that she could submit a rebuttal to the evaluation within 15 days of receiving it; Plaintiff WILSON told her she would do that. Plaintiff WILSON is informed and believes and hereon alleges that this evaluation and its entirely falsified contents are direct and egregious retaliation for Mr. Goyette's letter regarding Plaintiff WILSON's first day back at work, for Plaintiff WILSON's knowledge and reporting of the relationship between Defendant WATKINS and Ms. Casillas, for Plaintiff WILSON's assertions to Ms. Camarena that there has never been any allegations against her regarding poor work ethic or productivity, and Defendant WATKINS' close relationship with Defendant LACY.

151. On August 8, 2019, Mr. Goyette emailed Mr. Betts another letter, this one addressing the fact that Plaintiff WILSON's assigned work tasks necessitated direct contact with Defendant LACY, despite Mr. Betts' contention that they would only have incidental contact. Mr. Goyette further articulated that not only does her position necessitate contact, but likely negative contact, considering her assignment is to review and assess whether inspectors directly under Defendant LACY's supervision have completed their inspections properly. Mr. Goyette requested that Mr. Betts respond and explain if or how these tasks would not result in regular contact with Defendant LACY. Mr. Goyette further pointed out that this exact scenario further established the impropriety of bringing back both Plaintiff WILSON and Defendant LACY prior to the investigation into Plaintiff WILSON's complaint was complete. Mr. Goyette, to date, has received no response from Mr. Betts regarding the concerns raised in this letter.

152. On August 9, 2019, Mr. Goyette received a phone call from Mr. Betts, to advise him that Plaintiff WILSON "had filed a sexual harassment claim" on behalf of someone else and that Defendant CITY had hired an outside investigator named Andrew Aller who would be contacting Mr. Goyette regarding setting up an interview with Plaintiff WILSON. Mr. Betts then acknowledged that he received Mr. Goyette's letter regarding Plaintiff WILSON interacting with Defendant LACY's subordinates and said that he was "looking into it."

69

COMPLAINT

153. Mr. Goyette then conferred with Plaintiff WILSON regarding the sexual harassment claim that she allegedly filed. Plaintiff WILSON confirmed that she had not filed any sexual harassment claim, but then reiterated her conversation with Ms. Camarena regarding Defendant WATKINS' retaliatory evaluation, wherein she discussed Defendant WATKINS' sexual relationship with Ms. Casillas.

154. On August 13, 2019, Rachel Simons, Attorney with Goyette & Associates, spoke with Mr. Aller regarding setting up an interview with Plaintiff WILSON. Mr. Aller advised that he was hired as an outside investigator by Defendant CITY to investigate a verbal complaint that Plaintiff WILSON had allegedly filed which reported a "sexual assault" on behalf of another person. Mr. Aller also advised that he was aware that there was pending litigation but that he was told that his investigation was completely unrelated to the litigation; still, Mr. Aller said that he was scheduling the interview through Plaintiff WILSON's attorney so that she had the opportunity to have representation with her at the interview. Ms. Simons told Mr. Aller that Plaintiff WILSON had reported no "sexual assault" and that she likely never filed any complaint at all; Ms. Simons additionally stressed that the topic of this interview was indeed related to the pending litigation, so she especially appreciated Mr. Aller reaching out. The interview was scheduled for the following week.

155. On August 14, 2019, the Fresno Bee published an article entitled "A Fresno City Hall employee quit – then got a big raise. This can't keep happening." The article said that a Defendant CITY employee told their supervisor that they were quitting and the supervisor responded that the employee would get an extra $6,500 in their final paycheck. Plaintiff WILSON is informed and believes and hereon alleges that the employee referred to in the article is, in fact, Defendant FURTADO, who left Defendant CITY effective the end of July. This further demonstrates the lengths that Defendant CITY will go to protect and elevate its Caucasian employees, which is especially appalling when compared to the extent that Defendant CITY prevents its African-American employees from promoting or excelling in any way.

156. On August 16, 2019, Plaintiff WILSON timely submitted her rebuttal to the retaliatory evaluation, including roughly 50 pages of emails supporting her contentions that Defendant

70

COMPLAINT

WATKINS had mischaracterized, taken out of context, or completely fabricated his criticisms about her work productivity. Plaintiff WILSON, to date, has not received any response to this rebuttal.

157. On or about August 21, 2019, Plaintiff WILSON went to HR to request a copy of the Family and Medical Leave Act ("FMLA") documents and other medical records contained in her personnel file. As Plaintiff WILSON has done numerous times before, she requested that HR make copies, provide the page count, and charge her per page for the copies; every time she has done so in the past, she has simply waited a few minutes in the lobby of HR for them to complete this task. On this particular day, however, Plaintiff WILSON was told by both receptionists in HR that the person who could complete her request was not there, but that they'd pass along her request. On or about August 26, 2019, Plaintiff WILSON received a voicemail from Defendant CARDELL's assistant, letting Plaintiff WILSON know that she had made copies of the requested documents, that Defendant CARDELL would not be charging her for the copies, and that the copied file was being sent to Plaintiff WILSON via inter-office mail. Plaintiff WILSON immediately returned her call, but she did not answer. Plaintiff WILSON then called Defendant CARDELL directly, asking him why her confidential medical files would have been sent via inter-office mail, which offers no confidentiality and considering Plaintiff WILSON could have simply walked to the first floor of City Hall to retrieve the documents, had she been notified that they were ready. Defendant CARDELL provided no response. Plaintiff WILSON requested that Defendant CARDELL locate and retrieve her confidential medical files from inter-office mail and allow her to pick them up personally. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has had their confidential personnel files sent via inter-office mail or otherwise subjected to such an obvious risk of a confidentiality breach. Plaintiff WILSON waited a while to hear back from HR, then went to the copy center herself, where inter-office mail goes through before delivery, asking about any mail for her; she was informed that HR picked it up 30 minutes prior. She then finally retrieved her confidential medical files directly from HR. After reviewing the copies, Plaintiff WILSON noticed that multiple documents were missing; she emailed Defendant CARDELL and his assistant on or about August 28, 2019, requesting the missing documents. Plaintiff WILSON was able to pick up the missing documents from HR on or about August 29,

71

COMPLAINT

2019; when Plaintiff WILSON inquired as to why those documents were not included in the first set of documents she received, Defendant CARDELL's assistant told her it was because "they were still working on them." Plaintiff WILSON's tedious and petty experience with HR is entirely consistent with the disparate treatment based on her race that she has been subjected to by Defendant CITY as pled *supra*.

158. On August 23, 2019, Mr. Aller interviewed Plaintiff WILSON regarding the sexual harassment claim that she had allegedly filed; Ms. Phillips attended with her. Unlike Ms. Selling, Mr. Aller had no apparent connection to Betts & Rubin and had a list of prepared questions for Plaintiff WILSON, which kept this interview organized, efficient, and on-topic. Plaintiff WILSON answered his questions and told him exactly what she had told Ms. Camarena regarding Defendant WATKINS' retaliatory evaluation and what she had told Defendant BURNS more than a year before regarding Defendant WATKINS' relationship with Ms. Casillas.

159. On or about August 27, 2019, Plaintiff WILSON's husband called Plaintiff WILSON to let her know that Defendant CITY employee Ana Rocha from HR had called for her at home, wanting to discuss setting up an Interactive Process ("IAP") meeting, per Plaintiff WILSON's request. Plaintiff WILSON had, the week prior, requested the meeting, while also providing a copy of her completed FMLA forms and doctor's note, explaining that she was seeking an accommodation to park at the "North Lot" parking lot at City Hall as opposed to the Defendant CITY employee lot that was several blocks away. Plaintiff WILSON called Ms. Rocha from work, asking why she would have called for her at home; Ms. Rocha responded that she did not know that Plaintiff WILSON had returned to work but that she was aware that she was being represented by an attorney, so Plaintiff WILSON was welcome to have her attorney present for the meeting. Plaintiff WILSON inquired about who told her she was represented by an attorney, but did not tell her that she was put back to work; Ms. Rocha eventually admitted that Defendant CARDELL had passed along that information. Plaintiff WILSON was also perplexed as to how Ms. Rocha would have thought that Plaintiff WILSON would be requesting an accommodation if she was still on administrative leave; Plaintiff WILSON did not, however, question Ms. Rocha further, and set the appointment to meet with Defendant CITY HR employee Trish Eichhorn for September 4, 2019.

72

COMPLAINT

On September 4, 2019, Plaintiff WILSON arrived to HR with Mr. Silva to meet with Ms. Eichhorn. Once the meeting began, Plaintiff WILSON and Mr. Silva learned that Ms. Rocha, Ms. Roberson, and Defendant CITY employees Christina Therrien and Jennifer DeRuosi were also joining the meeting in addition to Ms. Eichhorn. Mr. Silva questioned why Ms. DeRuosi, a Deputy Defendant CITY Attorney, was present for the meeting, telling her that the only other time an attorney was present for an IAP meeting it was because that attorney was acting as the manager of personnel and not as an attorney. Ms. DeRuosi stated in a hostile manner that there was nothing abnormal about her attending the meeting and that she was only there to ensure compliance with the Americans with Disabilities Act ("ADA"). At the outset of this meeting, it was clear to Mr. Silva and Plaintiff WILSON that Plaintiff WILSON was going to be treated differently than other Defendant CITY employees at IAP meetings, considering there was a Defendant CITY attorney present acting in such legal capacity, in addition to a diligent note-taker for the HR department. Ms. Eichhorn determined almost immediately that Plaintiff WILSON's doctor's note was insufficient and that Defendant CITY could not grant her requested accommodation to park in the lot at City Hall. Ms. Eichhorn's only suggestion was that Plaintiff WILSON get a handicapped placard so that she could park in the handicapped spots at City Hall; however, she offered no other accommodation directly from Defendant CITY. Plaintiff WILSON is informed and believes and hereon alleges that other Defendant CITY employees that attend an IAP meeting are typically told that the Defendant CITY would have to look into whether their requested accommodation could be met, while Plaintiff WILSON was outright told that her requested accommodation was rejected. Further, Plaintiff WILSON has observed on countless occasions other Defendant CITY employees parking in the requested lot, including some Code Enforcement employees, and having Defendant CITY's Parking Enforcement look the other way. When Plaintiff WILSON pointed out this fact to Ms. Eichhorn, she turned to Ms. Therrien and Ms. Roberson to ask them if that was true; both Ms. Therrien and Ms. Roberson confirmed that this was true. Regardless, Ms. Eichhorn insisted that Defendant CITY could not grant the requested accommodation. Plaintiff WILSON had been harassed by Defendants ESTABROOKE and WATKINS on no less than two occasions, at the direction of Defendant LACY, for parking her work vehicle at City Hall, yet other Defendant CITY employees, who are

73

COMPLAINT

not African-American, continue to do so without issue. Plaintiff WILSON is informed and believes and hereon alleges that non-African-American Defendant CITY employees have even been granted permission to park at City Hall by their managers. Having no other choice, Plaintiff WILSON agreed to get a more specific note from her doctor regarding her limitations before their next IAP meeting. When Plaintiff WILSON told Ms. Eichhorn that she would get another doctor's note, she also asked Ms. Eichhorn if she could have the original doctor's note back. At the time, the note was lying on the table. Ms. Eichhorn said "no, this is part of your permanent file." Plaintiff WILSON said okay and then asked to simply look at the note. Ms. Eichhorn quickly placed her hand on it and pulled it closer as if Plaintiff WILSON was going to steal it. Plaintiff WILSON said "I can't even see the note? I'm not going to take it." Ms. Eichhorn's physical response to Plaintiff WILSON in this scenario was entirely disrespectful, exaggerated, and overreactive, especially considering Plaintiff WILSON was simply asking to see the doctor's note which she had previously provided. Plaintiff WILSON is informed and believes and hereon alleges that no other Defendant CITY employee has had an IAP meeting in which the HR representative has acted with such suspicion and hostility. Ultimately, Plaintiff WILSON elected to rescind her request for accommodation, realizing that any additional attempts to meet with Defendant CITY would be met with similar suspicion and hostility.

