1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16

LA-KEBBIA WILSON; CHARLES
SMITH,

              Plaintiffs,

      v.

CITY OF FRESNO; HOWARD LACY,

              Defendants.

No.  1:19-CV-01658-KES-BAM

ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS FOR
SUMMARY JUDGMENT

(Docs. 70, 72, 73)

17
18
19
20
21
22
23
24
25
26
27
28

     Following the Court's order on September 8, 2020 granting in part and denying in part defendants' motion to dismiss, plaintiff Wilson maintains the following claims against defendant City of Fresno ("City"):  (1) discrimination, (2) harassment, (3) retaliation, and (4) failure to prevent discrimination, harassment, and retaliation, under the Fair Employment and Housing Act (hereafter "FEHA"), Cal. Gov't Code § 12940(a), (j), (h), (k); (5) discrimination, (6) harassment, and (7) retaliation under 42 U.S.C. § 2000e-2(a)(1)–2000e-3(a) (hereafter "Title VII"); (8) violation of Cal. Labor Code § 1102.5; and (9) slander under Cal. Civ. Code § 46 and Gov't Code § 815.2.  Wilson also maintains two claims against defendant Howard Lacy:  for slander under Cal. Civ. Code § 46 and Gov't Code § 815.2, and for racial discrimination under 42 U.S.C. § 1983.

     Plaintiff Smith maintains six claims against the City:  (1) discrimination, (2) harassment,

1    and (3) retaliation claims under FEHA; (4) retaliation under Title VII; (5) retaliation under Cal.

2    Labor Code § 1102.5, and (6) failure to prevent discrimination, harassment, and retaliation under

3    FEHA.

4         The City moves for summary judgement against Wilson and Smith. Docs. 70, 72. Lacy

5    moves for summary judgment as to Wilson's claims against him. Doc. 73. Wilson filed

6    oppositions to the motions for summary judgment brought by the City of Fresno and Lacy.

7    Docs. 74, 76. Smith filed an opposition to the City's motion for summary judgment against him.

8    Doc. 75. The City replied, Docs. 82, 84, as did Lacy, Doc. 83. The Court heard oral argument

9    from the parties concerning the pending motions. Doc. 86.

10   **I. Background**

11        Wilson began working for the City in the code enforcement division on or about 2004.

12   Doc. 74-5 at 27. In 2009, Wilson sued the City, and certain employees of the City, alleging

13   discrimination, harassment, and retaliation based on race. Doc. 70-5 at 5-12. That lawsuit was

14   settled in 2012. The settlement agreement included a release by Wilson of claims against the City

15   and the City's employees arising from Wilson's employment prior to April 9, 2012. Docs. 70-5

16   at 32–33; 74-1 at 2.

17        In August 2013, Wilson was laid off from her position as a Community Revitalization

18   Specialist ("CRS"). Doc. 75-8 at 14. At the time, Wilson was the most senior employee on the

19   reinstatement list of 8 people. Doc. 74-7 at 5. Several of the other people on the reinstatement

20   list that were laid off at the same time as Wilson returned to employment with the City before

21   Wilson was offered a position. *See* Doc. 75-8 at 14. Wilson was reinstated in or about

22   November/December 2016. Doc. 74-1 at 15.

23        In 2016–2017, Smith worked for the City as a part-time employee, under defendant

24   Lacy's direct supervision. Doc. 75-1 at 9. While Smith was working in his temporary position

25   with the City, he was warned twice by different people not to file complaints with the human

26   resources department and to only discuss concerns with the personnel representative within the

27   department. Doc. 74-5 at 6. In or around December 2016, Smith saw Lacy and Wilson have an

28   awkward exchange in the hallway, and Smith asked Lacy about the interaction. Doc. 74-5 at 15–

16, 18.  Lacy responded by warning Smith to "stay away from her," saying "she's lazy," and describing Wilson as a "no-good piece of shit" who only got her job back after several layoffs because she "played the race card."  *Id.*  Lacy told Smith that if he wanted to get a full-time job with the City, he should stay away Wilson.  *Id.* at 16.

Smith was hired for a full-time position in code enforcement in April 2018.  Doc. 75-1 at 9.  Smith and Wilson both attended a code enforcement training in May 2018.  *See* Doc. 74-5 at 10.  Lacy called Smith late at night sometime after the training and accused Smith of having a private meeting with Wilson and/or exchanging nods with her during the training.  *Id.*  Lacy then advised Smith that he was watching Smith and suggested that meeting with Wilson would prevent Smith from passing probation and continuing his employment with the City.  *Id.*

On June 28, 2018, Smith and Lacy were jointly inspecting a property as part of their duties.  Doc. 74-5 at 11–12.  The property was owned by an African-American woman.  *Id.*  According to Smith, after the inspection was complete, Lacy said, "See Charlie, I'm not a racist.  Kiki [referring to Wilson] wants to say that I'm a racist, but I'm not.  I'm super nice.  It's her.  Kiki is an entitled ni**a.  I'm not saying ni**er.  I'm saying ni**a—N-I-*-*-A."  *Id.* at 12.  At that point, Smith states he told Lacy:  "[J]ust stop it already.  I don't want to hear this crap.  I get it, you hate Kiki, but I'm not here for your issue with Kiki."  *Id.*  Lacy then attempted to justify his comments by saying that "they don't even listen to the right kind of music," and called black rap artists "idiot rappers."  *Id.*  Smith pointed out that black rap artists made a lot more money than Lacy.  *Id.*  Lacy soon after ceased speaking with Smith, stopped replying to his emails, and stopped replying to Smith's texts.  *Id.*  At one point Smith attempted to speak to Lacy, and Lacy said "No, I'm too busy for you," and put a hand in Smith's face.  *Id.* at 5.

Soon after the June 28, 2018, conversation, Lacy informed Smith that Smith was being transferred to the Tire Team.  *Id.* at 5.  Smith indicates that working for the Tire Team was completely outside his skill set and that he had to re-learn everything from scratch.  *Id.* at 8.  Smith asserts that Lacy transferred him to the Tire Team despite several glowing remarks and compliments on his work with his prior team.  *Id.* at 7.

The same day Lacy informed Smith he was being transferred to the Tire Team, Smith had

1    a 20-minute conversation with Tim Burns, who was Lacy's supervisor and the Division Manager.

2    Doc. 74-5 at 14.  The conversation was primarily about basketball, but Smith also informed Burns

3    that he was concerned that his transfer to the Tire Team was an act of retaliation by Lacy.  *Id.*

4    Burns did not discuss Smith's concern about Lacy's retaliation and instead told Smith he would

5    be on the Tire Team for at least two years and that it was up to Smith to accept the transfer or not.

6    *Id.*

7        At some point in the course of his employment, Smith became aware that Lacy had sent

8    out letters under Smith's name without Smith's knowledge.  *See id.* at 20.  An acquaintance of

9    Smith informed him that, after a City inspection, she received a billing from the City reflecting

10    that Smith had done the work.  *Id.*  Smith had not conducted any work at that residence.  *Id.*

11    Smith reported the misrepresentation and possible fraud to Lacy.  *Id.* at 20.  Lacy told Smith not

12    to worry about it and that Lacy would be sending out lots of letters under Smith's name.  *Id.*

13        Following these events, Smith states he was concerned he was going to be fired and he did

14    not want that on his record.  Doc. 74-5 at 15.  On July 10, 2018, Smith emailed his letter of

15    resignation to the City.  *Id.* at 14.  Smith also emailed Burns requesting to meet with him.

16    Doc. 75-8 at 65.  Smith went up to Burns' office after not receiving a reply.  Doc. 74-5 at 6.

17    Burns was present but looked up from his computer, saw Smith and shook his head, and then

18    looked down and did not engage with Smith.  *Id.*  Smith left Burns' office and decided to change

19    his resignation notice to be effective immediately.  Doc. 75-1 at 7.  Approximately 40 minutes

20    later, Smith resigned effective immediately.  *Id.*

21        Later that same day Smith, angry and drunk, sent an insulting and profane email to Burns

22    and several other members of the City's management team.  *Id.* at 7.  Smith regretted the email

23    later.  *Id.*  Smith subsequently applied for open positions with the City in August 2018, but he

24    was not rehired.  Doc. 75-1 at 12.

25        After resigning, Smith called Wilson on or about July 11, 2018.  Doc 74-1 at 16.  He told

26    Wilson that Lacy had called her an "entitled ni**a" and told him she had "played the race card."

27    *Id.*  Following this conversation, Wilson, who was at work, headed to the human resources

28    department to file a complaint.  On her way there, she saw a coworker and raised her voice and

said, "They're all fucking liars. All of them." *Id.* at 6. Wilson made the statement in an open

area, in the direction of two coworkers who were standing together. *Id.*

One of the coworkers reported to Andrea Cuevas, the City's personnel manager in code

enforcement, that Wilson had yelled the profanity at him. Doc. 74-7 at 37. Cuevas decided to

investigate the employee's complaint herself rather than referring the investigation to a city

attorney or outside investigator. *Id.* at 37–38. Cuevas interviewed Wilson, learned that Wilson

had said the phrase shortly after learning she had been called a racial slur by Lacy, decided that

the context did not excuse Wilson's use of the profanity, and decided that a letter of reprimand to

Wilson was warranted. *Id.* at 34–35. Cuevas claims that it was impossible for her to know how

offensive the racial slur used by Lacy would be to a black person, because Cuevas was Hispanic.

*Id.* at 36. Burns issued Wilson a letter of reprimand for the use of profanity on August 10, 2018.

Doc. 70-5 at 56–57. A letter of reprimand is the fourth level of disciplinary action out of eight

possible progressive disciplinary actions, after an oral reprimand and before suspension. Doc. 74-

8 at 55–56.

On August 15, 2018, the City hired attorney Dallas Selling to investigate Wilson's

complaint concerning Lacy's conduct. Doc. 75-8 at 6. Selling's law practice offers legal services

with family law litigation, civil harassment restraining orders, small claims, conservatorships, and

guardianships. Doc. 74-7 at 47. Selling had no formal training in employment law or

investigations into employee misconduct prior to investigating Wilson's complaint. *Id.* at 48. On

January 30, 2019, the City's personnel director instructed Selling to interview most of the

witnesses identified by Wilson to "mitigate any opportunity for her to later claim that the

investigation was incomplete." Doc. 74-8 at 13. The City also instructed Selling to investigate

and provide findings on Wilson's conduct and behavior at the same time she was investigating

Lacy's alleged wrongdoing. *Id.*

Selling conducted 12 hours of interviews over a period of approximately one year before

submitting her findings and recommendations. *See id.* at 17. During Selling's interview with

Lacy, she failed to ask Lacy whether he had used the racial slur to describe Wilson; instead,

Selling questioned Lacy about his conversation with Smith without mentioning the racial slur,

1  assuming Lacy would correct her if he had used the slur.  Docs. 74-8 at 50; 74-7 at 60.  Selling

2  stated that she is unable to know if a black person would be offended by a white person calling

3  them a "ni**a" because she herself has thick skin.  Doc. 74-7 at 55–56.

4          During the pendency of the investigation, the City placed both Wilson and Lacy on

5  administrative leave with pay, which for Wilson lasted from August 31, 2018 to July 22, 2019.

6  Docs. 74-1 at 17; 70-6 at 94.  On August 30, 2019, Selling submitted her report to the City.

7  Selling found Wilson's complaint against Lacy to be without merit, concluding it was unlikely

8  that Lacy ever called Wilson an "entitled ni**a."  Doc. 74-8 at 18.  Selling found that Wilson was

9  known to be aggressive, hostile, and disruptive, and recommended that Wilson be terminated

10 from her employment.  Id. at 18–19.  On September 6, 2019, the City delivered to Wilson a letter

11 regarding the results of the investigation, which indicated that there were insufficient facts and

12 evidence to sustain Wilson's allegations against Lacy.  Id. at 2.  The City also found that Lacy's

13 statement "that Ms. Wilson has improperly asserted numerous false allegations of racial

14 discrimination" was not an intentional falsification of facts.  Doc. 75-8 at 3.