160. On September 3, 2019, seven weeks after Plaintiff WILSON returned to work, Ms. Roberson emailed Plaintiff WILSON to tell her that she was working on getting Plaintiff WILSON a work-issued cell phone. Plaintiff WILSON reminded Ms. Roberson that she still didn't have access to the proper systems in Accela and was therefore unable to enter any of her documentation. Plaintiff WILSON was rushed back to work seven weeks earlier despite Defendant CITY being unable or unwilling to provide her with the appropriate equipment or access to do her job properly. Plaintiff WILSON is informed and believes and hereon alleges that Defendant CITY provided Defendant LACY with all of the appropriate equipment and access to do his job properly, in addition to giving him a one-month grace period during which he was allowed to get re-acclimated to his position; this further demonstrates Defendant CITY's disparate treatment of African-American

Plaintiff WILSON and Caucasian Defendant LACY. Plaintiff WILSON, to date, has still not received her Defendant CITY-issued cell phone.

161. On September 6, 2019, Ms. Roberson delivered to Plaintiff WILSON a letter from Defendant CARDELL regarding the results of Ms. Selling's investigation into Plaintiff WILSON's complaint of discrimination, harassment, and retaliation against Defendant LACY. The letter said that Ms. Selling determined that the facts and evidence that she obtained during her investigation were not sufficient to support any of Plaintiff WILSON's allegations. The letter in its entirety was a single page with a single paragraph purporting to be the resolution of an investigation into all of the foregoing incidents that Plaintiff WILSON laid out in explicit detail in more than fifteen hours of interviews with Ms. Selling; this was an investigation that took Ms. Selling nearly 14 months to complete and one which was so delicate that Plaintiff WILSON was put on paid administrative leave for nearly a year. This cursory document – with no explanation whatsoever as to how and why Ms. Selling came to her conclusion -- and the fact that zero allegations were sustained further demonstrates the disparate treatment that Plaintiff WILSON is forced to endure at the hands of Defendant CITY based on her race; this is especially apparent when compared with Defendant CITY's swift and zealous response to Caucasian Mr. Skei's fabricated complaint regarding his hurt feelings for a comment neither directed at nor about him.

162. On September 9, 2019, sometime before 8:00am, Plaintiff WILSON, in compliance with Defendant CITY's policies and procedures for calling in sick, called Defendant CITY's attendance line and provided the code for FMLA sick day. Plaintiff WILSON did exactly the same thing on September 10, 2019. Despite following Defendant CITY's policies and procedures for calling in sick, Defendant CITY would later, as described below, issue a Notice of Proposed Suspension to Plaintiff WILSON based in part on her allegedly calling in sick on these days to avoid scheduled training (even though, as described below, she couldn't have known any training was scheduled because she was out sick).

163. On September 11, 2019, when Plaintiff WILSON returned to work, she found multiple emails from Mr. Skei regarding trainings, and one specifically sent only to Plaintiff WILSON apparently for a one-on-one training. Plaintiff WILSON was confused, considering her July 22nd

COMPLAINT

conversation with Ms. Camarena and Ms. Roberson in which she directly told them she was not comfortable being trained by Mr. Skei, resulting in Ms. Camarena and Ms. Roberson agreeing that she could be trained by Ms. Pasillas instead, and considering she had in fact completed training with Ms. Pasillas a month earlier. Plaintiff WILSON approached Ms. Roberson to ask her if she knew anything about Mr. Skei's emails and to express her confusion as to why he'd be emailing her directly regarding one-on-one training. Ms. Roberson said that she knew nothing about one-on-one trainings with Mr. Skei. Plaintiff WILSON reiterated why she was uncomfortable with training with Mr. Skei and ultimately Ms. Roberson asked Plaintiff WILSON to send her the email to which she was referring. Plaintiff WILSON printed out the email and left it on Ms. Roberson's desk.

164. Also on September 11, 2019, Plaintiff WILSON emailed Defendant CARDELL requesting a copy of the Investigation Report(s) from Ms. Selling and/or Defendant CITY which led to the conclusion that Defendant LACY did not violate any discrimination, harassment, or retaliation policies and also requesting that he confirm that Plaintiff WILSON had no internal remedies for appealing the investigation. Defendant CARDELL's responded, stating that Defendant CITY does not provide a copy of the Investigation Report(s), only the investigative findings; he also confirmed that there were no available internal appeals for the investigation.

165. On September 13, 2019, while Plaintiff WILSON was on her lawful afternoon break, Ms. Roberson approached and handed her a packet, saying that she was told to give it to Plaintiff WILSON. Plaintiff WILSON discovered it was a Notice of Proposed Three Day Suspension ("Notice") from Mr. Sloan. The Notice alleged that Plaintiff WILSON had violated various Defendant CITY codes, policies, and procedures, and that she had exhibited "conduct unbecoming of an officer or employee of the city" and insubordination, among other things, and then laid out the factual bases for these violations – which all allegedly had taken place during three meetings or conversations described in detail above: 1) the initial meeting that Plaintiff WILSON attended on July 22, 2019; 2) the IAP meeting Plaintiff WILSON attended on September 4, 2019; and 3) the conversation that Plaintiff WILSON had had with Ms. Roberson on September 11, 2019. Related to this September 11th conversation, and specifically the emails regarding the allegedly mandatory training with Mr. Skei, the Notice impliedly accused Plaintiff WILSON of purposely calling in sick

76

COMPLAINT

on September 9th and 10th when she allegedly knew that she had training to attend; the Notice simultaneously ignored the reality that Plaintiff WILSON, since she was out sick, could not have possibly known that any training had been scheduled for her and that it had been agreed between Plaintiff WILSON, Ms. Camarena, and Ms. Roberson that she would train with Ms. Pasillas. Further, the allegedly mandatory nature of this training was severely undermined by another email sent by Mr. Skei on September 25, 2019, wherein he casually stated that if anyone missed the training in question, they could simply re-schedule with him for a later date. Related to both the September 4th and September 11th meetings, the Notice charged Plaintiff WILSON with bringing up "old and irrelevant" issues and discussing "previous events" as if these were a violation of Defendant CITY policies; however, Plaintiff WILSON, in reality, was strictly following no less than five separate and distinct policies contained in Defendant CITY's "Fresno City Attorney's Office Policies and Procedures" which allow and/or require a Defendant CITY employee to come to their supervisor with any and all problems. The importance of these policies, especially the so-called "No Surprises" rule, was underscored by Ms. Camarena in an email dated October 2, 2019, reminding employees to talk to supervisors or managers regarding any issues, concerns, or situations that they think management should know about. The attachments to the Notice were copies of these various codes, policies, and procedures that Plaintiff WILSON was alleged to have violated, and other documents that allegedly supported the allegations, including, among others, an email from Ms. Roberson to Mr. Sloan purporting to outline the conversation that she had had with Plaintiff WILSON on September 11, 2019. The Notice additionally attached the Letter of Reprimand that Plaintiff WILSON was given based on Mr. Skei's false allegations from July 2018 as a lower step in progressive discipline. The factual allegations contained in the Notice were at the very best exaggerated or manipulated and taken out of context and at worst completely fabricated; further, the attachments that supposedly supported the allegations were similarly lacking and/or taken out of context. Specifically, Plaintiff WILSON is informed and believes and hereon alleges that Ms. Roberson was directed by Defendant CITY employee(s) to draft the email regarding the September 11, 2019 conversation for the sole purpose of asserting progressive discipline against Plaintiff WILSON and not because Ms. Roberson herself felt as if the conversation between the two of them

77

COMPLAINT

needed to be addressed in some manner. This belief is further supported by Ms. Roberson's own recitations that her "hands were tied" and she was "put in a bad situation" in referring to the attachment email during a September 17, 2019 meeting with Plaintiff WILSON. Plaintiff WILSON is additionally informed and believes and hereon alleges that the Notice was given to Plaintiff WILSON solely as a progressive discipline record for a future termination, all in continued retaliation for Plaintiff WILSON's filing of a Government Tort Claim, which Defendant CITY knew would ultimately lead to the filing of the present lawsuit, for subsequent conversations and letters between Plaintiff WILSON's counsel, labor representative, and Defendant CITY's outside counsel, for Plaintiff WILSON's written and verbal objections to her defamatory evaluation, and for Plaintiff WILSON's general objections to Defendant CITY's discriminatory, harassing, and retaliatory treatment of her over the past 15 years. Mr. Silva requested a *Skelly* hearing on Plaintiff WILSON's behalf to object to the Notice, which was set for Friday, September 27, 2019.

166. On September 16, 2019, Plaintiff WILSON saw as a topic on the agenda for the upcoming Defendant CITY council meeting a lawsuit filed by Defendant LACY against Defendant CITY. Plaintiff WILSON is informed and believes and hereon alleges that the anticipation, fear, and then actual fruition of Defendant LACY's lawsuit is at least one reason why Defendant CITY found that Defendant LACY had violated no discrimination, harassment, or retaliation policies as a result of Ms. Selling's investigation and in previous investigations.

167. On September 18, 2019, Plaintiff WILSON emailed Ms. Roberson regarding a case audit that she had been previously given that pertained to one of Defendant LACY's subordinates, a topic that remains unaddressed by Defendant CITY's outside counsel in response to Mr. Goyette's inquiry to date. Ms. Roberson had previously told Plaintiff WILSON that if she was assigned any cases that would require her to audit any of Defendant LACY's subordinates, which would be for the Vacant Building and Weed teams, that she simply send them back to Ms. Roberson and she would re-route them back to Defendant LACY's team. Ms. Roberson's treatment of this situation completely flies in the face of a previous statement that she had made to Plaintiff WILSON that it was her understanding that because Plaintiff WILSON did not have any current complaint or pending investigation against anyone that Plaintiff WILSON would not continue to receive "special

78

COMPLAINT

treatment." However, Ms. Roberson continued to recognize that Plaintiff WILSON should not be forced to interact with a Defendant CITY employee that referred to her as the most disgusting racial slur in existence; this additionally contradicts Ms. Roberson's alleged insistence in the Notice of Proposed Suspension that Plaintiff WILSON was still required to train with Mr. Skei.