15         Based on the investigation, on September 30, 2019, the City issued Wilson a three-day

16 suspension for violations of the Fresno Municipal Code and city policies.  Doc. 74-1 at 11.

17 Wilson appealed the suspension to the City's Civil Service Board ("CSB").  Id.  On September

18 14, 2020, the CSB issued findings and an order increasing the disciplinary sanction from a three-

19 day suspension to termination.  Id. at 14.  Wilson then filed a writ of administrative mandamus

20 with the Fresno County Superior Court.  Id.  The state court granted the writ on August 30, 2020,

21 because on an appeal the CSB was not allowed to increase the sanction from a suspension to

22 termination.  Doc. 70-7 at 101–02.  On remand, the CSB incorporated the prior findings and

23 imposed a 30-day suspension on Wilson without holding a further hearing.  Id.

24         On May 13, 2019, Wilson filed an administrative complaint with the California

25 Department of Fair Employment and Housing ("DFEH").[1]  Doc. 71-4 at 3.  DFEH issued Wilson

26 a notice of her right to sue on May 17, 2019.  Id.  Smith filed his administrative complaint with

27

28
_____
[1]  This agency is now called the Civil Rights Division.  At all relevant times for purposes of this
motion, the agency was called the Department of Fair Employment and Housing.

6

1   DFEH on or about June 10, 2019, and DFEH issued Smith a right to sue notice on June 11, 2019.

2   Doc. 75-1 at 3.  On October 22, 2019, the plaintiffs filed their complaint in state court.  Docs. 74-

3   1 at 3; 75-1 at 3.  The City defendants removed the action to this Court on November 21, 2019.[2]

4   **II. Legal Standard**

5          Summary judgment is appropriate when the moving party "shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

7   Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the

8   nonmoving party."  *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (internal

9   quotations omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is

10  "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477

11  U.S. at 841.  The parties must cite "particular parts of materials in the record."  Fed. R. Civ. P.

12  56(c)(1).  The Court then views the record in the light most favorable to the nonmoving party and

13  draws reasonable inferences in that party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

14  *Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

15         The party moving for summary judgment must first carry its initial burden of production.

16  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz*

17  *Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If, as in this case, the moving party would not

18  have the burden to prove the disputed claim at trial, then it must carry its initial burden of

19  production at summary judgment in one two ways: "either produce evidence negating an essential

20  element of the nonmoving party's claim or defense or show that the nonmoving party does not

21  have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

22  *Nissan Fire*, 210 F.3d at 1102.  Then, to carry its burden of persuasion on the motion, the moving

23  party must "persuade the court that there is no genuine issue of material fact."  *Id.*

24         If the moving party meets its initial responsibility, the burden then shifts to the opposing

25  party to establish that a genuine issue exists as to a material fact.  *Matsushita Elec. Indus. Co.*,

26

27  _____

    [2] The City terminated Wilson effective September 8, 2022, and the removal order was

28  subsequently upheld by the CSB.  The parties agree that Wilson's 2022 termination is not at issue
    in the present case.

475 U.S. 585–87; *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. at 587.

**III. Analysis and Discussion**

The three pending motions for summary judgment raise arguments requiring separate analysis.  This Order first addresses the City's motion for partial summary judgment as to Wilson's claims, then the City's motion for summary judgment as to Smith's claims, and finally Lacy's motion for summary judgment on Wilson's claims.

### A. City's Motion for Summary Judgment as to Wilson's Claims

The grounds for the City's motion can be summarized as follows: (1) any claim concerning actions prior to April 9, 2012 is barred by Wilson's 2012 settlement agreement with the City; (2) based on the timing of Wilson's filing of her administrative complaint, her Title VII claims are barred as to any acts prior to July 17, 2018; (3) Wilson's Title VII claims are time-barred by her failure to timely file this suit after receiving the DFEH's right to sue notice; (4) based on the timing of Wilson's filing of her administrative complaint, her FEHA claims are barred as to any acts prior to May 13, 2018; (5) Wilson's Title VII and FEHA discrimination and retaliation claims fail because the August 2018 letter of reprimand and Wilson's suspension were not adverse employment actions, and Wilson is barred from relitigating the CSB's determination that her suspension was not motivated by racial animus; (6) there is insufficient evidence of severe or pervasive conduct to establish Wilson's FEHA harassment claim; (7) there is insufficient evidence of severe or pervasive conduct to establish Wilson's Title VII harassment claim, and (8) based on Wilson's termination from City employment on September 8, 2022 on

1    unrelated grounds not at issue in this case, Wilson may not recover damages for lost wages after

2    September 8, 2022.  These arguments are addressed in turn.

3        **1. Conduct Prior to April 9, 2012**

4        The 2012 settlement agreement between Wilson and the City, effective as of April 9,

5    2012, states in pertinent part:

6        Plaintiff forever releases the City, together with their current and
         former Council Members, employees and agents, independent
7        contractors, and their predecessors, successors, assigns, trustees,
         representatives, attorneys, accountants, and insurers (referred to
8        collectively as "Releasees") from any and all claims, demands,
         causes of action, damages, liabilities, interest, penalties, attorneys'
9        fees and costs, whether known or unknown, alleged or not alleged,
         suspected or unsuspected, contingent or matured, including but not
10       limited to:

11       a.  any and all claims relating to or arising from plaintiff's
             employment relationship with the City to the Effective Date of
12           the Agreement.

13       b.  any and all claims under the law of any jurisdiction, including but
             not limited to wrongful termination in violation of public policy,
14           discrimination, harassment, retaliation, . . . negligent or
             intentional infliction of emotional distress . . . ;
15
         c.  any and all claims for violation of any federal, state or municipal
16           statute, including but not limited to Title VII of the Civil Rights
             Act of 1964, the Civil Rights Act of 1991 . . . the California Fair
17           Employment and Housing Act, the California Family Rights Act,
             and the California Labor Code;
18
         d.  any and all claims for violation of the Constitution of the United
19           States of America or the Constitution of any state;

20       e.  any and all claims arising out of any other laws and regulations
             relating to employment or employment discrimination;
21

22   Doc. 70-5 at 32–33.  Wilson acknowledges that she entered into the settlement agreement with

23   this release.  Doc. 74-1 at 2.

24       Wilson argues that her damages for pain and suffering resulting from acts prior to April 9,

25   2012, are not released under the settlement agreement, claiming they remain available under

26   workers' compensation law.  Doc. 74 at 13.  However, Wilson is not bringing a workers'

27   compensation claim and the settlement agreement broadly releases the City from liability for acts

28   prior to April 9, 2012, its effective date.  *See* Doc. 1.  Wilson does not cite any law supporting her

9

1    assertion that the continuing violations doctrine allows her claims to reach back to acts covered

2    by her contractual release of claims, and her argument is unpersuasive.  Any employment actions

3    taken by the City and its employees as to Wilson prior to April 9, 2012, are released by the

4    settlement agreement and cannot form the basis for Wilson's present claims.[3]  Based on the

5    foregoing, the City's motion to exclude acts prior to April 9, 2012 from consideration as a basis

6    for Wilson's claims is GRANTED.

7        **2. Title VII: Administrative Complaint Must be Filed Within 300 Days**

8        An employee has 180 days from the date of the Title VII violation to file an administrative

9    complaint with the Equal Employment Opportunity Commission ("EEOC"), or 300 days from the

10   date of the Title VII violation to file with a state or local agency that has the authority to grant

11   relief on the Title VII claims.  42 USCS § 2000e-5(e)(1); *see also Scott v. Gino Morena Enters.,*

12   *Ltd. Liab. Co.*, 888 F.3d 1101, 1106 (9th Cir. 2018).  Wilson filed an administrative complaint

13   with DFEH on May 13, 2019, and therefore is considered to have dual filed with the EEOC as of

14   that date.  Doc. 74-1 at 4.  The City argues that Wilson cannot rely on adverse actions by the City

15   prior to July 17, 2018, which is 300 days prior to the filing of her administrative claim, as the

16   basis for her Title VII claims.  Doc. 70-1 at 13–14.

17       Wilson argues the continuing violations doctrine allows her to use misconduct prior to

18   July 17, 2018 to support her Title VII claims.  However, the continuing violations doctrine was

19   limited when applied to federal claims by *National Railroad Passenger Corporation v. Morgan*,

20   536 U.S. 101, 110 (2002), which found that "[a] discrete retaliatory or discriminatory act

21   'occurred' on the day that it 'happened.'  A party, therefore, must file a charge within either 180

22   or 300 days of the date of the act or lose the ability to recover for it."  The continuing violations

23   doctrine does not save discrete discriminatory acts that are time barred, even if they are plausibly

24   or sufficiently related to the act that is not time barred.  *Id.* at 114.  In contrast, because a hostile

25   work environment requires a court to look at all the circumstances, if "an act contributing to the

26
_____

27   [3] Whether any act prior to April 9, 2012, may be referenced at trial for another purpose is not at
     issue in this Order.  Such evidentiary issues are more properly the subject of a motion in limine in
     advance of trial or an evidentiary ruling at trial.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536

28   U.S. 101, 113 (2002).

1    claim occurs within the filing period, the entire time period of the hostile environment may be

2    considered by a court for the purposes of determining liability." *Id.* at 117.

3        The City's motion for summary judgment on Wilson's Title VII claims, as to defendants'

4    actions prior to July 17, 2018, is GRANTED IN PART and DENIED IN PART. Wilson filed her

5    administrative complaint with DFEH on May 13, 2019, and therefore her Title VII retaliation and

6    discrimination claims may not be based on discrete retaliatory and discriminatory actions

7    occurring prior to July 17, 2018. Only discriminatory and retaliatory actions on or after July 17,

8    2018 may form the basis for Wilson's Title VII retaliation and discrimination claims. However,

9    as to Wilson's Title VII harassment claim, defendants' actions before July 17, 2018 may form

10   part of the basis for her harassment claim if they are shown to be related under the federal

11   continuing violations doctrine (and provided they are after the effective date of Wilson's release

12   of claims in 2012, as addressed above). *See id.* at 116–17.

13       **3. Title VII: 90 Days to File After Receiving Right to Sue Notice**

14       If the EEOC decides not to act on the administrative complaint, the EEOC "shall notify"

15   the aggrieved person and the complainant then has 90 days from such notice to file a civil action.

16   42 U.S.C. § 2000e-5(f)(1). The City argues that Wilson received her right to sue notice from

17   DFEH on May 17, 2019, and that Wilson had 90 days from that date to file a civil suit asserting

18   her Title VII claims. Doc. 70-1 at 12. As Wilson filed her civil suit on October 22, 2019, more

19   than 150 days later, the City argues that her Title VII claims are time-barred. *Id.* at 13.

20       In *Scott*, the Ninth Circuit clarified that the 90-day time period under 42 U.S.C.

21   § 2000e-5(f)(1) is triggered only upon the aggrieved person receiving an EEOC right to sue

22   notice, which is distinct from a state agency's right to sue letter. *See Scott*, 888 F.3d at 1107–08,

23   110. In *Scott*, the plaintiff did not file her complaint in court until more than 90 days after the

24   DFEH issued its right to sue letter, but her Title VII claims were found to be timely because the

25   90-day time limit was not triggered until the plaintiff received the EEOC's right to sue letter,

26   which did not occur until after the plaintiff filed her civil suit. *Id.* at 110.