168. On September 20, 2019, Defendant CITY employee Evelyn Yin-Zepeda trained Plaintiff WILSON on how to draft letters in Accela, which was the topic of the training provided by Mr. Skei that Plaintiff WILSON was charged with willfully and intentionally skipping as an act of insubordination in the Notice of Proposed Three Day Suspension and which would be later sustained to actually suspend Plaintiff WILSON without pay for three days. On subsequent dates, Ms. Yin-Zepeda and Ms. Pasillas trained Plaintiff WILSON on various other aspects of Accela, with no interference or objection from Ms. Roberson or Ms. Camarena. Plaintiff WILSON has also worked with Defendant CITY employee Najee Hakim for training on other Defendant CITY programs. This again contradicts Ms. Roberson's contention that Plaintiff WILSON would not be receiving any "special treatment" since she had no open complaints or pending investigations; this further demonstrates that Defendant CITY purposefully and maliciously included the allegation regarding training with Mr. Skei in the Notice and the subsequent Order of Suspension for Three Days solely for the purpose of augmenting a fabricated set of facts to sustain progressive discipline against Plaintiff WILSON.

169. On September 26, 2019, Mr. Goyette emailed to Mr. Sloan, as the designated *Skelly* officer, an eleven-page written *Skelly* response to the Notice of Proposed Three Day Suspension on Plaintiff WILSON's behalf, rebutting, clarifying, and/or mitigating every "factual allegation" contained in the Notice. On September 27, 2019, Plaintiff WILSON and Mr. Silva attended the *Skelly* hearing, at which Mr. Sloan, Ms. Camarena, and Ms. DeRuosi were also present. Mr. Sloan said that he had read the written response and allowed Mr. Silva and Plaintiff WILSON to present oral evidence outside of the written response; Mr. Sloan then took the issue under submission.

170. Also on September 26, 2019, Defendant CITY moved Defendant LACY back to his original desk within Code Enforcement, which placed him significantly closer to Plaintiff WILSON. Plaintiff WILSON is informed and believes and hereon alleges that this was done to intentionally

79

COMPLAINT

and maliciously exacerbate the discrimination, harassment, and retaliation that Plaintiff WILSON has suffered during her entire employment with Defendant CITY, but especially following their egregious dismissal of Plaintiff WILSON's complaint regarding Defendant LACY calling her an "entitled nigga."

171. On September 30, 2019, Ms. Roberson emailed Plaintiff WILSON around the end of the day, asking her to come to her office when she had a minute; when Plaintiff WILSON got there, Ms. Roberson handed Plaintiff WILSON the Order of Suspension for Three Days ("Order"), which confirmed that she was being suspended for three days, despite the *Skelly* written response and hearing. The Order contained precisely the same "factual allegations" as the Notice, but asserted that "although [Plaintiff WILSON] attempted to justify [her] actions by reiterating a long history of perceived maltreatment, [she] did not provide mitigation by way of factual information, or by way of recognition of the inappropriateness of [her] actions." Defendant CITY's use of the phrase "perceived maltreatment" further supports Plaintiff WILSON's contention that Defendant CITY has never and will never take a categorical racial slur directed at Plaintiff WILSON by Defendant CITY employees seriously. Further, despite Defendant CITY confirming Plaintiff WILSON's suspension and, in turn, disregarding everything contained in the *Skelly* response, Defendant CITY apparently, strangely, initiated an internal fact-finding investigation into alleged "novel complaints" made by Plaintiff WILSON in the *Skelly* response; to be clear, the *Skelly* response did not even give pause to Defendant CITY when evaluating whether the proposed suspension should be confirmed or not because it was confirmed the immediately next work day after the *Skelly* hearing, but it apparently did rise to the level of requiring an internal investigation into Plaintiff WILSON's alleged new allegations of retaliation contained within it. Plaintiff WILSON is still informed, still believes, and again hereon alleges that the Order was given to Plaintiff WILSON solely as a progressive discipline record for a future termination, again in continued retaliation for Plaintiff WILSON's filing of a Government Tort Claim, which Defendant CITY knew would ultimately lead to the filing of the present lawsuit, for subsequent conversations and letters between Plaintiff WILSON's counsel, labor representative, and Defendant CITY's outside counsel, for Plaintiff WILSON's written and verbal objections to her defamatory evaluation, and for Plaintiff WILSON's general objections to

80

COMPLAINT

Defendant CITY's discriminatory, harassing, and retaliatory treatment of her over the past 15 years. Plaintiff WILSON was suspended from her employment with Defendant CITY without pay for October 1st, 2nd, and 3rd.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

172. On or about May 9, 2019, Plaintiffs, by and through their attorneys, each timely submitted requests for right to sue letters from DFEH based on the conduct alleged herein.

173. On or about May 17, 2019, Plaintiff WILSON, by and through her attorneys, received the right to sue letter from DFEH. Such letter and affiliated documents were forwarded to Defendant CITY on or about June 28, 2019.

174. On or about June 11, 2019, Plaintiff SMITH, by and through his attorneys, received the right to sue letter from DFEH. Such letter and affiliated documents were forwarded to Defendant CITY on or about June 28, 2019.

175. Also on or about June 28, 2019, Plaintiffs, by and through their attorneys, each timely submitted City of Fresno Claims for Damages to Defendant CITY based on the conduct alleged herein; the cover letter to such Claims additionally demanded that Defendant CITY preserve all potentially relevant electronically stored information and prevent the deletion or spoliation of any evidence.

176. On or about July 12, 2019, Plaintiffs, by and through their attorneys, each received acknowledgement letters from Defendant CITY regarding their respective Claims for Damages.

177. On or about August 12, 2019, by operation of law, Plaintiffs' Claims for Damages were rejected by Defendant CITY.

## FIRST CAUSE OF ACTION

### (Discrimination, Gov. Code §§ 12940(a), 12926(o))

*(Plaintiffs v. Defendant CITY)*

178. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 177 as though fully set forth herein.

179. At all times relevant hereto, the California Fair Employment and Housing Act ("FEHA") was in full force and effect and was binding upon Defendant CITY. FEHA prohibits discrimination

81

COMPLAINT

on the bases of one or more of the protected characteristics under FEHA, including race or color. Further, FEHA provides that employers are strictly liable for acts of supervisors that fall within the scope of their employment; all individual Defendants were supervisors under FEHA and were acting within the scope of their employment during all relevant time periods alleged in this complaint.

180. California courts have adopted the federal *McDonnell Douglas* standard for discrimination claims under FEHA, which requires that a Plaintiff prove that (1) he is a member of a protected class; (2) he was qualified for the position he sought or was performing competently in the position held; (3) he suffered an adverse employment action; and (4) some other circumstance suggests discriminatory motive.

181. Plaintiff WILSON is a member of a protected class based on her African-American race. Plaintiff WILSON was qualified for the CRS position she currently holds, as she has held this position for the entirety of her employment with Defendant CITY; additionally Plaintiff WILSON was and is qualified for any of the senior and supervisor positions for which she has applied, or potentially even higher positions, as demonstrated not only by her 15 years of experience in the CRS position, but also by the Civil Service Board's confirmation of Plaintiff WILSON's year of Project Manager experience. Plaintiff WILSON has suffered countless adverse employment actions, outlined above in greater detail, but the most egregious and obvious one is that she has **never** been promoted; over a period of fifteen years, Plaintiff WILSON has applied, tested, and interviewed for hundreds of positions and Defendant CITY has prevented her from promoting in every single instance. In addition to the hundreds of times that Defendant CITY has denied Plaintiff WILSON a promotion, she has suffered the following adverse actions: as a general matter over the years, Defendant CITY has either completely ignored or fashioned a makeshift investigation into all of Plaintiff WILSON's complaints regarding the discrimination, harassment, and retaliation that she has suffered, only to find that there have been no violations whatsoever during Plaintiff WILSON's entire career with Defendant CITY; Defendant CITY placed Plaintiff WILSON on the lay-off list despite her having seniority over other Defendant CITY employees that were not placed on the list and then Defendant CITY actually laid off Plaintiff WILSON for over three years and prevented her from being reinstated, despite being listed first on the reinstatement list; Defendant

82

COMPLAINT

CITY gave Plaintiff WILSON a formal Letter of Reprimand based on an entirely fabricated complaint that was supported by either insufficient or fabricated evidence; Defendant CITY forced Plaintiff WILSON to work alongside Defendant LACY for more than a month after filing her complaint that he had called her an "entitled nigga" before putting him on paid administrative leave and then Defendant CITY ultimately put Plaintiff WILSON on paid administrative leave shortly thereafter; Defendant CITY then forced Plaintiff WILSON to again work alongside Defendant LACY after almost a year of administrative leave before the investigation into her complaint was even complete; Defendant WATKINS authored a retaliatory evaluation of Plaintiff WILSON's work allegedly supported by "facts" that he mischaracterized, took out of context, or completely fabricated; Defendant CARDELL issued a one paragraph memo to Plaintiff WILSON simply stating that the 14-month investigation into her complaint about Defendant LACY was complete and that no violations were found, with no explanation or basis for this decision; and finally, Defendant CITY suspended Plaintiff WILSON for three days without pay based on more "facts" that were at best grossly exaggerated or manipulated and taken out of context and at worst completely fabricated. The fact that Plaintiff WILSON has **never** been promoted in her fifteen-year tenure with Defendant CITY suggests a discriminatory motive in and of itself; Defendant CITY cannot offer a non-discriminatory reason that Plaintiff WILSON has been denied each and every position that she has applied for over the past fifteen years. The fact that Defendant CLARK couldn't articulate an objective definition of the "right fit," nor offer any explanation as to why Plaintiff WILSON has been consistently denied promotions even though she has more experience and education than virtually everyone that has been promoted above her, demonstrates that Defendant CITY's only definition of the "right fit" is anyone but African-American Plaintiff WILSON. Further, the entirety of Plaintiff WILSON's factual allegations provides the discriminatory context for the above adverse actions that Plaintiff WILSON has suffered; however, to summarize, it is clear that Plaintiff WILSON consistently experienced disparate treatment including, but not limited to, in the following instances: Plaintiff WILSON's leave time being investigated when she simply left to meet her union attorney on her lunch break; Defendant WATKINS asking other Defendant CITY employees to keep tabs on Plaintiff WILSON; Plaintiff

COMPLAINT

WILSON having to provide evidence of her work experience that she earned while working for Defendant CITY; Plaintiff WILSON being given the oldest truck in the fleet, despite her obvious seniority; Plaintiff WILSON being denied a tool bag for nearly three months for absolutely no reason; Plaintiff WILSON being consistently harassed for parking her work truck at City Hall, despite being surrounded by countless other Defendant CITY vehicles; Plaintiff WILSON being told to submit her social security card to HR to prove her legal name after working for Defendant CITY for 13 years at that time; Plaintiff WILSON being denied bereavement leave for her grandfather's funeral and being threatened by Defendant CITY staff that her vacation time would be taken away; Defendant WATKINS calling Plaintiff WILSON at home when she was absent from the office despite him knowing that she was working a later shift; Plaintiff WILSON having to provide an Administrative Order to Defendant CITY employees to prove that she was allowed to use her lawfully accrued vacation hours; Plaintiff WILSON having her confidential medical file sent to her via the very non-confidential inter-office mail system; Plaintiff WILSON being denied her requested accommodation immediately on the spot with no assistance or other solutions from Defendant CITY; Plaintiff WILSON being disciplined for uttering a curse word on the floor of Code Enforcement, despite all other employees doing it on a regular basis and receiving no discipline; Defendant CITY's immediate response and investigation, including two interviews with Plaintiff WILSON and the handing down of discipline, into a complaint filed by Caucasian Mr. Skei, yet no initiation of an investigation into Plaintiff WILSON's complaint that Defendant LACY called her an "entitled nigga" in that same time period and then of course the subsequent letter issued to Plaintiff WILSON finding no wrongdoing and resulting in no discipline for Defendant LACY.