27       The City's argument is foreclosed by *Scott*. Wilson filed with DFEH on May 13, 2019.

28

11

Doc. 70-5 at 42. Filing with the DFEH dual filed her administrative complaint with the EEOC.[4] Wilson was issued the DFEH notice granting her the right to sue on her Title VII claims on May 17, 2019. Doc. 70-5 at 54. As of the filing of her civil complaint, Wilson had not yet received a right to sue notice from the EEOC. *See* Doc. 70-3 at 1–3. Therefore, the clock on the 90-day limitations period had not yet begun to run. *See Scott*, 888 F.3d at 110. As in *Scott*, Wilson timely filed her Title VII claims. The City's motion for summary judgment as to Wilson's Title VII claims on the ground that Wilson failed to timely file her civil suit is DENIED.

### 4. Timeliness Under FEHA

The City argues that Wilson's FEHA claims may not be based on actions by the defendants prior to May 13, 2018, due to FEHA's statutory limitations period. Doc. 70-1 at 14. A party must file a verified complaint within one year of alleged FEHA violations. Cal. Gov't Code § 12960. Discriminatory, retaliatory, and harassing employer actions are time barred from forming the basis of a FEHA claim if they occurred more than a year prior to the filing of an administrative complaint. *Yanowitz v. L'Oreal USA, Inc.*, 32 Cal. Rptr. 3d 436, 456 (2005). However, under the continuing violations doctrine in California, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period." *Id.* The California continuing violations doctrine applies to discrimination, retaliation, and harassment claims. *Id.* at 457–58. This is an explicit departure from the limitations in *National Railroad* on the continuing violations doctrine for purposes of Title VII claims. *Id.*

Wilson filed her administrative complaint with the DFEH on May 13, 2019. Accordingly, she may rely on actions prior to May 13, 2018, for her FEHA claims only if the continuing violations doctrine covers those actions. *See* doc. 74-1 at 3; Cal. Gov't Code § 12960. In considering the alleged actions not released by the 2012 settlement agreement, Wilson's claims are largely based on defendants' actions after Wilson learned on July 11, 2018 of Lacy's use of a

---

[4] *See* WORKSHARING AGREEMENT BETWEEN DFEH and EEOC for Fiscal Year 2019 at 2 (Oct. 3, 2018) *https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2019/01/WorksharingAgreementFY2019WSA.pdf*.

1    racial slur against her.  As to the City's conduct prior to May 13, 2018 but not barred by the 2012

2    settlement agreement, Wilson relies on the following alleged actions: (i) despite her seniority and

3    available positions, the City failed to rehire her for several years after her 2013 layoff, finally

4    rehiring her only in late 2016 when she was the last remaining person on the rehire list, and (ii) a

5    statement by Lacy in 2013 that he wanted to keep his "blood pure," and Lacy's statements to

6    Smith in December 2016 that Wilson was "lazy" and a "no good piece of shit."  *See* docs. 74-7 at

7    5, 8; 75-8 at 14; 84 at 10.

8         To determine if actions taken beyond the limitations period come in under the continuing

9    violations doctrine as part of a course of conduct, a court considers whether the actions (1) were

10   similar kinds of actions, (2) occurred with reasonable frequency, and (3) acquired a degree of

11   permanence.  *Yanowitz*, 32 Cal. Rptr. 3d at 459.  The failure to rehire was frequent for the period

12   from 2013 to 2016, and each new opening Wilson was qualified for and not rehired for was a new

13   instance of failing to re-hire.  However, the failure to rehire ended when the City rehired Wilson

14   in late 2016, *see* doc. 74-7 at 7–8, which is over 18 months before the conduct that is the subject

15   of Wilson's current claims.  Moreover, none of Wilson's current allegations concern a failure to

16   rehire.  Wilson's allegation that the City failed to rehire her from 2013–2016 does not meet any of

17   the similarity, frequency, or permanence requirements necessary for application of the continuing

18   violation doctrine, and it is therefore barred by Cal. Gov't Code § 12960.

19        As to Lacy's statements, Wilson has failed to satisfy her burden of demonstrating that they

20   occurred with the requisite frequency.  *See Jumaane v. City of Los Angeles*, 241 Cal. App. 4th

21   1390, 1402 (2015).  In *Brennan v. Townsend & O'Leary Enterprises, Inc.*, the California Court of

22   Appeal considered the continuing violations doctrine in a case of sexual harassment, explaining

23   that "we cannot see how the incidents of wrongful conduct relied upon by plaintiff in this action

24   can be considered as continuing with reasonable frequency when the incidents are spaced apart no

25   less than six months and sometimes more than a year."  199 Cal. App. 4th 1336, 1354 n.4 (2011).

26   Although the court in *Brennan* went on to assume that none of the plaintiff's examples of sexual

27   harassment were statutorily barred, its discussion on frequency is nonetheless valuable in

28   understanding California's interpretation of the doctrine.  Here, Lacy's statements allegedly

1    occurred sometime in 2013 and December 2016, respectively.  Doc. 84 at 10.  His use of a racial

2    slur allegedly occurred on June 28, 2018.  Doc. 74-5 at 11–12.  Thus, the gaps in misconduct are

3    much greater than those in *Brennan*:  3 years—at a minimum—from his 2013 statement to his

4    insults concerning Wilson in December 2016, and then an additional 18 months from that latter

5    conduct to his calling Wilson a racial slur in June 2018.  Accordingly, Wilson has failed to

6    demonstrate that the misconduct occurred with reasonable frequency.  *Yanowitz*, 32 Cal. Rptr. 3d

7    at 459.  The City's motion to limit Wilsons's FEHA claims to actions occurring on or after to

8    May 13, 2018, is GRANTED.  Wilson is limited to relying on the defendants' actions on or after

9    May 13, 2018 as the basis for her FEHA claims of discrimination, retaliation, and harassment.

10        **5. Wilson's Discrimination and Retaliation Claims Under FEHA and Title VII**

11        The City argues that Wilson's 2018 letter of reprimand and her subsequent suspension

12    were not adverse employment actions and that there is insufficient evidence to support Wilson's

13    Title VII and FEHA retaliation and discrimination claims.  *See* Doc. 70-1 at 19–20.  This Order

14    first addresses whether these measures were adverse employment actions and then considers

15    whether Wilson's discrimination and retaliation claims survive the motion for summary

16    judgment.

17            *a. 2018 Letter of Reprimand*

18        The City argues the August 2018 letter of reprimand issued to Wilson for using profanity

19    in the workplace, standing alone, is not an adverse employment action because the letter of

20    reprimand did not impact Wilson's job classification, compensation, benefits, or any other term of

21    employment, and because Wilson cannot establish the necessary animus.  Doc. 70-1 at 20.

22    Wilson argues that the City itself defines letters of reprimand as a disciplinary action and the

23    manner and context in which the letter of reprimand was issued was part of a series of employer

24    actions which negatively affected Wilson's ability to perform her job function or be selected for

25    advancement.  Doc. 74 at 19.

26        "For claims of disparate treatment under Title VII, an adverse employment action is one

27    that 'materially affects the compensation, terms, conditions, or privileges of employment.'"

28    *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (quoting *Davis v. Team*

14

1   *Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).  If the action affected an employer's decision to

2   take other actions that did materially affect an employee's employment, then the original

3   employer action may also constitute an adverse employment action.  *See id.* at 1013.  "Under

4   Ninth Circuit law, a letter of reprimand may constitute an adverse employment action; however,

5   in order to determine whether a letter is considered an adverse employment action, the court must

6   consider whether there was any employment consequence as a result of the reprimand letter."

7   *Thomas v. Spencer*, 294 F. Supp. 3d 990, 999 (D. Haw. 2018) (citing *Vasquez v. Cty. of L.A.*, 349

8   F.3d 634 (9th Cir. 1998); *see also Kortan v. Cal. Youth Authority*, 217 F.3d 1104, 1112–13 (9th

9   Cir. 2000)).

10      The City's guide to corrective action explains that a written reprimand is the fourth level

11  of progressive discipline out of eight possible disciplinary actions and is to be used when "an

12  offense is sufficiently serious" to require more than an oral warning.  *See* Doc. 74-8 at 55.  The

13  letter contains a statement of the specific action of the employee and a warning that further

14  violations will result in more serious discipline.  *Id.*  The 2018 reprimand was used as an exhibit

15  in Wilson's CSB hearing during her appeal of her suspension, Doc. 70-6 at 3 (Ex. C & 1), and it

16  is noted under the "Previous Work History" section and "Evidence" section of the the of the CSB's

17  "Findings, Decision and Order After Hearing", which ultimately led to Wilson's 30-day

18  suspension.  Doc. 70-7 at 6, 13.  In the findings section of that order, the CSB relied on the

19  reprimand letter, among other evidence, in finding that Wilson spoke in an "accusatory and

20  inappropriate" manner by using profanity, that Wilson's conduct was habitual, and that Wilson

21  would be "unable to change her behavior to an acceptable standard."  *Id.* at 22–23.

22      Viewing this evidence in the light most favorable to the plaintiff, as is required on a

23  summary judgment motion, the 2018 letter of reprimand materially affected Wilson's

24  employment because it was relied on in a later proceeding that resulted in her suspension.  *Cf.*

25  *Thomas*, 294 F. Supp. 3d at 1000 (finding that when reprimand letter was placed in personnel file

26  but was later removed and was not used as part of subsequent employment action, reprimand

27  letter was not an adverse employment action).  As the 2018 letter of reprimand was part of the

28  record on which the CSB relied in later suspending Wilson, the letter of reprimand constitutes an

1    adverse employment action.[5]

2                    *b. 2019 Suspension*

3          The City argues the CSB decision concerning Wilson's appeal of her 2019 suspension

4    must be given preclusive effect.  The effect of a state court judgment or administrative agency

5    decision in subsequent federal suits is determined by 28 U.S.C. § 1738, the full faith and credit

6    statute.  Section 1738 states that the judicial proceedings of any state court "shall have the same

7    full faith and credit in every court within the United States and its Territories and Possessions as

8    they have by law or usage in the courts of such State, Territory or Possession from which they are

9    taken."  "In determining the preclusive effect of a state administrative decision . . . we follow the

10   state's rules of preclusion."  *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012).  Under

11   California law, if an administrative proceeding possessed the necessary judicial character and the

12   final decision was not overturned by a writ of mandate, then the administrative decision will have

13   a preclusive effect on a later civil action.  *Runyon v. Bd. of Trs. of Cal. State Univ.*, 108 Cal. Rptr.

14   3d 557, 566 (2010); *see also White*, 671 F.3d at 927.

15         The factors to consider in determining whether the CSB proceeding had the requisite

16   judicial character are whether "(1) the administrative hearing was conducted in a judicial-like

17   adversary proceeding; (2) the proceedings required witnesses to testify under oath; (3) the agency

18   determination involved the adjudicatory application of rules to a single set of facts; (4) the

19   proceedings were conducted before an impartial hearing officer; (5) the parties had the right to

20   subpoena witnesses and present documentary evidence; and (6) the administrative agency

21   maintained a verbatim record of the proceedings."  *Imen v. Glassford*, 247 Cal. Rptr. 514, 518

22   (Ct. App. 1988).

23         Wilson's CSB hearing was an adversarial proceeding in which both parties were

24   _____

25   [5]  The City also argues that the letter of reprimand cannot be considered an adverse employment action because Wilson did not identify in a deposition the decision maker who acted with

26   retaliatory or discriminatory animus in issuing the letter of reprimand.  Doc. 70-1 at 21.  Wilson disputes this point, identifies Andreia Cuevas as the decision maker, and asserts that Cuevas's

27   investigation was rushed and racially motivated.  Doc. 74-1 at 6; Doc. 74-2 at 5.  To the extent there is a dispute as to this material fact, that also supports the denial of the City's summary

28   judgment motion on this issue.