182. Plaintiff SMITH is a member of a protected class as a result of his association with Plaintiff WILSON. Plaintiff SMITH was performing competently in the position that he held as a Community Revitalization Technician and never received any negative feedback regarding such performance for the three months he held the position; additionally Plaintiff SMITH was qualified for each of the permanent and temporary positions that he interviewed for and/or applied for following his constructive discharge by Defendant CITY. Plaintiff SMITH suffered adverse employment actions first in the form of being denied his three month probationary review by his

84

COMPLAINT

supervisor, then being transferred to another team for no stated reason but in reality for the purpose of retaliation, which ultimately culminated in a constructive discharge when Defendant LACY created a work environment so intolerable that Plaintiff SMITH felt, as any reasonable person in Plaintiff SMITH's position would feel, compelled to resign. Further, Defendant BURNS created a work environment so intolerable that Plaintiff SMITH rescinded his two-week notice and resigned effective that same day. Plaintiff SMITH suffered additional adverse actions in the form of being denied a return to employment with Defendant CITY after Mr. Silva submitted the audio recording and letter on August 9, 2018 of Plaintiff SMITH recounting all of the racially-motivated comments made by Defendant LACY. Following submission of this letter, Plaintiff SMITH interviewed for four permanent positions, for which he had qualified before his constructive discharge, and was offered none of them, despite having high rankings for all of them. Plaintiff SMITH additionally applied for three temporary positions, for which he had direct and specific experience, and he wasn't even called in for an interview. The following circumstances not only suggest, but definitively prove, a discriminatory motive for the adverse actions that Plaintiff SMITH suffered at the hands of Defendant CITY: Defendant LACY had made it very clear to Plaintiff SMITH on numerous occasions that he did not like Plaintiff WILSON and that Plaintiff SMITH should stay away from her, especially if he wanted to complete his probation; when Defendant LACY allegedly heard that Plaintiff SMITH was allegedly meeting with Plaintiff WILSON during their CACEO training, he texted and talked to Plaintiff SMITH on the phone at 9 o'clock at night, despite not even being Plaintiff SMITH's supervisor at the time, about how disappointed he was to hear of this news and to remind Plaintiff SMITH that he had "eyes and ears everywhere"; after Defendant LACY requested that Plaintiff SMITH be transferred to his team, Plaintiff SMITH ultimately stood up to Defendant LACY when he called Plaintiff WILSON an "entitled nigga" by telling him that he had had enough of that already and to stop talking about her; almost immediately after that day, Defendant LACY transferred Plaintiff SMITH to another team and completely stopped talking to him both professionally and personally, going so far as to put his hand up when Plaintiff SMITH simply tried to say hello in passing; Defendant BURNS' inexplicable dismissal of Plaintiff SMITH's repeated requests to meet with him for an exit interview after resigning with no explanation and no

85

COMPLAINT

follow up when Plaintiff SMITH changed his end date to that same day; denial by Defendant CITY of further employment for Plaintiff SMITH with no plausible explanation and despite his clear qualifications for each job for which he interviewed or applied; an ultimate finding of no discrimination, harassment, or retaliation for Defendant LACY's behavior and no subsequent explanation as to how or why Defendant CITY could have reached such a conclusion considering all of the allegations made by Plaintiff SMITH. All of the foregoing circumstances demonstrate that all of the adverse actions that Plaintiff SMITH suffered were caused by Defendant LACY's discrimination, harassment, and retaliation against Plaintiff SMITH for his perceived or alleged connection with and support of Plaintiff WILSON.

## SECOND CAUSE OF ACTION

### (Harassment, Gov. Code §§ 12940(j), 12926(o))

*(Plaintiff WILSON v. All Defendants; Plaintiff SMITH v. Defendants CITY and LACY)*

183. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 182 as though set forth herein.

184. At all times relevant hereto, FEHA was in full force and effect and was binding upon Defendants and each of them. FEHA prohibits discrimination on the bases of one or more of the protected characteristics under FEHA, including race or color. Further, FEHA provides that employers are strictly liable for acts of supervisors that fall within the scope of their employment; all individual Defendants were supervisors under FEHA and were acting within the scope of their employment during all relevant time periods alleged in this complaint.

185. To establish racial harassment or a racially hostile work environment under FEHA, Plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment and would have seriously affected the psychological well-being of a reasonable employee.

186. Plaintiff WILSON is a member of a protected class based on her African-American race. Plaintiff WILSON was subjected to unwelcome harassment, which was clearly based on her race,

86

COMPLAINT

by each and every Defendant on numerous occasions, including, but not limited to: Plaintiff WILSON had to endure overhearing and witnessing Defendant LACY disparage African-Americans generally for the last fifteen years; Defendant LACY then launched an ongoing racially-motivated campaign specifically against Plaintiff WILSON wherein he told countless other Defendant CITY employees to stay away from her, that she was trouble, that she was lazy, and ultimately that she was an "entitled nigga"; Defendant LACY and other Defendant CITY employees refusing to acknowledge Plaintiff WILSON's seniority when disseminating Defendant CITY equipment; Defendant CARDELL calling Plaintiff WILSON's union attorney simply because she left for lunch; Defendants CARDELL, CLARK, FURTADO, BURNS, CUEVAS, and ESTABROOKE trivializing, ignoring, and challenging Plaintiff WILSON's complaints about discrimination, harassment, and retaliation that she had been suffering because of her race; Defendant CARDELL's cavalier mention that he has "two black women working for him" when Plaintiff WILSON was attempting to explain that nearly every African-American employee that has been hired since she started in 2004 has been terminated; Defendant FURTADO purposefully altering Plaintiff WILSON's ranking to prevent her from promoting; Defendant WATKINS calling Plaintiff WILSON at home to check up on her and generally tasking other Defendant CITY employees with keeping tabs on her; Defendants CARDELL, CLARK, FURTADO, BURNS AND CUEVAS ignoring Plaintiff WILSON's requests to have Defendant LACY moved and/or put on administrative leave for over a month after Plaintiff WILSON found out that he called her an "entitled nigga"; Plaintiff WILSON being forced to work alongside Defendant LACY both before and after the investigation was complete, knowing that Defendant CITY was never going to actually discipline him for his behavior; and finally, each and every adverse action taken against Plaintiff WILSON, listed *supra*. These concerted efforts of all Defendants to harass Plaintiff WILSON and to support other Defendant CITY employees that harassed Plaintiff WILSON created a nearly unbearable work environment for her; Plaintiff WILSON has endured more workplace harassment in the last fifteen years than any reasonable person would be able to endure in fifteen lifetimes. Plaintiff WILSON attempted to remedy the harassment that she suffered by making formal and informal complaints to Defendant CITY only to be met with dismissal of every single allegation

87

COMPLAINT

that she has ever made; Plaintiff WILSON has felt so dejected, as any reasonable person would, that her entire personality has changed in the workplace as a means of protecting herself from further harassment.

187. Plaintiff SMITH is a member of a protected class as a result of his association with Plaintiff WILSON. Plaintiff SMITH was subjected to unwelcome harassment by Defendant LACY on multiple occasions, including, but not limited to, the following: when Defendant LACY texted Plaintiff SMITH at 9pm at night, when he wasn't even Plaintiff SMITH's supervisor, and during the subsequent phone conversation accused Plaintiff SMITH of having a private meeting with Plaintiff WILSON, and then admonished him for allegedly doing so, while threatening that Plaintiff SMITH would need to "stick with him" if he wanted to make probation; when Defendant LACY went on a racially-motivated tirade about Plaintiff WILSON being an "entitled nigga," even going so far as to clarify that he wasn't saying she was a "nigger" but a "nigga," to which Plaintiff SMITH asked Defendant LACY to stop unloading his issues with Plaintiff WILSON onto him; when Defendant LACY accused Plaintiff SMITH of no longer trusting him and told Plaintiff SMITH that he would be sending out "a bunch of letters and bills" in Plaintiff SMITH's name, while simultaneously dismissing Plaintiff SMITH's concern regarding another Defendant CITY employee who had just cursed him out for simply asking a question; when Defendant LACY transferred Plaintiff SMITH to another team with no explanation, almost immediately after the previous two instances had occurred; when Defendant LACY abruptly ignored Plaintiff SMITH both at work and away from work almost immediately after the above instances, despite having been friendly in the past, even outside of work; and when Defendant LACY, after being informed of Plaintiff SMITH's resignation, threatened Plaintiff SMITH by saying that he would only be doing FresGo for the rest of his time with Defendant CITY. All of Defendant LACY's harassing behavior was clearly driven by his racially-motivated feelings towards Plaintiff WILSON, which he directed at Plaintiff SMITH because of his alleged interactions with and perceived defense of Plaintiff WILSON. Defendant LACY's harassment did, in fact, disrupt and interfere with Plaintiff SMITH's work environment so much so that he felt as if he had no other choice but to resign. Any reasonable person in Plaintiff SMITH's situation would have been affected psychologically because Defendant LACY's

harassment was so pervasive and manipulative that Plaintiff SMITH felt as though he had to support Defendant LACY in his campaign against Plaintiff WILSON, only to finally stand up to him and immediately be discarded, transferred, and ultimately lose his employment with Defendant CITY, a position which he loved and would have continued if not for Defendant LACY's discrimination, harassment, and retaliation.

## THIRD CAUSE OF ACTION

### (Retaliation, Gov. Code § 12940(h))

*(Plaintiffs v. Defendant CITY)*

188. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 187 as though set forth herein.

189. At all times relevant hereto, FEHA was in full force and effect and was binding upon Defendant CITY. FEHA prohibits discrimination on the bases of one or more of the protected characteristics under FEHA, including race or color. Further, FEHA provides that employers are strictly liable for acts of supervisors that fall within the scope of their employment; all individual Defendants were supervisors under FEHA and were acting within the scope of their employment during all relevant time periods alleged in this complaint.

190. Retaliation under FEHA is established by showing (1) plaintiff was engaged in a protected activity; (2) defendant subjected the plaintiff to an adverse employment action; and (3) a causal link between the protected activity and the defendant's action. FEHA provides that 'protected activity' includes complaining of or opposing conduct that an employee reasonably believes is in violation of FEHA, in addition to filing a complaint or participating in an investigation regarding the same.