                                                16

1   represented by counsel. Doc. 74-1 at 12. Wilson acknowledges that "[a]t the hearing, the parties

2   had the opportunity to subpoena witnesses; [and] the parties had an opportunity to present

3   argument, introduce witness testimony, cross-examine witnesses, introduce documentary

4   evidence and object to evidence." *Id.* at 13. Witnesses were placed under oath, the proceedings

5   were recorded by a court reporter, and the CSB was operating in a quasi-judicial capacity as

6   authorized by charter. *Id.* at 12–13. There is no genuine dispute as to the nature of the CSB

7   administrative hearing, therefore the Court turns to whether issue preclusion applies to the CSB's

8   decision regarding Wilson's suspension.

9       The City argues the CSB decision found that Wilson's suspension was justified and was

10  not racially motivated. Doc. 70-1 at 20. The City argues that the doctrine of issue preclusion

11  therefore prevents relitigating whether the suspension was a racially motivated adverse

12  employment action. *Id.* Issue preclusion, or collateral estoppel, prevents successive litigation of

13  an issue of a law or fact resolved in a prior court judgment. *White*, 671 F.3d at 926 (citing *Taylor*

14  *v. Sturgell*, 553 U.S. 880, 892, (2008)).

15      Under California law, issue preclusion applies when: (1) the issue sought to be precluded

16  is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the

17  prior proceeding; (3) the issue was "necessarily decided" in the prior proceeding; (4) the prior

18  decision was final and decided on the merits; (5) the party against whom issue preclusion is

19  sought was the same as, or was in privity with, the party in the former proceeding; and (6) the

20  application of the doctrine is consistent with preserving the integrity of the judicial system, the

21  promotion of judicial economy, and protection of litigants from harassment by vexatious litigants.

22  *Lucido v. Superior Court*, 272 Cal. Rptr. 767, 769–70 (Cal. 1990).

23      The first *Lucido* element concerns determining whether the issue to be precluded is

24  identical to an issue decided in a prior proceeding. *See Lucido*, 272 Cal. Rptr. at 342. "The

25  'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the

26  two proceedings, not whether the ultimate issues or dispositions are the same." *Id.* In this matter,

27  the factual background of Wilson's suspension as alleged in her complaint is identical to the issue

28  before the CSB, where Wilson had the opportunity to testify. *Compare* Doc. 70-7 at 8–17 (CSB

1    decision), *with* Doc. 1 at ¶¶ 141–42, 145, 161–65, 169, 171 (allegations within complaint).

2         Next, the issue must have been actually litigated in the previous hearing.  272 Cal. Rptr. at

3    342.  The Ninth Circuit has found that "an issue is actually litigated when an issue is raised,

4    contested, and submitted for determination."  *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir.

5    2019).  A review of the closing arguments at the CSB hearing shows that the issue of whether the

6    three-day suspension was imposed based on racial animus was asserted and contested before the

7    CSB and was submitted to the CSB for decision.  *See* doc. 70-6 at 121–122.  This is sufficient to

8    establish the issue was actually litigated in the CSB proceeding.

9         To meet the third *Lucido* factor, the issue must have been "necessarily decided" in the

10   previous hearing.  272 Cal. Rptr. at 342.  To be "necessarily decided," the issue must "not have

11   been 'entirely unnecessary' to the judgment in the initial proceeding."  *Id.*  In this matter, the CSB

12   incorporated its original findings and evidence into its final decision and order, only changing the

13   sanction from termination to a 30-day suspension as ordered by the Superior Court's writ of

14   mandamus.  Doc. 70-7 at 108-109.  The CSB found Wilson engaged in an unprovoked pattern of

15   abusive and aggressive conduct towards her coworkers and superiors on three occasions after

16   being given several warnings that the conduct needed to stop, and that Wilson's testimony of

17   persecution, harassment, and discrimination by the City was suspect and not credible, and that the

18   same applied to her witnesses.  Doc. 70-7 at 23.  The question of whether the City acted with

19   racial animus in suspending Wilson was raised, and that issue was decided adversely to Wilson,

20   as the CSB found Wilson's arguments and testimony not credible.  Therefore, the element of

21   being necessarily decided is also met.

22        The fourth *Lucido* factor requires the previous proceeding to have been final and decided

23   on the merits.  272 Cal. Rptr. at 342.  The CSB ultimate decision was final and it addressed the

24   merits of Wilson's arguments, meeting the fourth *Lucido* factor.  Doc. 70-7 at 108–09; Doc. 70-1

25   at 20.  Wilson appears to argue that the decision was not final because there was no opportunity to

26   present additional evidence following the grant of the writ of mandamus, *see* Doc. 74 at 22, but

27   the writ of mandamus was granted on an issue of law concerning the CSB's increase of the initial

28   sanction from a suspension to termination.  On remand, the CSB simply revised the sanction back

18

1    to a suspension to comply with the Superior Court's order, and there was no need for a further

2    hearing.

3          There does not appear to be any dispute as to the fifth factor, as the parties are identical.

4    *See* 272 Cal. Rptr. at 342.  Finally, granting preclusion in this instance is in line with the policies

5    of judicial economy and preserving the integrity of the judicial system, as California law

6    recognizes that such agency proceedings are of sufficient judicial character to be entitled to full

7    faith and credit.  *See Lucido*, 272 Cal. Rptr. at 342.

8          The CSB's determination as to the City's suspension of Wilson in October 2019 meets all

9    the requirements for the doctrine of issue preclusion to apply, and Wilson may not relitigate the

10   suspension decision or claim that it was motivated by racial animus.  Accordingly, the City's

11   motion for partial summary judgment as to the issue of Wilson's suspension is GRANTED.

12   Wilson may not rely on her suspension as an "adverse employment action" for purposes of her

13   FEHA or Title VII claims, and she is precluded from arguing her suspension was motivated by

14   racial animus.

15                *c. Wilson's Title VII discrimination claim survives summary judgment*

16         Under the *McDonnell Douglas* burden shifting framework used in Title VII discrimination

17   claims, a plaintiff must first show (1) they belong to a protected class, (2) they were qualified for

18   the position, (3) they were subject to an adverse employment action, and (4) similarly situated

19   individuals outside the protected class were treated more favorably.  *McDonnell Douglas Corp. v.*

20   *Green*, 411 U.S. 792, 802 (1973).  Once a plaintiff presents a prima facie case of these elements,

21   the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory

22   reason for the challenged adverse employment action.  *Id.*  If the employer articulates a legitimate

23   reason for the challenged behavior, then the plaintiff must show the employer's offered

24   explanation is pretextual by establishing that a discriminatory reason was the more likely

25   explanation for the employer's action or by showing that the proffered explanation is not

26   believable.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, (1981).  "As a

27   general matter, the plaintiff in an employment discrimination action need produce very little

28   evidence in order to overcome an employer's motion for summary judgment," because the

1    ultimate question of discrimination is most appropriately conducted before a factfinder on the full

2    record.  *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000).

3         Wilson belongs to a protected class as an African American, and the City does not dispute

4    that she was qualified for her position.  Wilson has presented admissible evidence that she was

5    subject to the following adverse employment actions on account of her race:  the August 2018

6    letter of reprimand, Doc. 70-5 at 56, and the City's failure to focus the investigation on Lacy's

7    misconduct as opposed to Wilson's behavior, *see* Docs. 74-8 at 2, 13; 74-6 at 56.  A reasonable

8    person could conclude from the City's investigation that there may have been racial bias in the

9    City's investigation.  The City selected Selling to handle the investigation despite her alleged

10   inexperience with investigating workplace misconduct, doc. 74-7 at 47–48; Selling never asked

11   Lacy if he used a racial slur to describe Wilson, *id.* at 57–60; and Selling failed to demonstrate

12   any understanding of the offensiveness of the racial slur allegedly used by Lacy, *id.* at 56.  Wilson

13   also provided evidence that her white co-workers were not disciplined for more significant

14   violations of the City's professionalism policies, such as Lacy not being disciplined despite being

15   subject to a citizen's arrest, and the City's failure to discipline Lacy for his use of profanity in the

16   office.  Doc. 74-6 at 44; Doc. 74-5 at 28.  This is sufficient to establish Wilson's prima facie

17   claim for racial discrimination.

18        The City has offered an alternative explanation for the letter of reprimand, noting that

19   Wilson's misconduct was investigated and promptly addressed through the letter of reprimand

20   because she admitted to using the profanity, which was against the City's professionalism policy.

21   Doc. 70-1 at 22.  However, the City fails to explain why the City shifted Selling's investigation

22   from focusing on Wilson's complaint against Lacy to also including an investigation of Wilson.

23        Wilson provides evidence from which a jury could find that the City's explanation for the

24   letter of reprimand is pretextual, as Cuevas was aware that Wilson used the profanity only shortly

25   after she found out that Lacy had referred to her by a deeply offensive racial slur.  Doc. 74-7 at

26   35.  Cuevas admits that she did not consider that as a mitigating factor in her investigation, *id.*,

27   and she claimed not to know if a black person would be offended by being called the n-word, *id.*

28   at 36.  Additionally, Wilson has presented evidence that white employees were not disciplined for

1    swearing or other more extreme actions, s*ee* Docs. 70-8 at 57; 74-6 at 42–43; 74-8 at 10–11, 43.

2    The evidence offered is sufficient for a reasonable jury to find that the City's explanation for the

3    2018 letter of reprimand was not credible.  *See Chuang,* 225 F.3d at 1128 (little direct evidence is

4    needed to move past summary judgment).

5         There is sufficient evidence supporting Wilson's discrimination claim to survive a motion

6    for summary judgment.  The City's motion for summary judgment on Wilson's Title VII

7    discrimination claim is DENIED.

8              *d. Wilson's Title VII retaliation claim survives summary judgment*

9         The elements of a Title VII retaliation claim are that "(1) the plaintiff participated in a

10   protected activity, (2) the plaintiff suffered an adverse action, and (3) there was a causal link

11   between the protected activity and the adverse action."  *Ray v. Henderson*, 217 F.3d 1234, 1240

12   (9th Cir. 2000).  The protected activity in this matter is Wilson reporting Lacy's use of an

13   egregious slur against her.  *See* Doc. 74-8 at 13.  The adverse employment actions are the same as

14   discussed above: the letter of reprimand, which was issued after Wilson's report of Lacy's

15   misconduct, and Selling's subsequent investigation.  Wilson presents evidence that Cuevas was

16   aware that the outburst for which Wilson was given a letter of reprimand was prompted by

17   Wilson becoming aware of Lacy's offensive racial slurs against her.  Doc. 74-7 at 35.  Wilson's

18   complaint against Lacy led to Selling's investigation, which the City expanded to include an

19   investigation into Wilson.  Wilson has claims that these actions followed and resulted from

20   Wilson's complaint of Lacy's use of a racial slur.  Wilson has made a prima facie case of Title

21   VII retaliation.

22        The City offers the same explanations on the retaliation claim as on the discrimination

23   claims for the letter of reprimand and the City's expansion of Selling's investigation from

24   focusing on Lacy's misconduct to investigating Wilson.  As discussed above, Wilson has

25   sufficiently demonstrated a triable issue of fact as to whether the City's explanations are pre-

26   textual.  The City's motion for summary judgment as to Wilson's Title VII retaliation claim is

27   DENIED.

28

21

*e. Wilson's FEHA discrimination/retaliation claims survive summary judgment*

FEHA discrimination and retaliation claims are evaluated under the same *McDonnel Douglas* burden shifting framework. *See Yanowitz*, 32 Cal. Rptr. 3d at 444; *Guz v. Bechtel Nat'l, Inc.*, 100 Cal. Rptr. 2d 352, 378, (2000) ("California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, . . . based on a theory of disparate treatment."). The extended statute of limitations and more expansive doctrine of continuing violations allows Wilson to include additional evidence as support for her FEHA claims, including the information Wilson learned from Smith on or around July 11, 2018, as addressed above. For the same reasons as with Wilson's Title VII claims, the City's motion for summary judgment on Wilson's FEHA discrimination and retaliation claims is also DENIED.