191. Plaintiff WILSON engaged in protected activity on an ongoing basis by vocally objecting to Defendant CITY's treatment of her over the past 15 years, mostly in meetings and/or interviews with Defendants CARDELL, CLARK, BURNS, and CUEVAS and then by formally or informally making numerous internal complaints directly to Defendant CITY and/or filing complaints with the EEOC and/or DFEH and/or filing a civil lawsuit all pertaining to and alleging Defendant CITY and its employees' violations of FEHA, Title VII, and 42 U.S.C. §§ 1981 and

89

COMPLAINT

1983; these instances, more specifically alleged above, include, but are not limited to: the various complaints that she filed about Defendant LACY's racial animus against African-Americans generally in her first few years working for Defendant CITY; the racial and gender discrimination lawsuit that Plaintiff WILSON filed against Defendant CITY in 2009; the hostile work environment complaint that she filed with Defendant ESTABROOKE regarding Matt Wade's racially-motivated harassment; the complaint that Defendant CLARK filed on Plaintiff WILSON's behalf alleging discrimination, harassment, and retaliation from Defendant LACY; the conversation that Plaintiff WILSON had with Defendant BURNS wherein she informed him of Defendant WATKINS' sexual relationship with Ms. Casillas; and, the pinnacle complaint that she filed with Defendant CLARK regarding Defendant LACY calling her an "entitled nigga." Plaintiff WILSON re-alleges the adverse actions listed under the First Cause of Action. Plaintiff WILSON additionally re-alleges that all of the disparate treatment listed under the First Cause of Action is due, at least in part, to Plaintiff WILSON engaging in the above-listed protected activities. Further, each adverse action can generally be traced back to the fundamental principle that Defendant CITY and its employees do not appreciate that Plaintiff WILSON has been so vocal about their discrimination, harassment, and retaliation that has been waged against her because of her race. The following provides a sampling of the direct connection between some of the adverse actions and Plaintiff WILSON's protected activities: the anonymous emails on which Defendant CITY council relied in approving Plaintiff WILSON's three-year layoff specifically listed Plaintiff WILSON's filing her previous lawsuit as a reason why she should be laid off and why she's so problematic to Defendant CITY; Plaintiff WILSON was disciplined for her alleged actions that occurred literally minutes after she found out that Defendant LACY had called her an "entitled nigga" and while she was physically on her way to report it; Defendant WATKINS issued Plaintiff WILSON's only negative performance evaluation of her career after finding out that Plaintiff WILSON had reported to Defendant BURNS that he had a sexual relationship with a subordinate; Plaintiff WILSON was forced to come back to work from administrative leave and work with Defendant LACY less than a month after she filed the DFEH complaint that supports this lawsuit; and Plaintiff WILSON was suspended for three days without pay at least in part because, according to the Notice and the Order, she brought up "old and

90

COMPLAINT

irrelevant issues," namely, that Defendant CITY had been discriminating against, harassing, and retaliating against her for years.

192. Plaintiff SMITH engaged in protected activity on multiple occasions as more specifically alleged above, including, but not limited to: when he complained of and opposed, directly to Defendant LACY's face, Defendant LACY's ongoing racially-motivated campaign against Plaintiff WILSON which included Defendant LACY calling Plaintiff WILSON an "entitled nigga," a "no good piece of shit," "lazy," and categorizing her continued employment with Defendant CITY as her "playing the race card," which Plaintiff SMITH reasonably believed to be and categorically is discriminatory; and when he subsequently recorded a statement alleging the same discriminatory conduct and allowed his labor representative to produce the recording to Defendant CITY along with a letter detailing the most egregious utterances and conduct by Defendant LACY. As alleged above, Plaintiff SMITH suffered adverse employment action by being denied his three month probationary evaluation and being retaliatorily transferred to another team, which then culminated in Plaintiff SMITH's constructive discharge, which was further exacerbated by Defendant BURNS refusing Plaintiff SMITH's exit interview requests, causing Plaintiff SMITH to accelerate his leave date to the same day he gave notice, and ending with Plaintiff SMITH being denied multiple permanent and temporary positions with Defendant CITY for which he was categorically qualified. As alleged above, these adverse actions can be directly linked to Plaintiff SMITH's objection to Defendant LACY's use of the word "nigga" when referring to Plaintiff WILSON and his subsequent reporting of all of Defendant LACY's racially-motivated and illegal conduct; within a matter of 13 calendar days of Plaintiff SMITH's objection, he was subject to a denial of his evaluation, a retaliatory transfer to another team, and a constructive discharge. Defendant LACY had previously accused Plaintiff SMITH of simply speaking to Plaintiff WILSON and expressed his extreme disappointment, but after Plaintiff SMITH assured him that it wasn't true, Defendant LACY let it slide. However, Defendant LACY could not ignore Plaintiff SMITH refusing to participate in his continued disgusting display of categorical racism so he swiftly retaliated against Plaintiff SMITH and within 13 calendar days of Plaintiff SMITH's objection, he had been constructively discharged and then subsequently prevented from returning to employment with Defendant CITY.

91

COMPLAINT

**FOURTH CAUSE OF ACTION**

**(Failure to Prevent Discrimination, Harassment, and Retaliation, Gov. Code § 12940(k))**

*(Plaintiffs v. Defendant CITY)*

193. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 192 as though set forth herein.

194. A failure to prevent discrimination, harassment, and retaliation claim under FEHA requires a Plaintiff to prove that: (1) she was subjected to discrimination, harassment or retaliation; (2) defendant failed to take all reasonable steps to prevent discrimination, harassment, or retaliation; and (3) this failure caused plaintiff to suffer injury, damage, loss, or harm.

195. Plaintiff WILSON was subjected to discrimination, harassment, and retaliation as properly alleged in her factual allegations section and under the first three causes of action. Defendant CITY failed to take any steps whatsoever to prevent the discrimination, harassment, and retaliation that she suffered for the last fifteen years, which is evidenced by all of the above allegations, which include, but are not limited to: even after countless complaints by Plaintiff WILSON over the years and an overwhelming amount of tangible and/or testimonial evidence, Defendant CITY has never found even one single incident that constituted discrimination, harassment, or retaliation; Defendant CITY has not disciplined or even reprimanded any Defendant CITY employee about which Plaintiff WILSON has made complaints; Defendant CITY forced Plaintiff WILSON to continue working alongside all of the Defendant CITY employees that have subjected her to such discrimination, harassment, and retaliation, the most egregious example of course being the month that she had to work with Defendant LACY after finding out that he called her an "entitled nigga" before he was finally put on administrative leave; and Defendant CITY failed to put Plaintiff WILSON back to work after she was wrongly included on the layoff list and after she was put at the first position on the reinstatement list. Defendant CITY's failures caused Plaintiff WILSON to continue to be subjected to discrimination, harassment, and retaliation over a fifteen year period and this caused Plaintiff WILSON to suffer damages and injuries including, but not limited to: lack of promotion on countless occasions, lost wages, lost earning potential based on

illegal layoff and extended retaliatory administrative leave, continuous and ongoing severe emotional distress, chronic physical health problems and general loss of enjoyment of life.

196. Plaintiff SMITH was subjected to discrimination, harassment, and retaliation as properly alleged in his factual allegations section and under the first three causes of action. Defendant CITY failed to take any reasonable steps whatsoever to prevent the discrimination, harassment, and retaliation that he suffered, which is evidenced by all of the above allegations, which include, but are not limited to: failing to oversee or require approval of Defendant LACY's unilateral retaliatory transfer of Plaintiff SMITH to another team; failing to allow Plaintiff SMITH to give an exit interview, essentially preventing him from reporting the discrimination, harassment, and retaliation that he suffered at the hands of Defendant LACY, which was ultimately confirmed by Defendant BURNS by his refusal to meet with Plaintiff SMITH on his last day; failing to meaningfully respond to Mr. Silva's August 9th letter on behalf of Plaintiff SMITH, which not only outlined the most egregious illegal conduct that he suffered, but also included with it an audio recording that explicitly spelled out each and every discriminatory, harassing, and retaliatory action that he suffered; attempting to persuade Plaintiff SMITH to meet with Defendant CARDELL and the allegedly neutral outside investigator together and without his legal representative, a clear conflict of interest for an allegedly neutral outside investigation; failing to prevent or even ensuring that Plaintiff SMITH had absolutely no chance of actually landing any of the positions that he interviewed for after his constructive termination, both permanent and temporary, for which he had qualified before his constructive termination; and failing to provide any explanation whatsoever as to the reasoning for Defendant CITY's findings that Defendant LACY had violated no discrimination, harassment, or retaliation provisions. Defendant CITY's failures caused Plaintiff SMITH to suffer damages and injuries including, but not limited to: lost wages and lost earning capacity due to constructive discharge and continuous and ongoing severe emotional distress.

///

///

///

///

93

COMPLAINT

## FIFTH CAUSE OF ACTION

### (Discrimination, 42 U.S.C. § 2000e-2(a)(1))

#### *(Plaintiff WILSON v. Defendant CITY)*

197. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 196 as though set forth herein.

198. The *McDonnell Douglas* standard is also used for discrimination claims under Title VII and requires that a Plaintiff prove that (1) she is a member of a protected class; (2) she was qualified for the position she sought or was performing competently in the position held; (3) she suffered an adverse employment action; and (4) some other circumstance suggests discriminatory motive.

199. Because Title VII uses the same standard as FEHA, Plaintiff WILSON specifically re-incorporates paragraph 181 *supra* to act as the factual allegations that support this cause of action.

## SIXTH CAUSE OF ACTION

### (Harassment, 42 U.S.C. § 2000e-2(a)(2))

#### *(Plaintiff WILSON v. Defendant CITY)*

200. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 199 as though set forth herein.

201. Under Title VII, a plaintiff establishes a claim for racial harassment or a racially hostile work environment by asserting that (1) she was subjected to verbal or physical conduct because of her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive work environment. Further, when the harassment comes from a supervisor and culminates in a tangible employment action, the employer is strictly liable for the supervisor's conduct.

202. Although the standard for harassment under Title VII is slightly different than the one under FEHA, Plaintiff WILSON specifically re-incorporates paragraph 186 *supra* to act as the factual allegations that support this cause of action and additionally alleges that all of the harassment outlined did so alter the conditions of Plaintiff WILSON's employment so much so that it created an abusive environment. Plaintiff WILSON additionally re-alleges that all individual Defendants were supervisors acting within the scope of their employment at all times relevant to this complaint;

94

COMPLAINT

Plaintiff WILSON also re-incorporates all the adverse actions listed *supra* to demonstrate that numerous, tangible employment actions were taken against her.

## SEVENTH CAUSE OF ACTION

### (Retaliation, 42 U.S.C. § 2000e-3(a))

*(Plaintiffs v. Defendant CITY)*

203. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 202 as though set forth herein.

204. A plaintiff establishes a retaliation claim under Title VII by showing (1) plaintiff was engaged in a protected activity; (2) defendant subjected plaintiff to an adverse employment action; and (3) a causal link between the protected activity and the defendant's action.

205. Because Title VII uses the same standard as FEHA, Plaintiff WILSON specifically re-incorporates paragraph 191 *supra* to act as the factual allegations that support this cause of action.

206. Because Title VII uses the same standard as FEHA, Plaintiff SMITH specifically re-incorporates paragraph 192 *supra* to act as the factual allegations that support this cause of action.