**6. Sufficiency of Wilson's FEHA Harassment Claim**

The City argues that it is entitled to summary judgment on Wilson's FEHA harassment claim because Wilson is unable to demonstrate that the City's conduct is sufficiently severe to support a harassment claim under FEHA during the applicable timeframe. Doc. 70-1 at 24.

To establish a prima facie case of a hostile work environment, Wilson must demonstrate that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment." *Ortiz v. Dameron Hosp. Ass'n*, 250 Cal. Rptr. 3d 1, 12 (Ct. App. 2019). Additionally instructive is section 12923 of the California Government Code, titled "Application of laws about harassment," which states in pertinent part:

> The Legislature hereby declares that harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being. In this regard . . . "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job." ([*Harris v.*

22

1    *Forklift Systems*, 510 U.S. 17, 26 (1993)]).

2    (b) A single incident of harassing conduct is sufficient to create a
     triable issue regarding the existence of a hostile work environment if
3    the harassing conduct has unreasonably interfered with the plaintiff's
     work performance or created an intimidating, hostile, or offensive
4    working environment.

5    (c) The existence of a hostile work environment depends upon the
     totality of the circumstances and a discriminatory remark, even if not
6    made directly in the context of an employment decision or uttered by
     a nondecisionmaker, may be relevant, circumstantial evidence of
7    discrimination.

8    (e) Harassment cases are rarely appropriate for disposition on
     summary judgment.

9

10    A California appellate court applying section 12923 has held that cases that focused on the

11   "concerted pattern of harassment of a repeated, routine or a generalized nature" were no longer

12   good law in determining what conduct creates a hostile work environment on a summary

13   judgment motion. *Beltran v. Hard Rock Hotel Licensing, Inc.*, 315 Cal. Rptr. 3d 842, 855 (Ct.

14   App. 2023).

15    In applying this standard to the totality of the facts viewed in the light most favorable to

16   Wilson, a supervisor in Wilson's work environment (Lacy) called her an egregious racial slur to a

17   newer employee (Smith), Doc. 74-1 at 16. Lacy did so after telling Smith to stay away from

18   Wilson, Doc. 74-5 at 10, and stating that Wilson "played the race card" to get her position, *id.* at

19   15–16. Lacy told Smith that, if he wanted to advance in the workplace, he should stay away from

20   Wilson, and he then called Smith after hours to warn him to not even nod at Wilson during a

21   training. *Id.* at 10. Wilson was distraught and angry upon learning of Lacy's conduct. *See, e.g.*,

22   Doc. 74-7 at 35. The City's broadening of its investigation from investigating Wilson's complaint

23   regarding Lacy's conduct to also investigating Wilson, allegedly in retaliation against Wilson,

24   also affected Wilson's working environment and made her job more difficult. *See, e.g.*, Doc. 70-

25   7 at 13–14. Under the totality of the circumstances, this is not the rare circumstance in which

26   summary judgment is appropriate in a FEHA work environment harassment case. *See* Cal. Gov't

27   Code § 12923(e); *Beltran*, 315 Cal. Rptr. 3d at 854–55. There is sufficient evidence for this claim

28   to go before a jury. The City's motion for summary judgment is DENIED as to Wilson's FEHA

1    harassment claim.

2    **7. Sufficiency of Wilson's Title VII Harassment Claim**

3         The City does not specifically address Wilson's Title VII workplace harassment claim,

4    and instead notes in a footnote that Title VII uses similar standards for admissible evidence of

5    workplace harassment by citing to Sixth Circuit case law.  Doc. 70-1 at 26 n.10.  Whether this

6    statement is true following the passage of California Government Code section 12923 is not

7    addressed by either party, and the Court will not grant the City's motion as to Wilson's Title VII

8    harassment claim in the absence of appropriate briefing.  To the extent the City moves for

9    summary judgment on Wilson's Title VII harassment claim, that motion is DENIED.

10    **8. Effect of Termination on September 8, 2022, on Damages for Lost Wages**

11         The City terminated Wilson effective September 8, 2022, based on grounds not at issue in

12    this case.  The City argues that Wilson therefore cannot recover damages for lost wages beyond

13    that date.  At oral argument, Wilson confirmed that she does not contest her termination date and

14    agreed that she may not recover damages for lost wages beyond September 8, 2022.  The City's

15    motion to limit Wilson's damages for lost wages to those she incurred through September 8, 2022

16    is therefore GRANTED.

17    ***B. City's Motion for Summary Judgment as to Smith's Claims***

18         Smith maintains six claims against the City for: (i) discrimination, (ii) harassment, and

19    (iii) retaliation under FEHA; (iv) retaliation under Title VII; (v) retaliation under Cal. Labor Code

20    § 1102.5; and (vi) failure to prevent discrimination, harassment, and retaliation under FEHA.  The

21    City seeks summary judgment against Smith on all claims.  Doc. 72 at 3–4.

22         The City argues that (1) Smith's Title VII retaliation claim is untimely, and, alternatively,

23    Smith's retaliation claim cannot be based on acts prior to August 14, 2018, (2) Smith cannot

24    establish his retaliation claims under Title VII, FEHA, or Labor Code section 1102.5, (3) Smith

25    cannot establish his FEHA discrimination claim, (4) Smith cannot establish his FEHA harassment

26    claim, and (5) Smith's FEHA claim for the City's failure to prevent retaliation fails because of the

27    failure of his underlying FEHA claims.

28

1

**1. Timeliness Under Title VII**

2       The City makes similar arguments regarding the timeliness of Smith's Title VII claim as

3   with respect to Wilson's Title VII claims.  As addressed above, *Scott* controls the interpretation of

4   42 U.S.C. § 2000e-5(f) concerning the timeliness of a plaintiff's Title VII claims.  *See Scott*, 888

5   F.3d at 1107–08, 1110.  When an administrative complaint is filed with DFEH, it is considered

6   dual filed with the EEOC, and DFEH's right to sue notice also provides the party the right to sue

7   on associated Title VII claims.  *Id.* at 1110.  However, the party's 90-day time limit within which

8   to bring its Title VII claims does not begin to run until the EEOC also issues its right to sue

9   notice.  *Id.* at 1111.

10       Smith filed his complaint with DFEH, and therefore dual filed his complaint with the

11   EEOC, on June 10, 2019.  DFEH issued Smith a notice of his right to sue on June 11, 2019.

12   Doc. 74-1 at 3.  The EEOC did not issue Smith a right to sue letter before he filed the complaint

13   in this case, so the 90-day limitations period for Smith to file his Title VII claim in court did not

14   begin to run.  *See id.*  Accordingly, Smith's claims are not barred by the 90-day time limitation

15   under 42 U.S.C. § 2000e-5(f), and the City's motion for summary judgment on this ground is

16   DENIED.

17       The City also argues that Smith's Title VII retaliation claim cannot be based on conduct

18   prior to August 14, 2018, which is 300 days prior to the effective filing of his claim with the

19   DFEH and EEOC on June 10, 2019.  Doc. 72-1 at 11.  Smith argues that the continuing violations

20   doctrine allows him to rely on acts from before the 300-day time period in 42 U.S.C. § 2000e-5(e)

21   to support his Title VII retaliation claim.  Doc. 75 at 11.  However, as discussed above, only

22   discrete actions within the 300-day limitations period are actionable in a Title VII retaliation

23   claim, and the continuing violations doctrine may not be used to bring in discrete acts outside the

24   300-day window.  *National Railroad Passenger Corp.*, 536 U.S. at 114–15.  Therefore, only

25   discrete acts of retaliation by defendants on or after August 14, 2018 may be the basis of liability

26   for Smith's Title VII retaliation claim.  The City's motion to exclude acts prior to August 14,

27   2018, from forming the basis for liability on Smith's Title VII retaliation claim is GRANTED.

28

1        **2. Retaliation Claims Under Title VII, FEHA, and Labor Code § 1102.5**

2        The City argues that Smith's retaliation claims fail as Smith did not engage in a protected

3 activity and Smith was not subject to an adverse employment action. Doc. 72-1.

4        *a. Title VII retaliation claim*

5        The elements of a Title VII retaliation claim are "(1) the plaintiff participated in a

6 protected activity, (2) the plaintiff suffered an adverse action, and (3) there was a causal link

7 between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240

8 (9th Cir. 2000). A protected activity under Title VII includes opposing a practice made unlawful

9 under Title VII. 42 U.S.C. § 2000e-3. To be considered an adverse employment action for a

10 retaliation claim under Title VII, "a plaintiff must show that a reasonable employee would have

11 found the challenged action materially adverse, 'which in this context means it well might have

12 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

13 *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). As

14 with Wilson's Title VII claims, the *McDonnell Douglas* framework applies. *See Texas Dep't of*

15 *Community Affairs*, 450 U.S. at 256.

16        As addressed above, only adverse employment actions on or after August 14, 2018 may

17 form the basis for Smith's Title VII retaliation claim. Smith must identify a discrete action that

18 occurred within that relevant timeframe. *National Railroad Passenger Corp.*, 536 U.S. at 114–

19 15. The only such alleged adverse employment action was the City's failure to rehire Smith.

20 Smith has alleged that he participated in the protected activity of opposing Lacy's discriminatory

21 remarks against Wilson on June 28, 2018, and that, because of his opposition to Lacy's conduct,

22 the City refused to rehire him in late August 2018 after he had resigned. Doc. 75 at 13–14. The

23 City's proffered non-discriminatory reason for declining to rehire Smith is that Smith sent a

24 profane email to his supervisors after his resignation. Doc. 72-1 at 23 (citing Doc. 72-6 at 103).

25 Smith does not deny sending the email or its profane nature, and the City's explanation for

26 declining to rehire Smith satisfies its burden of production.

27        Smith argues that the City's explanation was pretextual, pointing among other things to

28 the City's discriminatory treatment of him in the period in June and July 2018 after he objected to

1    Lacy's use of offensive racial slurs, including Smith's transfer to the Tire Team and Burns'

2    failure to respond when Smith raised concerns that the transfer was retaliatory. "At the pretext

3    stage, the plaintiff's burden remains low, and 'very little evidence is necessary to raise a genuine

4    issue of fact regarding an employer's motive.'" *Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th

5    Cir. 2024) (quoting *Opara v. Yellen*, 57 F.4th 709, 723–24 (9th Cir. 2023). There are genuine

6    disputes of material fact as to whether the City's refusal to rehire Smith was pretextual, and the

7    City's motion for summary judgment as to Smith's Title VII retaliation claim is therefore

8    DENIED.

9                    *b. FEHA retaliation claim*

10    The elements of a retaliation claim under FEHA are (1) a plaintiff engaged in a protected

11    activity, (2) the employer subjected the employee to an adverse employment action, and (3) there

12    is a causal link between the protected activity and the employer's action. *Yanowitz*, 32 Cal. Rptr.