## EIGHTH CAUSE OF ACTION

### (Violation of the Equal Protection Clause of the 14th Amendment, 42 U.S.C. § 1983)

*(Plaintiff WILSON v. All Defendants)*

207. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 206 as though set forth herein.

208. A plaintiff asserting a section 1983 claim must prove two elements: (1) that defendant was acting under the color of state law when committing the conduct at issue; and (2) the conduct at issue deprived the plaintiff of a constitutional right.

209. A plaintiff may establish municipal liability for a section 1983 claim in one of three ways: (1) a local government entity employee committed the alleged constitutional violation pursuant to a formal government policy or long-standing practice or custom which constitutes the standard operating procedure of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and the challenged action itself

thus constituted an act of the official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

210. The Equal Protection Clause of the 14th Amendment of the United States Constitution affords to any person within its jurisdiction the equal protection of the laws. To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant intentionally or purposefully discriminated against her based upon her membership in a protected class. A showing of intentional or purposeful discrimination requires that a defendant act at least in part *because of* plaintiff's membership in this protected class.

211. Individual Defendants were acting, at all times relevant hereto, within the scope of their employment, as supervisors employed by Defendant CITY, and therefore were acting under color of state law. The conduct of individual Defendants alleged above deprived Plaintiff WILSON of her right to equal protection under the law. As properly alleged above in the First and Fifth Causes of Action, Plaintiff WILSON specifically re-incorporates paragraph 181 *supra* to demonstrate that Plaintiff WILSON was discriminated against because of her African-American race.

212. Municipal liability exists for Defendant CITY for every violation of the Equal Protection Clause committed by each of the individual Defendants for at least one, if not all, of the following reasons: Defendant CITY has created a policy of inaction, in which it is deliberately indifferent to violations of the anti-discrimination, harassment, and retaliation laws and policies and the individual Defendants were following this policy of inaction when they committed each of the racially-motivated discriminatory acts against Plaintiff WILSON as alleged above; even if Defendant CITY had not created an official policy of inaction, each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and therefore their racially-motivated discriminatory actions would constitute an act of an official governmental policy; and/or each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and they, as such final policy-maker, ratified the acts of either subordinate Defendant CITY employees or of other individual Defendants.

///

///

96

COMPLAINT

## NINTH CAUSE OF ACTION

### (Discrimination, 42 U.S.C. § 1981)

*(Plaintiff WILSON v. All Defendants)*

213. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 212 as though set forth herein.

214. The *McDonnell Douglas* standard is also used for discrimination claims again individuals under section 1981 and requires that a Plaintiff prove that (1) she is a member of a protected class; (2) she was qualified for the position she sought or was performing competently in the position held; (3) she suffered an adverse employment action; and (4) some other circumstance suggests discriminatory motive.

215. In order to prove municipal liability under section 1981, a plaintiff may utilize one of three possible methods: (1) a local government entity employee committed the alleged constitutional violation pursuant to a formal government policy or long-standing practice or custom which constitutes the standard operating procedure of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and the challenged action itself thus constituted an act of the official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

216. Because section 1981 uses the same standard as FEHA and Title VII, Plaintiff WILSON specifically re-incorporates paragraph 181 *supra* to act as the factual allegations that support this cause of action as it pertains to individual Defendants.

217. Municipal liability similarly exists for Defendant CITY for every racially-motivated discriminatory action committed by each of the individual Defendants for at least one, if not all, of the following reasons: Defendant CITY has created a policy of inaction, in which it is deliberately indifferent to violations of the anti-discrimination, harassment, and retaliation laws and policies and the individual Defendants were following this policy of inaction when they committed each of the racially-motivated discriminatory acts against Plaintiff WILSON as alleged above; even if Defendant CITY had not created an official policy of inaction, each individual Defendant was a

97

final policy-maker in that each was a supervisor with authority in each of their particular areas and therefore their racially-motivated discriminatory actions would constitute an act of an official governmental policy; and/or each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and they, as such final policy-maker, ratified the acts of either subordinate Defendant CITY employees or of other individual Defendants.

## TENTH CAUSE OF ACTION

### (Harassment, 42 U.S.C. § 1981)

*(Plaintiff WILSON v. All Defendants)*

218. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 217 as though set forth herein.

219. A plaintiff establishes a claim for racial harassment or a racially hostile work environment under section 1981 by proving (1) she was subjected to verbal or physical conduct because of her race; (2) the conduct was unwelcome and (3) the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create a hostile work environment.

220. In order to prove municipal liability under section 1981, a plaintiff may utilize one of three possible methods: (1) a local government entity employee committed the alleged constitutional violation pursuant to a formal government policy or long-standing practice or custom which constitutes the standard operating procedure of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and the challenged action itself thus constituted an act of the official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

221. Because section 1981 uses the same standard as Title VII, Plaintiff WILSON specifically re-incorporates paragraph 202 *supra* to act as the factual allegations that support this cause of action as it pertains to individual Defendants.

222. Municipal liability similarly exists for Defendant CITY for every racially-motivated harassing action committed by each of the individual Defendants for at least one, if not all, of the following reasons: Defendant CITY has created a policy of inaction, in which it is deliberately

98

COMPLAINT

indifferent to violations of the anti-discrimination, harassment, and retaliation laws and policies and the individual Defendants were following this policy of inaction when they committed each of the racially-motivated harassing acts against Plaintiff WILSON as alleged above; even if Defendant CITY had not created an official policy of inaction, each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and therefore their racially-motivated harassing actions would constitute an act of an official governmental policy; and/or each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and they, as such final policy-maker, ratified the acts of either subordinate Defendant CITY employees or of other individual Defendants.

## ELEVENTH CAUSE OF ACTION

### (Retaliation, 42 U.S.C. § 1981)

*(Plaintiff WILSON v. All Defendants)*

223. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 222 as though set forth herein.

224. Retaliation is established under section 1981 by showing (1) plaintiff was engaged in a protected activity; (2) defendant subjected the plaintiff to an adverse employment action; and (3) a causal link between the protected activity and the defendant's action.

225. In order to prove municipal liability under section 1981, a plaintiff may utilize one of three possible methods: (1) a local government entity employee committed the alleged constitutional violation pursuant to a formal government policy or long-standing practice or custom which constitutes the standard operating procedure of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and the challenged action itself thus constituted an act of the official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

226. Because section 1981 uses the same standard as FEHA and Title VII, Plaintiff WILSON specifically re-incorporates paragraph 191 *supra* to act as the factual allegations that support this cause of action as it pertains to individual Defendants.

99

COMPLAINT

227. Municipal liability similarly exists for Defendant CITY for every racially-motivated retaliatory action committed by each of the individual Defendants for at least one, if not all, of the following reasons: Defendant CITY has created a policy of inaction, in which it is deliberately indifferent to violations of the anti-discrimination, harassment, and retaliation laws and policies and the individual Defendants were following this policy of inaction when they committed each of the racially-motivated retaliatory acts against Plaintiff WILSON as alleged above; even if Defendant CITY had not created an official policy of inaction, each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and therefore their racially-motivated retaliatory actions would constitute an act of an official governmental policy; and/or each individual Defendant was a final policy-maker in that each was a supervisor with authority in each of their particular areas and they, as such final policy-maker, ratified the acts of either subordinate Defendant CITY employees or of other individual Defendants.

## TWELFTH CAUSE OF ACTION

### (Violation of Labor Code § 1102.5)

*(Plaintiff WILSON v. All Defendants; Plaintiff SMITH v. Defendants CITY, LACY, and BURNS)*

228. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 227 as though set forth herein.

229. CA Labor Code § 1102.5 prevents an employer, or any person acting on behalf of the employer, from retaliating against an employee for disclosing information regarding the employee's reasonable belief that the employer was in violation of or in noncompliance with a federal, state, or local rule or regulation or for refusing to participate in such a violation or noncompliance. Section 1102.5 similarly prevents an employer, or any person acting on behalf of the employer, from making, adopting, or enforcing any rule, regulation or policy which prevents an employee from disclosing such information. A plaintiff must prove the same elements as for a FEHA retaliation claim, which are: (1) plaintiff was engaged in a protected activity; (2) defendant subjected the plaintiff to an adverse employment action; and (3) a causal link between the protected activity and the defendant's action.

///

100

COMPLAINT

230. In addition to complaining of the FEHA, Title VII, and sections 1983 and 1981 violations as properly alleged above in the Third, Seventh, Eighth, and Eleventh Causes of Action, respectively, Plaintiff WILSON engaged in additional protected activity pursuant to section 1102.5. Plaintiff WILSON reported to Defendants WATKINS, FURTADO, CLARK, BURNS, ESTABROOKE and CARDELL on multiple occasions that Defendants LACY and WATKINS were assessing a $200 administrative fee to customers that was not within Defendant CITY's Master Fee Schedule and also that Defendant CITY was fraudulently sending out letters that included this illegal fee which were fraudulently signed by Plaintiff WILSON. Plaintiff WILSON additionally engaged in protected activity when she interviewed with OIG regarding Defendant CITY's use of block grant funds. Plaintiff WILSON suffered all of the adverse actions alleged in the First Cause of Action for her activities protected by FEHA, but also for those protected by this section. Also, almost immediately after Plaintiff WILSON first notified Defendant CITY about the $200 administrative fee, Defendant LACY had Defendant WATKINS single Plaintiff WILSON out to move her work vehicle from City Hall, despite other non-African-American Defendant CITY employees parking their work vehicles directly next to her. Further, after Plaintiff WILSON interviewed with OIG, Defendant FURTADO and Mr. Skei attempted to establish a policy that Code Enforcement employees did not speak to OIG and further Defendant FURTADO told Plaintiff WILSON that she was not happy that she had met with OIG.

231. In addition to complaining of and/or refusing to participate in the FEHA violations as properly alleged above in the Third Cause of Action, Plaintiff SMITH engaged in additional protected activity pursuant to section 1102.5. Plaintiff SMITH reported to Defendant LACY that Defendant CITY was fraudulently sending out letters to customers alleging that Plaintiff SMITH had completed inspections and assessed bill amounts on properties to which he was never even assigned. Plaintiff SMITH stressed that it was extremely misrepresentative of Defendant CITY to send these letters out and that he was not comfortable with it; Defendant LACY's only response was to accuse Plaintiff SMITH of not trusting him and then telling him that Defendant CITY would continue to send out such letters in this fraudulent, misrepresentative, and illegal manner. Plaintiff SMITH reported this illegal act to Defendant LACY only four calendar days after his objection to

101
COMPLAINT

Defendant LACY's use of "nigga" when referring to Plaintiff WILSON and on the same day that he reminded Defendant LACY of his three-month evaluation, which was never completed. Plaintiff SMITH was told he was being transferred to the tire team the day after this report of illegal activity, and he was constructively discharged only seven calendar days after that. Coupled with Plaintiff SMITH's reporting of the above-alleged FEHA violations, it is clear that Plaintiff SMITH's reporting of this illegal activity only added fuel to the fire and was yet another catalyst in the chain of Defendant LACY's retaliatory conduct again him.

## THIRTEENTH CAUSE OF ACTION

### (Slander, Civ. Code § 46, Gov. Code § 815.2)

*(Plaintiff WILSON v. Defendants CITY, LACY, and DOES 1-100, inclusive)*

232. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 231 as though set forth herein.