13    3d at 444. Under FEHA, an employee engaged in a protected activity if their actions opposed any

14    practice or conduct the employee reasonably believed was unlawful and the employer was aware

15    the opposition was based on protesting the perceived unlawful conduct. *Id.* at 448. A subordinate

16    employee's use of subtle or indirect means to avoid engaging in or furthering discriminatory

17    conduct by a supervisor may also be protected. *See id.* at 449. A FEHA retaliation claim is

18    evaluated under the *McDonnell Douglas* framework on a motion for summary judgment. *Id.* at

19    445.

20    First, the City argues that Smith's attempts to stop Lacy from saying further racially

21    derogatory slurs regarding Wilson is not a protected activity under FEHA because Smith did not

22    make a formal complaint. Doc. 72-1 at 15. That argument is unpersuasive. Smith did not simply

23    walk away when Lacy, his supervisor, used offensive racial slurs in reference to Wilson. Smith,

24    who was only a probationary employee, told Lacy to "just stop it already" and said, "I don't want

25    to hear this crap." That statement was a strong protest objecting to Lacy's conduct, particularly

26    coming from a probationary employee.

27    An informal complaint to a supervisor that protests a behavior prohibited under FEHA is

28    considered a protected activity because FEHA protects employees in situations "in which a

1    subordinate employee may wish to avoid directly confronting a supervisor with a charge of

2    discrimination and the employee engages in subtler or more indirect means in order to avoid

3    furthering or engaging in discriminatory conduct." *Yanowitz*, 32 Cal. Rptr. 3d at 449; *see*

4    *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 506 (9th Cir. 2000) (informal

5    complaints are the appropriate subject of a retaliation claim). The relevant question is not

6    whether the employee made a formal complaint of discrimination, but whether the employee

7    conveyed to the employer the employee's reasonable concerns that the employer is acting in an

8    unlawful discriminatory manner. *Yanowitz*, 32 Cal. Rptr. 3d at 449. A reasonable jury could find

9    Smith sufficiently did so in his response to Lacy's use of racial slurs. Moreover, after Lacy

10   transferred Smith to the Tire Team in alleged retaliation, Smith reported to Burns (Lacy's

11   supervisor) that he was concerned that Lacy was retaliating against him. There is therefore

12   sufficient evidence from which a jury could find that Smith engaged in protected activity under

13   FEHA.

14        The next question is whether Smith has shown a prima facie case that he was subject to an

15   adverse employment action. Unlike Title VII, all adverse employment actions that occurred

16   within the year prior to the filing of the administrative complaint may serve as the basis for

17   Smith's FEHA retaliation claim. The evidence of adverse employment actions against Smith

18   include among other allegations: (1) the transfer of Smith to the Tire Team in July 2018, and

19   Burns' failure to address Smith's concern that the transfer was retaliatory, and (2) the City's

20   refusal to rehire Smith after his resignation. *See* Doc. 75 at 14. Smith argues these were

21   retaliatory actions after he objected to Lacy's use of offensive racial slurs against Wilson. *See*

22   Doc. 75 at 12 (citing *Yanowitz*, 32 Cal. Rptr. 3d at 456).

23        An adverse employment action "must materially affect the terms, conditions, or privileges

24   of employment to be actionable, the determination of whether a particular action or course of

25   conduct rises to the level of actionable conduct should take into account the unique circumstances

26   of the affected employee as well as the workplace context of the claim." *Id.* at 453. The conduct

27   must meet the "materiality" test, which extends to "the entire spectrum of employment actions

28   that are reasonably likely to adversely and materially affect an employee's job performance or

1  opportunity for advancement in his or her career." *Id.* at 1054.  As addressed above, the refusal to

2  rehire Smith was an adverse employment action.

3  Similarly, the circumstances of Lacy's transfer of Smith to the Tire Team, and Burns'

4  refusal to address Smith's concern that the transfer was a retaliatory action by Lacy, sufficiently

5  establishes for purposes of this motion that Smith suffered an adverse employment action due to

6  the transfer.  Lateral transfers to materially different jobs may be considered adverse employment

7  actions.  *Patten v. Grant Joint Union High Sch. Dist.*, 37 Cal. Rptr. 3d 113, 121 (Ct. App. 2005)

8  (lateral transfer of principal to different school with lesser reputation was materially adverse

9  employment action because it affected principal's ability to advance in career).  Smith establishes

10  that he had performed well on his prior team but knew nothing about the Tire Team and faced

11  having to start over on that team.  The responsibilities of the two positions were materially

12  different, as Smith was transferred from a position in which he excelled to one in which had to

13  begin again "from scratch."  A reasonable jury could conclude that the transfer was reasonably

14  likely to adversely and materially affect Smith's job performance and his opportunity for

15  advancement beyond probationary status.  *See Patten*, 37 Cal. Rptr. 3d at 121.  Under these

16  circumstances and viewing the evidence in the light most favorable to Smith, the lateral transfer

17  constitutes a material adverse employment action.

18  Smith's transfer to the Tire Team and Burns' failure to address Smith's concern that the

19  transfer was retaliatory conduct by Lacy, and the City's failure to rehire Smith, sufficiently

20  establish a prima facie case for retaliation under the *McDonnell Douglas* framework.[6]  The next

21  step is to examine the City's proffered non-discriminatory reasons for these actions.

22  The City claims Smith's transfer to the Tire Team in July 2018 was a common assignment

23  that was within the parameters of the job for which Smith was hired.  Doc. 72-1 at 17; Doc. 72-6

24  at 114.  The City argues that the transfer could not have been in retaliation for Smith's interaction

25  with Lacy because Burns, rather than Lacy, made the decision to transfer Smith, and that the

26  position on the Tire Team provided Smith the same salary, benefits, and job classifications as his

27

28  [6] Given the findings on this claim, the Order need not address Smith's allegations of additional adverse employment actions.

1    previous assignment.  Doc. 72-1 at 16–17 (citing Doc. 72-6 at 91–92).  The City argues it

2    declined to rehire Smith in August 2018 due to the profane email he previously sent to his

3    supervisors following his resignation.  Doc. 72-1 at 23 (citing Doc. 72-6 at 103).

4        A "plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's

5    proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise

6    not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

7    employer." *Chuang*, 225 F.3d at 1127 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217,

8    1220 (9th Cir. 1998)).  The evidence of the City's different treatment of Smith after Smith

9    objected to Lacy's use of the racial slurs are sufficient to create genuine disputes of material fact

10   as to whether the City's stated reasons were pretextual.  Doc. 75 at 14–15.  For example, whether

11   Burns or Lacy made the decision to transfer Smith is material and disputed, and Lacy appears to

12   admit he was involved to some extent in the decision.  *See* Doc. 72-6 at 100.  Additionally, as

13   further addressed below, genuine disputes of material fact exist regarding the City's motivation

14   for the failure to rehire Smith.

15       "As a general matter, the plaintiff in an employment discrimination action need produce

16   very little evidence in order to overcome an employer's motion for summary judgment," because

17   the ultimate question of discrimination is most appropriately conducted before a factfinder on the

18   full record.  *Chuang*, 225 F.3d at 1124.  Smith meets this hurdle for his FEHA retaliation claim.

19       Accordingly, the City's motion for summary judgment on Smith's FEHA retaliation claim

20   is DENIED.

21           *c. Retaliation under Cal. Labor Code § 1102.5*

22       A claim under California's whistleblower statute, California Labor Code section 1102.5,

23   must establish (1) an employee engaged in a protected whistleblowing activity (2) the employer

24   then subjected the employee to an adverse employment action, and (3) the employee's protected

25   whistleblowing action was a contributing factor to an adverse employment action.  Cal. Lab Code

26   § 1102.5(b); *see Lawson v. PPG Architectural Finishes, Inc.*, 289 Cal. Rptr. 3d 572, 575, (2022).

27   The employee is engaged in a whistleblower activity under section 1102.5 when the

28   whistleblower has reasonable cause to believe the employer is violating state or federal law or a

1   local, state, or federal rule/regulation and the whistleblower discloses the violation "with a

2   government agency, with a person with authority over the employee, or with another employee

3   who has authority to investigate or correct the violation." *Lawson*, 289 Cal. Rptr. 3d at 575.  The

4   *McDonnell Douglas* burden-shifting framework does not apply to a claim under section 1102.5.

5   *Id.* at 577.  Instead, a plaintiff must show by a preponderance of the evidence that the employee's

6   whistleblowing activity "was a contributing factor" to an adverse employment action.  *Id.*  The

7   employer then must demonstrate by clear and convincing evidence that the employer would have

8   taken the same action(s) for legitimate, independent reasons even if the employee had not

9   engaged in a whistleblowing activity.  *Id.*

10          Smith's stated basis for his section 1102.5 claim is that he reported the suspected illegal

11  activity of sending out fraudulent letters to a supervisor.  *See* Doc. 75 at 12–13.  In June 2018, a

12  Fresno resident received a bill from the City for an inspection purportedly conducted by Smith.

13  Doc 74-8 at 67–68.  The resident knew Smith and later brought the bill to his attention because

14  Smith had not done any such work.  As Smith had not done the inspection, he expressed concern

15  to Lacy that letters with his name on them were being sent out for work that he did not do.  *Id.*

16  Lacy responded to Smith's concerns by asking if Smith trusted him and telling Smith the City

17  would continue to send letters out under Smith's name.  Doc. 74-5 at 20–21.  However, Smith

18  does not identify when this communication occurred or how it led to an adverse employment

19  action.[7]

20          Under these facts, Smith has not sufficiently demonstrated that this brief communication

21  with Lacy contributed to any subsequent adverse employment action.  He fails to draw a

22  connection between this incident and any of his alleged adverse employment actions.

23  Accordingly, the City's motion for summary judgment on Smith's claim for a violation of

24  California Labor Code section 1102.5 is GRANTED.

25  _____

26  [7]  The complaint alleges additional details concerning this event, Doc. 1 at 13, however the
    complaint's allegations are not evidence and cannot establish a genuine dispute of material fact at

27  the summary judgment stage.  *See Olivier v. Baca*, 913 F.3d 852, 861 (9th Cir. 2019) (citing
    *Flaherty v. Warehousemen, Garage & Serv. Station Emp. Loc. Union No. 334*, 574 F.2d 484, 486

28  n.2 (9th Cir. 1978)).

1

### 3. Smith's FEHA Discrimination Claim

2        To establish his FEHA discrimination claim, Smith must show (1) he belonged to a

3    protected class, (2) he was qualified and performing competently for the position he held, (3) he

4    was subject to an adverse employment action, and (4) similarly situated individuals outside the

5    protected class were treated more favorably.  *Guz v. Bechtel Nat'l, Inc.*, 100 Cal. Rptr. 2d 352,

6    379, (2000).  The *McDonnell Douglas* framework applies to FEHA discrimination claims on

7    summary judgment.  *See id.* at 378.  "As a general matter, the plaintiff in an employment

8    discrimination action need produce very little evidence in order to overcome an employer's

9    motion for summary judgment," because the ultimate question of discrimination is most

10   appropriately conducted before a factfinder on the full record.  *Chuang v. Univ. of Cal. Davis*,

11   225 F.3d 1115, 1124 (9th Cir. 2000).

12       Smith's objection to Lacy's use of racial slurs against Wilson is protected under FEHA,

13   *see Yanowitz*, 32 Cal. Rptr. 3d at 444, therefore Smith has provided evidence that he was part of a

14   protected class for these purposes.  There is no dispute Smith was qualified for the position he

15   held with the City.  As discussed above, Smith was subjected to adverse employment actions,

16   including being transferred to the Tire Team, Burns' failure to address Smith's concern that the

17   transfer was retaliatory, and the City's failure to rehire him.  However, Smith fails to establish

18   that similarly-situated individuals outside the protected class were treated more favorably.