233. Under CA Civil Code § 46, slander, a type of defamation, is defined as "a false and unprivileged publication, orally uttered…which tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits." Defamation that falls within section 46 constitutes slander per se, which requires no proof of special damages on the part of the Plaintiff.

234. Defendant LACY, within the scope of his employment as a supervisor employed by Defendant CITY, did orally utter the following statements to his subordinate Plaintiff SMITH regarding Plaintiff WILSON: to stay away from her "because she's a no good piece of shit," that "she's lazy," and that when everyone got laid off, the only reason she got her job back was because she "played the race card." Each of these characterizations about Plaintiff WILSON's work performance and ethic is patently false, as has been properly alleged in the factual allegations above, and were clearly intended to injury Plaintiff WILSON's employment reputation. To reiterate, Plaintiff WILSON was reinstated in 2016 because Defendant CITY decidedly could not point to any work performance deficit on the part of Plaintiff WILSON and because she correctly pointed

102

COMPLAINT

out that Defendant CITY could furnish no legally-cognizable reason as to why she hadn't yet been reinstated, despite being first on the reinstatement list. Plaintiff WILSON is informed and believes and hereon alleges that Defendant LACY has orally uttered similarly false iterations of the above to countless other Defendant CITY employees.

235. On another occasion, Defendant LACY, within the scope of his employment as a supervisor employed by Defendant CITY, did orally utter the following statement to his subordinate Plaintiff SMITH regarding Plaintiff WILSON: "Kiki is an entitled nigga. I'm not saying nigger. I'm saying nigga – N-I-G-G-A." Because the word "nigga" is a racial epithet, and racial epithets are never true, this statement is as false as it is offensive; further, this utterance damages not only Plaintiff WILSON's personal reputation but professional one as Defendant LACY was attempting use the slur as a categorization of Plaintiff WILSON's employment abilities and status based on her race.

## FOURTEENTH CAUSE OF ACTION

### (Negligence, Gov. Code § 815.2)

*(Plaintiffs v. All Defendants)*

236. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 235 as though set forth herein.

237. CA Gov. Code § 815.2(a) holds a public entity liable for the acts or omissions of its employees within the scope of their employment, if their acts or omissions would have otherwise given rise to a cause of action against the employee. All individual Defendants were acting within the scope of their employment for Defendant CITY at all times relevant to this complaint.

238. The elements of a cause of action for negligence are: (a) a legal duty to use due care; (b) a breach of such legal duty; and (c) the breach as the proximate or legal cause of the resulting injury. CA Civil Code § 1714(a) provides that "everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or property or person."

239. Defendants, as a matter of law, owed to Plaintiff WILSON a duty to use ordinary care to not cause injury to her by their acts or conduct. Defendants breached their duty to Plaintiff WILSON

103

COMPLAINT

by initiating, facilitating, ratifying, participating in, and/or supporting the racial discrimination, harassment, and retaliation asserted against Plaintiff WILSON, as more specifically alleged above. Defendants' breach of these duties actually and proximately caused Plaintiff to suffer foreseeable mental, physical, and financial injuries including, but not limited to: lack of promotion on countless occasions, lost wages, lost earning potential based on illegal layoff and extended retaliatory administrative leave, continuous and ongoing severe emotional distress, chronic physical health problems and general loss of enjoyment of life.

240. Defendants, as a matter of law, owed to Plaintiff SMITH a duty to use ordinary care to not cause injury to him by their acts or conduct. Defendants breached their duty to Plaintiff SMITH by discriminating against, harassing, and retaliating against him for his affiliation with and support of Plaintiff WILSON, as more specifically alleged above. Defendants' breach of these duties actually and proximately caused Plaintiff SMITH to suffer foreseeable mental, physical, and financial injuries including, but not limited to: lost wages and lost earning capacity due to constructive discharge and continuous and ongoing severe emotional distress.

## FIFTEENTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress, Gov. Code § 815.2)

### *(Plaintiffs v. All Defendants)*

241. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 240 as though set forth herein.

242. CA Gov. Code § 815.2(a) holds a public entity liable for the acts or omissions of its employees within the scope of their employment, if their acts or omissions would have otherwise given rise to a cause of action against the employee. All individual Defendants were acting within the scope of their employment for Defendant CITY at all times relevant to this complaint.

243. An action for negligent infliction of emotional distress is established by proving that (1) the defendant was negligent; (2) plaintiff suffered serious emotional distress; and (3) that defendant's negligence was a substantial factor in causing plaintiff's serious emotional distress. Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry,

104

COMPLAINT

shock, humiliation, and shame. Serious emotional distress exists if an ordinary, reasonable person would be unable to cope with it.

244. Defendants were negligent in their acts and omissions against Plaintiff WILSON, as properly alleged in the Fourteenth Cause of Action. Plaintiff WILSON suffered serious emotional distress proximately and actually caused by the actions of Defendants, alleged in greater detail above, including, but not limited to: distress related to enduring fifteen years of racially-motivated discrimination, harassment, and retaliation at the hands of Defendant CITY employees and the resulting distress regarding Defendant CITY's ignorance and denial regarding her complaints and oppositions to such treatment; and distress related to finally having proof of Defendant LACY's racial animus towards African-Americans and specifically towards Plaintiff WILSON, only to have Defendant CITY not only allow Defendant LACY to keep his job, but even to discipline Plaintiff WILSON for her suffering such emotional distress.

245. Defendants were negligent in their acts and omissions against Plaintiff SMITH, as properly alleged in the Fourteenth Cause of Action. Plaintiff SMITH suffered serious emotional distress proximately and actually caused by the actions of Defendants, especially the actions of Defendants LACY and BURNS, alleged in greater detail above, including, but not limited to: distress related to the abrupt change in treatment from Defendant LACY once Plaintiff SMITH objected to his use of "entitled nigga" when referring to Plaintiff WILSON; distress related to Defendant BURNS denying him an exit interview; distress related to both Defendant LACY and Defendant BURNS' treatment of him on his last day of employment, which was so severe that Plaintiff SMITH abandoned his two-week notice and terminated his employment effective that very day; distress related to being forced to leave a job that he loved because Defendant LACY was discriminating against, harassing, and retaliating against him for his alleged connection with Plaintiff WILSON; and distress related to Defendant CITY's cavalier and unacceptable treatment of his and Plaintiff WILSON's complaint regarding Defendant LACY.

///

///

///

105

COMPLAINT

## SIXTEENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress, Gov. Code § 815.2)

*(Plaintiffs v. All Defendants)*

246. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 245 as though set forth herein.

247. CA Gov. Code § 815.2(a) holds a public entity liable for the acts or omissions of its employees within the scope of their employment, if their acts or omissions would have otherwise given rise to a cause of action against the employee. All individual Defendants were acting within the scope of their employment for Defendant CITY at all times relevant to this complaint.

248. A plaintiff establishes a cause of action for intentional infliction of emotional distress by proving that (1) defendant's conduct was extreme or outrageous; (2) defendant intended to cause plaintiff emotional distress or defendant acted with reckless disregard of the probability that plaintiff would suffer emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the actual and proximate causation of plaintiff's emotional distress was defendant's extreme or outrageous conduct. A defendant's conduct is 'outrageous' when it is so extreme that it exceeds all bounds of conduct that is tolerated in a civilized society.

249. Defendants' racially-motivated conduct as alleged more specifically above, especially that of Defendant LACY calling Plaintiff WILSON an "entitled nigga," categorically constitutes extreme and outrageous behavior, as no civilized society can tolerate racism of any kind, let alone sanctioned and ratified racism within a local government employer. Further, the discriminatory, harassing, and retaliatory conduct displayed by Defendants is similarly extreme and outrageous because it continued on without reprieve for fifteen years and this fact alone exceeds all bounds of conduct that is tolerated in a civilized society. Defendants acted with the intention of causing Plaintiff WILSON emotional distress and there can be no argument to the contrary for their motivation; it is clear and obvious that racially-motivated conduct would cause distress to Plaintiff WILSON and any other person in her position. Plaintiff WILSON did in fact suffer severe or extreme emotional distress that was actually and proximately caused by Defendants racially-motivated conduct as alleged above.

106

COMPLAINT

250. Defendants' conduct, as alleged more specifically above, directed at Plaintiff SMITH similarly categorically constitutes extreme and outrageous behavior because no civilized society can tolerate a person being discriminated against, harassed, and retaliated against for his affiliation with and defense of an African-American woman. Defendants acted with the intention of causing such emotional distress to Plaintiff SMITH and there can be no contrary argument as to their motivation; it is clear and obvious that subjecting Plaintiff SMITH to such racially-motivated conduct would cause such emotional distress. Plaintiff SMITH did in fact suffer severe or extreme emotional distress that was actually and proximately caused by Defendants' racially-motivated conduct as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants, and each of them, for the following:

1. For compensatory damages, including, but not limited to, lost wages and non-economic damages, including pain and suffering, in an amount according to proof;

2. For punitive damages or other penalties, as allowed under applicable law;

3. For injunctive and/or declaratory relief, as allowed under applicable law;

4. Reasonable costs and attorneys' fees incurred, as allowed under applicable law, including but not limited to, CCP § 1021.5, CA Gov't Code § 12965(b), and 42 U.S.C. § 1988;

5. For prejudgment interest on all amounts claimed pursuant to CA Civil Code §§ 3287 and/or 3288; and

6. For such other and further relief as this Court may deem just and proper.

Dated: October 22, 2019

GOYETTE & ASSOCIATES, INC.
A Professional Corporation

By: _____
Gary G. Goyette
Attorney for Plaintiffs

107
COMPLAINT

# EXHIBIT B

SUM-100

| | | |
|---|---|---|
| **SUMMONS** *(CITACION JUDICIAL)* | **RECEIVED** | **FOR COURT USE ONLY** *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CITY OF FRESNO, HOWARD LACY, JEFFREY CARDELL, JENNIFER CLARK, KELLI
FURTADO, TIMOTHY BURNS, ADDITIONAL PARTIES ATTACHMENT FORM IS ATTACHED

2019 OCT 24  P 4: 15
CITY OF FRESNO

E-FILED
10/22/2019 11:35 AM
Superior Court of California
County of Fresno
By: A. Rodriguez, Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

LA-KEBBIA WILSON AND CHARLES SMITH

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Fresno County Superior Court, 1130 O Street, Fresno, CA 93721-2220 | CASE NUMBER: *(Número del Caso):* **19CECG03821** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gary G. Goyette, (SBN 224715), 2366 Gold Meadow Way, Suite 200, Gold River, CA 95670, (916) 851-1900

| | | |
|---|---|---|
| DATE: *(Fecha)* 10/22/2019 | Clerk, by *(Secretario)* A. Rodriguez | , Deputy *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* City of Fresno

under: ☐ CCP 416.10 (corporation)
☐ CCP 416.20 (defunct corporation)
☐ CCP 416.40 (association or partnership)
☒ other *(specify):* CCP 416.50   Public Entity

☐ CCP 416.60 (minor)
☐ CCP 416.70 (conservatee)
☐ CCP 416.90 (authorized person)

4. ☐ by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| WILSON, ET AL. V. CITY OF FRESNO, ET AL. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

KEVIN WATKINS, ANDREIA CUEVAS, DEL ESTABROOKE, and DOES 1 through 100, inclusive.