19   Without the evidence of a similarly situated individual outside the protected class being treated

20   more favorably than Smith, Smith fails to make a prima facie case for employment discrimination

21   under FEHA.  The City's motion for summary judgment on Smith's FEHA discrimination claim

22   is GRANTED.

23

### 4. Smith's FEHA Harassment Claim

24       To establish a prima facie case of harassment, Smith must demonstrate that "(1) [he] is a

25   member of a protected class; (2) [he] was subjected to unwelcome harassment; (3) the harassment

26   was based on [his] protected status; (4) the harassment unreasonably interfered with [his] work

27   performance by creating an intimidating, hostile, or offensive work environment; and (5)

28   defendants are liable for the harassment."  *Ortiz*, 250 Cal. Rptr. 3d 1, 12 (Ct. App. 2019).  Courts

1    are instructed under FEHA that "[a] single incident of harassing conduct is sufficient to create a

2    triable issue regarding the existence of a hostile work environment if the harassing conduct has

3    unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile,

4    or offensive working environment" and "[h]arassment cases are rarely appropriate for disposition

5    on summary judgment."  Cal. Gov't Code § 12923.

6           Smith's FEHA harassment claim is based on Lacy's communications with him, including:

7    (1) Lacy's statements to Smith in late 2016 calling Wilson offensive names, stating that Wilson

8    got her job back only because she "played the race card," and warning Smith to stay away from

9    her if Smith wanted to get a fulltime job with the City, (2) Lacy calling Smith late at night in May

10   2018 demanding to know if Smith had nodded at or met with Wilson during a training and

11   warning him not to do so, (3) Lacy's use of offensive racial slurs about Wilson when talking to

12   Smith in June 2018, (4) Lacy giving Smith the "silent treatment" after Smith objected to Smith's

13   use of racial slurs and his other comments, including Lacy putting a hand in Smith's face to tell

14   him to go away and stop talking and Lacy's refusal to respond to Smith's messages, and

15   (5) Lacy's warnings that Smith should not go to the human resources department with complaints.

16   Doc. 75 at 17–18.  Smith also presents evidence that Lacy's supervisor, Burns, refused to discuss

17   the issue when Smith complained that his transfer to the Tire Team was a retaliatory, and that

18   Burns refused to meet with Smith on the day of Smith's resignation.  *Id.* at 6, 14.

19          Association harassment requires acquaintance or friendship with a person of a protected

20   class, or advocacy for the person belonging to a protected class.  *See Michelucci v. Cty. of Napa*,

21   No. 18-cv-05144-HSG, 2019 WL 1995332, at *5 (N.D. Cal. May 6, 2019).

22          There are genuine disputes of material fact as to whether defendants' conduct was

23   sufficiently severe and pervasive to establish Smith's FEHA harassment claim, precluding

24   summary judgment on this claim.  This is not the rare circumstance appropriate for summary

25   judgment.  *See* Cal. Gov't Code § 12923.  The City's motion for summary judgment on Smith's

26   FEHA harassment claim is DENIED.

27

28

1

2

### 5. Smith's FEHA Claim for Failure to Prevent Discrimination, Retaliation, or Harassment

3       The City argues that Smith's FEHA claim for failure to prevent discrimination, retaliation,

4   and harassment fails because Smith has failed to establish an underlying FEHA discrimination,

5   retaliation, or harassment claim.  Doc. 72-1 at 26.  As the Court finds that Smith's FEHA

6   retaliation and harassment claims survive summary judgment, Smith's claim against the City for

7   failure to prevent retaliation and harassment also survives.  The City's motion for summary

8   judgment on this claim is therefore DENIED.

9                    *C. Lacy's Motion for Summary Judgment*

10      Lacy moves for summary judgment as to Wilson's claims against him for (1) racial

11  discrimination under 42 U.S.C. § 1983, and (2) slander under Cal. Civ. Code § 46.  In the

12  alternative, Lacy asks the Court to rule on whether certain of Wilson's allegations are time-

13  barred.

14      **1. Wilson's Claim Under 42 U.S.C. § 1983**

15      As addressed above, in her 2012 settlement agreement with the City, Wilson released any

16  claims for employment actions by the City and its employees prior to April 9, 2012.  Therefore,

17  any alleged conduct before April 9, 2012 cannot be the basis for Wilson's § 1983 claim against

18  Lacy.

19      Lacy also argues that, to the extent Wilson's claim is based on conduct before October 22,

20  2017, it is barred by the statute of limitations.  Doc. 73-1 at 14–19.  Wilson acknowledges that

21  much of the alleged conduct by Lacy occurred before October 22, 2017, but she argues that those

22  earlier acts form part of a continuing course of conduct that is properly included as part of her

23  § 1983 claim under the continuing violations doctrine.  Doc. 76 at 5–6.

24      The statute of limitations for § 1983 claims brought in federal courts in California is two

25  years.  *See Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014).

26  "Under federal law, a claim accrues when the plaintiff knows or should know of the injury that is

27  the basis of the cause of action."  *Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir. 2009).  The

28  Supreme Court has clarified that "[d]iscrete acts such as termination, failure to promote, denial of

34

1    transfer, or refusal to hire," are the kind of acts that must occur within the appropriate statute of

2    limitations period to support a discrimination claim.  *See Nat'l R.R. Passenger Corp. v. Morgan*,

3    536 U.S. 101, 114 (2002).

4          As explained above, the continuing violations doctrine was limited when applied to

5    federal claims by *Morgan*.  *See* discussion *supra* pp.10–11.  Moreover, the Ninth Circuit has

6    explained that "[a]lthough *Morgan* was a Title VII case . . . we have applied *Morgan* to bar

7    § 1983 claims predicated on discrete time-barred acts, not-withstanding that those acts are related

8    to timely-filed claims."  *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822,

9    829 (9th Cir. 2003) (citation omitted).  Accordingly, the acts allegedly committed by Lacy prior

10   to October 22, 2017 are time-barred and Wilson may not rely on them as a basis for her § 1983

11   claim.[8]

12         Turning next to the merits, to succeed on a § 1983 claim, Wilson must show that Lacy

13   violated a right guaranteed to Wilson by federal statute or the U.S. Constitution, and that Lacy

14   was acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  Here, Wilson

15   brings a § 1983 claim premised on several equal protection violations allegedly committed by

16   Lacy within the scope of his employment as a supervisor employed by the City.  Doc. 1 at 100–

17   01.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

18   'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

19   direction that all persons similarly situated should be treated alike."  *Serrano v. Francis*, 345 F.3d

20   1071, 1081 (9th Cir. 2003) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439

21   (1985)).  "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that

22   the defendant acted with an intent or purpose to discriminate against him based upon his

23   membership in a protected class."  *Serrano*, 345 F.3d at 1082.  "Intentional discrimination means

24   that a defendant acted at least in part *because of* a plaintiff's protected status."  *Maynard v. City of*

25   _____

26   [8]  Wilson does not dispute the dates Lacy offers as to when her claims for conduct prior to
     October 22, 2017 accrued.  Docs. 73-1 at 14–19; 76 at 5–6.  In any event, the Court finds that the
27   accrual dates identified by Lacy accurately represent "when the plaintiff knows or should know of
     the injury that is the basis of the cause of action" as applied in this case.  *Douglas v. Noelle*, 567
28   F.3d 1103, 1109 (9th Cir. 2009).

1  *San Jose*, 37 F.3d 1396, 1404 (9th Cir.1994) (emphasis in original) (citing *Pers. Adm'r of Mass.*
2  *v. Feeney*, 442 U.S. 256, 279 (1979)).

3          As to the alleged conduct occurring within the limitations period, Wilson has identified
4  that Lacy:  (1) refused to let her pick up tires from customers on tire amnesty day, even though
5  that was the normal practice and non-African-American employees picked up tires from
6  customers that same day; (2) intentionally delayed approving repairs on her work truck for
7  several weeks, even though other employees received timely repairs; (3) refused to approve
8  providing her with a new truck, despite her seniority and the fact that the non-African-American
9  employees driving the other six trucks eligible for replacement all received new trucks; (4) zip-
10 tied her earbuds together and threw them behind her workstation; (5) called her a racial epithet
11 and told employees to stay away from her; (6) broke her reading glasses in half; and (7) made a
12 habit of congregating by her cubicle and walking directly by her multiple times after she returned
13 from administrative leave.  Docs. 76 at 3, 5; 76-2 at 2–14.

14         As to tire amnesty day, Lacy argues he did not cause another employee to prevent Wilson
15 from picking up tires on February 18, 2018.  Doc. 73-1 at 20.  Wilson relies on her statement of
16 disputed fact that Lacy was involved with the other employee in this action, but the supporting
17 testimony she cites does not establish Lacy's involvement.  Doc. 76-5 at 36.  Accordingly, Wilson
18 has not created a genuine factual dispute.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984
19 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is
20 insufficient to raise genuine issues of fact and defeat summary judgment.").

21         Regarding the delayed repairs on Wilson's old truck and refusal to approve a new truck,
22 Lacy points to testimony from another employee who provided Wilson with keys to the old truck.
23 Doc. 76-1 at 20.  However, that employee did not attribute any delay in repair to Lacy.  When
24 asked whether Lacy ever refused to provide Wilson with a new truck, the employee stated,
25 "Yeah, I don't think anyone was given that opportunity."  Doc. 73-5 at 196, 205.  Wilson does not
26 identify any admissible supporting evidence regarding the delayed repairs or refusal to approve a
27 new truck.  The allegations in Wilson's complaint are not evidence and cannot establish a genuine
28 dispute of material fact at the summary judgment stage.  *See Olivier v. Baca*, 913 F.3d 852, 861

1    (9th Cir. 2019) (citing *Flaherty v. Warehousemen, Garage & Serv. Station Emp. Loc. Union No.*

2    *334*, 574 F.2d 484, 486 n.2 (9th Cir. 1978)).  Wilson has also failed to present evidence that any

3    failure to provide a new truck was racially motivated.  *Jones v. Williams*, 791 F.3d 1023, 1037

4    (9th Cir. 2015) ("To avoid summary judgment on a claim of racial discrimination, the plaintiff

5    must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of

6    the evidence that [the challenged action] was racially motivated.").

7            With respect to the earbuds, Wilson states she believes Lacy took, handled and zip-tied

8    her earbuds since he was the only one with a key to access the zip ties kept in the office.  Docs.

9    76-2 at 14; 76-5 at 40.  Lacy responds that "zip-ties are commonplace items anyone can purchase

10   at a number of different places" and Wilson's attempt to connect him to this incident is purely

11   speculative.  Doc. 73-1 at 21.  In the absence of any direct evidence implicating Lacy, Wilson's

12   speculation that Lacy might have been the person who zip-tied her earbuds together does not

13   create a triable issue of fact for a jury to resolve.  Although a plaintiff may rely on circumstantial

14   evidence in establishing a defendant's discriminatory purpose, *Ballou v. McElvain*, 29 F.4th 413,

15   422 (9th Cir. 2022), Wilson fails to identify evidence that would permit a reasonable jury to find

16   that it was Lacy who zip-tied the earbuds.[9]  In sum, "[t]he mere existence of a scintilla of

17   evidence in support of [Wilson's] position" is insufficient to survive summary judgment.

18   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

19           Next, Wilson argues that Lacy violated her 14th amendment right to be free from racial

20   discrimination by calling her racial slurs to her co-worker, Smith.  *See* Doc. 76 at 4.  In the Ninth

21   Circuit, such verbal harassment alone is not actionable under 42 U.S.C. § 1983.  *Freeman v.*

22   *Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (verbal harassment or abuse directed at protected

23   classification does not form a constitutional deprivation under § 1983), *overruled in part on other*

24   *grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008); *Patrick v. Martin*, 402 F.

25   App'x 284, 285 (9th Cir. 2010) ("verbal harassment is insufficient to state a section 1983

26   claim.").

27
28   [9]  Neither party has identified evidence, for example, examining whether the zip tie used on
     Wilson's earbuds matched those kept in the office.

1    As to Wilson's glasses, Lacy argues that when Wilson found them broken "it was the first

2  time she had seen them since the day before, a span of at least fifteen hours, and that her entire

3  basis for believing that Defendant Lacy was the culprit was that she had seen him coming out of a

4  door to the third floor after the division meeting."  Doc. 73-1 at 21.  Wilson relies on her

5  statement of disputed fact that she had reason to believe Lacy broke her glasses since she saw him

6  near her cubical on the third floor in proximity to the time the glasses were broken, but the

7  supporting testimony she cites fails to specify any temporal or physical proximity and is

8  otherwise conclusory as to Lacy's involvement.  Doc. 76-5 at 41.  Accordingly, Wilson has not

9  created a genuine factual dispute.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

10  2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

11  genuine issues of fact and defeat summary judgment.").

12    Regarding Lacy's making a habit of congregating by Wilson's cubicle and walking

13  directly by her multiple times, Lacy argues that he was simply doing his job and was "under no

14  duty to become invisible as an accommodation to Plaintiff Wilson, and the fact he did not or

15  could not do so does not rise to the level of a deprivation under § 1983."  Doc. 73-1 at 22.  Wilson

16  does not make any argument or identify any supporting evidence on this issue.  The allegations in

17  Wilson's complaint are not evidence and cannot establish a genuine dispute of material fact at the

18  summary judgment stage.  *See Olivier*, 913 F.3d at 861 (citing *Flaherty*, 574 F.2d at 486 n.2).

19    For the reasons explained above, there is no genuine dispute as to any material fact on

20  Wilson's § 1983 claim and Lacy is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

21  Therefore, Lacy's motion for summary judgment on Wilson's claim under 42 U.S.C. § 1983 is

22  GRANTED.

23    **2. Wilson's Slander Claim Under Cal. Civ. Code § 46**

24    Lacy argues that Wilson's claim for slander is barred by the one-year statute of limitations

25  for slander claims and is not saved by the doctrine of equitable tolling.  Doc. 73-1 at 25.  Wilson

26  argues that the City's investigation into Wilson's allegations tolled her slander claim against Lacy

27  from July 11, 2018 through September 6, 2019, and that she timely filed her slander claim less

28  than one year later, on October 22, 2019.  Doc. 76 at 6–7.

1    The statute of limitations on a slander claim under California law is one year.  Cal. Civ.

2    Proc. Code § 340(c); *see also Bowen v. M. Caratan, Inc.*, 142 F. Supp. 3d 1007, 1033 (E.D. Cal.

3    2015).  Equitable tolling is applied by California courts "to prevent the unjust technical forfeiture

4    of causes of action, where the defendant would suffer no prejudice."  *Jones v. Blanas*, 393 F.3d

5    918, 928 (9th Cir. 2004) (citing *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 370 (2003), *as modified*

6    (Aug. 27, 2003)).  "The doctrine applies 'occasionally and in special situations' to 'soften the

7    harsh impact of technical rules which might otherwise prevent a good faith litigant from having a

8    day in court.'"  *Saint Francis Mem'l Hosp. v. State Dep't of Pub. Health*, 9 Cal. 5th 710, 719

9    (2020) (quoting *Addison v. State of California*, 21 Cal. 3d 313, 316 (1978)).  "[U]nder

10   California's test for equitable tolling, a plaintiff must establish 'timely notice, and lack of

11   prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff.'"

12   *Butler v. Nat'l Cmty. Renaissance of California*, 766 F.3d 1191, 1204 (9th Cir. 2014) (some

13   internal quotation marks omitted) (quoting *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45

14   Cal. 4th 88, 102 (2008)).

15   When considering timely notice, "courts focus on whether the party's actions caused the

16   defendant to be fully notified within the [statute of limitations] plaintiffs' claims and their

17   intent to litigate."  *Saint Francis Mem'l Hosp.*, 9 Cal. 5th at 726 (internal quotation marks and

18   citation omitted).  Here, Lacy does not contest that the first element of timely notice is satisfied.

19   The fact that Lacy was placed on administrative leave and later interviewed as part of the City's

20   investigation into Wilson's complaint suffices to satisfy this element.  *See Abdullah v. City of San*

21   *Diego*, No. 18CV1634 DMS (MSB), 2021 WL 2588855, at *1 (S.D. Cal. June 23, 2021) (internal

22   affairs complaint satisfied notice requirement).  Similarly, Lacy makes no argument as to

23   prejudice, implicitly conceding that the "application of equitable tolling would [not] prevent

24   [him] from defending [Wilson's slander] claim on the merits."  *Saint Francis Mem'l Hosp.*, 9 Cal.

25   5th at 728.

26   The final element of equitable tolling "encompass[es] two distinct requirements:  A

27   plaintiff's conduct must be objectively reasonable and subjectively in good faith."  *Id.* at 729.

28   "An analysis of reasonableness focuses not on a party's intentions or the motives behind a party's

39

1    actions, but instead on whether that party's actions were fair, proper, and sensible in light of the

2    circumstances." *Id.* "Good faith pivots instead on a party's intentions." *Id.* Whether a party's

3    late filing was subjectively in good faith turns on "whether it was the result of an honest mistake

4    or was instead motivated by a dishonest purpose." *Id.*

5           Lacy contests whether Wilson's delay was reasonable and in good faith considering that

6    Wilson testified "[i]t was clear from the very beginning" that she would not get a "fair shake"

7    from Dallas Selling following their interview on September 18, 2018. Doc. 73-5 at 131–33.

8    Lacy cites *Ucci v. LAPD*, No. 215CV08386CASKES, 2020 WL 1032359 (C.D. Cal. Jan. 7,

9    2020), *report and recommendation adopted*, No. 215CV08386CASKES, 2020 WL 1042273

10   (C.D. Cal. Jan. 7, 2020), for the proposition that Wilson "cannot base her equitable tolling claim

11   on an investigation she clearly expected from the outset would not be in her favor." Doc. 73-1 at

12   27. In *Ucci*, the plaintiff, alleged he had "delayed filing his lawsuit for nearly two years because

13   he was instructed to file an LAPD internal affairs complaint and appeal to the Inspector General's

14   Office." *Ucci*, 2020 WL 1032359, at *3. The court rejected the plaintiff's tolling argument

15   because (1) given the plaintiff's allegations of corruption by the LAPD, he could not truthfully

16   claim to expect a favorable result from their internal affairs investigation; (2) the internal affairs

17   investigation was not a prerequisite to the plaintiff's suit; (3) the plaintiff's telephonic complaints

18   placed an undue burden on local government inconsistent with equitable considerations; and

19   (4) the plaintiff did not need information from the LAPD to pursue his claims. *Id.* at *14–15.

20          Wilson argues her delay was in good faith because she allowed the City to gather

21   information and she had no way of knowing the investigation would be deficient until its

22   conclusion. Doc. 76 at 7.

23          Here, the Court finds the first, second, and fourth, rationales set forth in *Ucci* to be

24   persuasive and applicable to the present situation. There is no dispute that Wilson believed she

25   would not receive a "fair shake" from the City's investigation as of September 18, 2018. Under

26   these circumstances, her roughly thirteen-month delay before filing suit cannot be considered

27   objectively reasonable. This is underscored by the fact that the City's investigation was not a

28   prerequisite to Wilson filing her claim. Wilson was aware of the basis for her slander claim

                                                    40

against Lacy as of July 11, 2018—the date Smith informed her of Lacy's alleged slanderous statements. Wilson could have filed suit and availed herself of discovery procedures to further substantiate her claim; instead, she waited for the conclusion of what she describes as "a horribly biased and deficient investigation." Doc. 76 at 7. Wilson's contention of being unable to discern the fairness and adequacy of the investigation until it ended is undercut by her knowledge that Selling was hired to conduct the investigation and by the stated concerns Wilson held as of September 18, 2018. For these reasons, Wilson's delay in filing was not objectively reasonable.[10]

In sum, this is not the "unusual circumstance[]" in which the doctrine of equitable tolling was meant to apply. *See Saint Francis Mem'l Hosp.*, 9 Cal. 5th at 730. Wilson learned from Smith on or about July 11, 2018 of Lacy's slanderous statements. Doc. 76-1 at 6. Wilson filed her slander claim against Lacy on October 22, 2019. *Id.* at 8. Lacy agrees that Wilson was entitled to 46 days of tolling under the Tort Claims Act. Wilson therefore needed to file her slander claim by August 26, 2019 to be timely. Doc. 73-1 at 27. As Wilson filed her slander claim against Lacy after that date, it is barred by the statute of limitations. Lacy's motion for summary judgement on Wilson's claim for slander is GRANTED.

///
///
///
///
///
///
///
///
///
///
///

---

[10] Given this finding, the Court need not address whether Wilson's delay was in good faith.

1    **IV. Conclusion**

2         Based on the foregoing, and in summary, the Court rules as follows on the three pending

3    motions for summary judgment:

4         1.  The City's motion to exclude acts prior to April 9, 2012 as the basis for Wilson's

5             claims against the City is GRANTED.

6         2.  The City's motion to bar Wilson's Title VII claims (Claims 5, 6, and 7) as

7             untimely is DENIED.

8         3.  The City's motion to exclude acts prior to July 17, 2018 as the basis for liability on

9             Wilson's Title VII claims, is GRANTED as to Wilson's Title VII retaliation and

10            discrimination claims (Claims 5 and 7), and DENIED as to Wilson's Title VII

11            harassment claim (Claim 6).

12        4.  The City's motion to exclude acts prior to May 13, 2018, as the basis for liability

13            on Wilson's FEHA claims is GRANTED.

14        5.  The City's motion regarding the CSB's suspension decision is GRANTED and

15            Wilson is precluded from arguing her suspension was motivated by racial animus.

16        6.  The City's motion for summary judgment as to Wilson's Title VII discrimination,

17            harassment, and retaliation claims (Claims 5, 6, and 7) is DENIED.

18        7.  The City's motion for summary judgment as to Wilson's FEHA claims for

19            discrimination, harassment, and retaliation (Claims 1, 2, and 3) is DENIED.

20        8.  The City's motion to limit Wilson's recovery of damages for lost wages to those

21            incurred on or before September 8, 2022, is GRANTED.

22        9.  The City's motion to bar Smith's Title VII claim (Claim 7) as untimely filed is

23            DENIED.  The City's motion to exclude acts prior to August 14, 2018 as the basis

24            for liability on Smith's Title VII retaliation claim (claim 7) is GRANTED.  The

25            City's motion for summary judgment as to Smith's Title VII retaliation claim

26            (Claim 7) is otherwise DENIED.

27        10. The City's motion for summary judgment as to Smith's FEHA harassment and

28            retaliation claims (Claims 2 and 3), and Smith's FEHA claim for failure to prevent

harassment and retaliation (Claim 4), is DENIED.

11. The City's motion for summary judgment on Smith's claim for violation of Cal. Labor Code § 1102.5 (Claim 12) is GRANTED.

12. The City's motion for summary judgment as to Smith's FEHA discrimination claim (Claim 1) is GRANTED.

13. Lacy's motion for summary judgment as to Wilson's claim under 42 U.S.C. § 1983 (Claim 8) and claim for slander (Claim 13) is GRANTED.

IT IS SO ORDERED.

Dated:    January 17, 2025

_____
UNITED STATES DISTRICT JUDGE

43