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**



**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO: 224715 | FOR COURT USE ONLY |
|---|---|
| NAME: Gary G. Goyette<br>FIRM NAME: GOYETTE & ASSOCIATES, INC.<br>STREET ADDRESS: 2366 Gold Meadow Way, Suite 200<br>CITY: Gold River          STATE: CA    ZIP CODE: 95670<br>TELEPHONE NO.: (916) 851-1900      FAX NO.: (916) 851-1995<br>E-MAIL ADDRESS: goyetteg@goyette-assoc.com<br>ATTORNEY FOR (Name): La-Kebbia Wilson and Charles Smith | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno
 STREET ADDRESS: 1130 O Street
 MAILING ADDRESS: 1130 O Street
 CITY AND ZIP CODE: Fresno, 93721-2220
  BRANCH NAME:

Plaintiff/Petitioner: La-Kebbia Wilson, et al.
Defendant/Respondent: City of Fresno, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>19CECG03821 |
|---|---|

TO *(insert name of party being served)*: KEVIN WATKINS

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:   October 29, 2019

JESSICA POST
(TYPE OR PRINT NAME)

▶ *Jessica Post*
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [x] A copy of the summons and of the complaint.
2. [x] Other *(specify)*:

   Civil Case Cover Sheet, Alternative Dispute Resolution Information Packet, Notice of Case Management Conference

*(To be completed by recipient)*:

Date this form is signed:   11 | 1 , 2019

JAMES B. BETTS, on behalf of Kevin Watkins
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ *JSB*
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO: 224715<br>NAME: Gary G. Goyette<br>FIRM NAME: GOYETTE & ASSOCIATES, INC.<br>STREET ADDRESS: 2366 Gold Meadow Way, Suite 200<br>CITY: Gold River                       STATE: CA       ZIP CODE: 95670<br>TELEPHONE NO.: (916) 851-1900       FAX NO.: (916) 851-1995<br>E-MAIL ADDRESS: goyetteg@goyette-assoc.com<br>ATTORNEY FOR (Name):  La-Kebbia Wilson and Charles Smith | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno
STREET ADDRESS: 1130 O Street
MAILING ADDRESS: 1130 O Street
CITY AND ZIP CODE:  Fresno, 93721-2220
BRANCH NAME:

Plaintiff/Petitioner: La-Kebbia Wilson, et al.

Defendant/Respondent: City of Fresno, et al.

| | |
|---|---|
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>19CECG03821 |

TO (insert name of party being served): ANDREIA CUEVAS

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  October 29, 2019

JESSICA POST
(TYPE OR PRINT NAME)

▶ _Jessica Post_
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. [X] A copy of the summons and of the complaint.
2. [X] Other (specify):
   Civil Case Cover Sheet, Alternative Dispute Resolution Information Packet, Notice of Case Management Conference

(To be completed by recipient):

Date this form is signed: _____, 2019

JAMES B. BETTS, on behalf of Andreia Cuevas
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:            STATE BAR NO: 224715<br>NAME: Gary G. Goyette<br>FIRM NAME: GOYETTE & ASSOCIATES, INC.<br>STREET ADDRESS: 2366 Gold Meadow Way, Suite 200<br>CITY: Gold River                    STATE: CA    ZIP CODE: 95670<br>TELEPHONE NO.: (916) 851-1900        FAX NO.: (916) 851-1995<br>E-MAIL ADDRESS: goyetteg@goyette-assoc.com<br>ATTORNEY FOR (Name): La-Kebbia Wilson and Charles Smith | FOR COURT USE ONLY |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno<br>STREET ADDRESS: 1130 O Street<br>MAILING ADDRESS: 1130 O Street<br>CITY AND ZIP CODE: Fresno, 93721-2220<br>BRANCH NAME: | |
| Plaintiff/Petitioner: La-Kebbia Wilson, et al.<br>Defendant/Respondent: City of Fresno, et al. | |
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>19CECG03821 |

TO (insert name of party being served): TIMOTHY BURNS

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  October 29, 2019

JESSICA POST
(TYPE OR PRINT NAME)

▶ _(signature)_
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):

1. [ X ] A copy of the summons and of the complaint.

2. [ X ] Other (specify):
   Civil Case Cover Sheet, Alternative Dispute Resolution Information Packet, Notice of Case Management Conference

(To be completed by recipient):

Date this form is signed: _____ "|5_____ , 2019

JAMES B. BETTS, on behalf of Timothy Burns
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _(signature)_
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

# EXHIBIT C

POS-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:     STATE BAR NO.: 224715<br>NAME: Gary G. Goyette<br>FIRM NAME: GOYETTE & ASSOCIATES, INC.<br>STREET ADDRESS: 2366 Gold Meadow Way, Suite 200<br>CITY: Gold River     STATE: CA    ZIP CODE: 95670<br>TELEPHONE NO.: (916) 851-1900    FAX NO.: (916) 851-1995<br>E-MAIL ADDRESS: goyetteg@goyette-assoc.com<br>ATTORNEY FOR (Name): La-Kebbia Wilson and Charles Smith | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno
  STREET ADDRESS: 1130 O Street
  MAILING ADDRESS: 1130 O Street
  CITY AND ZIP CODE: Fresno, 93721-2220
  BRANCH NAME:

Plaintiff/Petitioner: La-Kebbia Wilson, et al.
Defendant/Respondent: City of Fresno, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>19CECG03821 |
|---|---|

TO (insert name of party being served): HOWARD LACY

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 30, 2019

JESSICA POST
_____
(TYPE OR PRINT NAME)

► _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. [X] A copy of the summons and of the complaint.
2. [X] Other (specify):
   Civil Case Cover Sheet, Alternative Dispute Resolution Information Packet, Notice of Case Management Conference

(To be completed by recipient):

Date this form is signed: _November 14_, 2019

BRUCE J. BERGER, on behalf of Howard Lacy
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY
ON WHOSE BEHALF THIS FORM IS SIGNED)

► _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

# EXHIBIT D

## Case Information

19CECG03821 | La-Kebbia Wilson vs. City of Fresno

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| 19CECG03821 | Civil | Gaab, Kimberly |
| File Date | Case Type | Case Status |
| 10/22/2019 | 08 Unlimited - Civil Rights | Open |

## Party

Plaintiff
**Wilson, La-Kebbia**

Active Attorneys ▾
**Lead Attorney
Goyette, Gary G.
Retained**

Plaintiff
**Smith, Charles**

Active Attorneys ▾
**Lead Attorney
Goyette, Gary G.
Retained**

Defendant
**City of Fresno**

Defendant
**Lacy, Howard**

Defendant
**Cardell, Jeffrey**

Defendant
Clark, Jennifer

Defendant
Furtado, Kelli

Defendant
Burns, Timothy

Defendant
Watkins, Kevin

Defendant
Cuevas, Andreia

Defendant
Estabrooke, Del

## Events and Hearings

10/22/2019 Civil Complaint filed ▼

Complaint

10/22/2019 Summons issued and filed ▼

Summons

Summons issued and filed

10/22/2019 Civil case cover sheet ▾

Civil Case Cover Sheet

10/22/2019 Notice of Hearing ▾

Notice of Hearing

Comment
CMC set for 2/25/20 at 3:30pm. Assignment of Judge for all purposes.

02/25/2020 Case Management Conference ▾

Judicial Officer
Tharpe, D Tyler

Hearing Time
3:30 PM

## Financial

Wilson, La-Kebbia

| | | | | |
|---|---|---|---|---|
| Total Financial Assessment | | | | $585.00 |
| Total Payments and Credits | | | | $585.00 |
| 10/22/2019 | Transaction Assessment | | | $585.00 |
| 10/22/2019 | EFile Payment | Receipt # WEB-2019-83982 | Wilson, La-Kebbia | ($585.00) |

Case 1:19-cv-01658-KES-FJS   Document 1   Filed 11/21/19   Page 125 of 128

**Documents**

Complaint

Summons

Civil Case Cover Sheet

CV-48 Notice of Case Management Conference and Assignment of Judge for All Purposes

Notice of Hearing

Summons issued and filed

| SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO<br>Civil Unlimited Department, Central Division<br>1130 "O" Street<br>Fresno, California  93724-0002<br>(559) 457-1900 | FOR COURT USE ONLY<br><br>10/22/2019<br><br>**Filed by Court** |
|---|---|
| TITLE OF CASE:<br><br>**La-Kebbia Wilson vs. City of Fresno** | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF<br>JUDGE FOR ALL PURPOSES** | CASE NUMBER:<br><br>**19CECG03821** |

**To All Parties and their Attorneys of Record: Gary G. Goyette**

> This case has been assigned to **Kimberly Gaab**, Judge  for **all purposes**.
> All future hearings will be scheduled before this assigned judge.

You are required to appear at a Case Management Conference on **02/25/2020** at **3:30 PM** in **Department 402** of the court located at **1130 "O" Street, Fresno, California.**

You must comply with the requirements set forth in Fresno Superior Court Local Rule Chapter 2.

Failure to appear at the conference may result in imposition of sanctions, waiver of jury trial, or other adverse consequences.

**Defendants:** Appearance at the Case Management Conference does not excuse you from having to file your response in proper legal form within 30 days after the Summons is served on you. You could lose the case if you do not file your response on time.  If you do not know an attorney, and do not have one, you may call an attorney referral service or a legal aid office (listed in the phone book).

---

## DECLARATION

I declare under penalty of perjury under the laws of the State of California that I gave a copy of the **Notice of Case Management and Assignment of Judge for All Purposes** to the person who presented this case for filing.

Date:  **10/22/2019** _____  Clerk, by  **Ashley Rodriguez** _____ , Deputy

**NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT
OF JUDGE FOR ALL PURPOSES**

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Gary G. Goyette (SBN 224715)<br>Goyette & Associates, Inc.<br>2366 Gold Meadow Way, Suite 200<br>Gold River, CA 95670<br>TELEPHONE NO.: (916) 851-1900    FAX NO.: (916) 851-1995<br>ATTORNEY FOR *(Name):* La-Kebbia Wilson and Charles Smith | E-FILED<br>10/22/2019 11:35 AM<br>Superior Court of California<br>County of Fresno<br>By: A. Rodriguez, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno
STREET ADDRESS: 1130 O Street
MAILING ADDRESS: 1130 O Street
CITY AND ZIP CODE: Fresno, 93721-2220
BRANCH NAME: B. F. Sisk Courthouse

CASE NAME:
Wilson, et. al v. City of Fresno, et. al

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ✓ Unlimited  ☐ Limited<br>(Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 19CECG03821<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
✓ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ✓ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✓ monetary  b. ✓ nonmonetary; declaratory or injunctive relief  c. ✓ punitive
4. Number of causes of action *(specify):* 16
5. This case ☐ is  ✓ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 22, 2019

GARY G. GOYETTE
_____(TYPE OR PRINT NAME)_____    _____(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_____

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*.

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition